UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CARLO M. CROCE : | |
| : | Case No. 2:17-cv-00338 |
| **Plaintiff,** : | |
| : | Judge James L. Graham |
| vs. : | |
| : | Magistrate Judge Preston Deavers |
| DAVID A. SANDERS : | |
| : | |
| **Defendant.** : | |

_____

# Exhibit 1 to Defendant's Appendix in Support of Motion for Summary Judgment – Excerpts of Deposition of Carlo Croce

## Page 1

IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
--|--
Case No. 2:17-CV-00338
--|--
Carlo M. Croce,
        Plaintiff,
vs.

David A. Sanders,
        Defendant.
--|--

Deposition of: CARLO M. CROCE, MD

Date and Time: Wednesday, March 27, 2019
        8:53 a.m.
Place:    James E. Arnold & Associates
       115 West Main Street
       Suite 400
       Columbus, Ohio

Reporter:   Maria DiPaolo Jones, RDR, CRR
        Notary Public - State of Ohio
--|--

## Page 2

APPEARANCES:
On behalf of Plaintiff:
   MR. JAMES E. ARNOLD
   MS. JAIME GLINKA
   James E. Arnold & Associates, LPA
   115 West Main Street, Suite 400
   Columbus, Ohio 43215-5099
   614.460-1600

On behalf of Defendant:

   MR. WILLIAM A. NOLAN
   Barnes & Thornburg, LLP
   41 South High Street, Suite 3300
   Columbus, Ohio 43215-6104
   614.628.0096

   MS. KARA KAPKE
   Barnes & Thornburg, LLP
   11 South Meridian Street
   Indianapolis, Indiana 46204-3535
   317.236.1313

ALSO PRESENT:

   Dr. David A. Sanders

## Page 3

INDEX
--|--
CARLO M. CROCE, MD        PAGE
Cross-examination by Mr. Nolan   4
--|--

DEFENDANT'S EXHIBITS

| NUMBER | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 1 | Second Amended Complaint | 11 |
| 2 | 12/5/2013 emails Bates stamped CROCE(S)001632 - 1633, CONFIDENTIAL | 51 |
| 3 | 9/2014 emails Bates stamped CROCE(S)002499 - 2500, CONFIDENTIAL | 68 |
| 4 | 11/5/2018 correction in Oncogene | 77 |
| 5 | 9/2016 emails Bates stamped CROCE(S)002982 - 2984, CONFIDENTIAL | 80 |
| 6 | 3/19/2019 PLOS ONE article | 83 |
| 7 | 11/23/2016 letter from Glanz | 95 |
| 8 | 11/2016 emails, with attachment, Bates stamped CROCE(S)004259 - 4264, CONFIDENTIAL | 97 |
| 9 | 12/29/2016 email from Melino, with attachment, Bates stamped CROCE(S)001163 - 1164, CONFIDENTIAL | 98 |
| 10 | 1/23/2017 emails Bates stamped CROCE(S)004153, CONFIDENTIAL | 102 |
| 11 | 1/2/2017 email from Green Bates stamped CROCE(S)001022, CONFIDENTIAL | 105 |
| 12 | The New York Times article | 109 |
| 13 | 3/2017 emails Bates stamped CROCE(S)004250, CONFIDENTIAL | 112 |

## Page 4

DEFENDANT'S EXHIBITS

| NUMBER | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 14 | 1/25/2017 letter from Hill, with attachments, Bates stamped CROCE(S)003224 - 3246, CONFIDENTIAL | 114 |
| 15 | 11/1/2007 emails, with attachment, Bates stamped CROCE(S)000456 - 0458, CONFIDENTIAL | 155 |
| 16 | 8/2016 and 9/2016 emails Bates stamped CROCE(S)002941 - 2943, CONFIDENTIAL | 170 |
| 17 | 12/29/2016 emails Bates stamped CROCE(S)003918 - 3919, CONFIDENTIAL | 176 |
| 18 | 11/10/2015 letter from Croce Bates stamped CROCE(S)002696, CONFIDENTIAL | 180 |
| 19 | 12/2012 and 5/6/2013 emails, with attachment, Bates stamped CROCE(S)002672 - 2677, CONFIDENTIAL | 184 |
| 20 | 6/2014 emails Bates stamped CROCE(S)001700 - 1703, CONFIDENTIAL | 191 |
| 21 | 2016 and 2014 emails Bates stamped CROCE(S)001277 - 1283, CONFIDENTIAL | 200 |
| 22 | 12/12/2016 letter from Croce Bates stamped CROCE(S)004075 - 4076, CONFIDENTIAL | 205 |
| 23 | 1/2017 emails Bates stamped CROCE(S)004177 - 4179, CONFIDENTIAL | 207 |
| 24 | 2/2/2017 letter from Hill Bates stamped CROCE(S)003266 - 3272, CONFIDENTIAL | 209 |
| 25 | 12/7/2018 article | 217 |

Page 5

1  CARLO M. CROCE, MD,
2  being by me first duly sworn, as hereinafter
3  certified, deposes and says as follows:
4           CROSS-EXAMINATION
5  BY MR. NOLAN:
6      Q.  Dr. Croce, good morning. I'm Bill Nolan
7  with the law firm of Barnes & Thornburg. This is my
8  partner, Kara Kapke. We represent Dr. Sanders in the
9  case you filed in federal court against Dr. Sanders.
10         Can you please state your full name for
11 the record.
12     A.  Carlo Maria Croce.
13     Q.  Thank you.
14         And, Dr. Croce, have you ever been deposed
15 before?
16     A.  Yes.
17     Q.  How many times?
18     A.  Five or six.
19     Q.  When most recently?
20     A.  For Genentech, a pharmaceutical company.
21 I provide my expertise.
22         MR. ARNOLD: When?
23     Q.  Yeah, just when was the last time you were
24 deposed for any reason?
25     A.  Three, four years ago.

Page 6

1      Q.  Okay. So you're familiar with the
2  process.
3      A.  Yes. At least I think so.
4      Q.  Right. Let me just -- so this will all be
5  very familiar to you I'm sure, but let's just go over
6  a few understandings. First of all, it's not an
7  endurance contest, if you need a break, will you let
8  me know?
9      A.  Uh-huh.
10     Q.  And which leads me to my second one, which
11 is so the court reporter can have a good record
12 you'll need to say "yes" or "no" instead of a shake
13 of the head or "uh-huh," "huh-uh." Is that okay?
14     A.  Of course.
15     Q.  Very natural to get reminded of that every
16 now and then so I will do that as politely as I can
17 from time to time probably.
18         I'll certainly ask that you let me finish
19 my questions. At the same time, I want to make sure
20 I let you finish your answers so will you let me know
21 if I inadvertently cut you off so you can finish?
22     A.  Okay.
23     Q.  Okay. And also will you let me know if
24 you don't understand a question of mine?
25     A.  I'm a little bit deaf so speak loud.

Page 7

1      Q.  Okay. A little bit deaf?
2      A.  No. A little bit deaf, yes.
3      Q.  Okay.
4      A.  I don't hear very well where there is
5  noise, but I can hear you very well.
6      Q.  Very good. So I'm glad you mentioned
7  that. So if you don't hear me, will you let me know?
8      A.  Of course.
9      Q.  And if you don't understand for any
10 reason, will you let me know?
11     A.  Of course.
12     Q.  English is not your first language?
13     A.  No. Italian is my first language, but I
14 can understand English.
15     Q.  Okay. You consider yourself fluent in
16 English?
17     A.  I consider myself a little fluent.
18     Q.  Dr. Croce, do you feel fine today?
19     A.  I have a little bit of a high blood
20 pressure, but otherwise I am okay.
21     Q.  Is there any reason, illness, fatigue,
22 medication, that you would not have your best
23 recollection today?
24     A.  I don't think so.
25     Q.  Okay. Very good. Thank you.

Page 8

1          Dr. Croce, just a few sort of basics about
2  yourself. What is your current address?
3      A.  Is 2140 Cambridge Boulevard here in
4  Columbus, Ohio. In Upper Arlington.
5      Q.  Okay. And how long have you lived there?
6      A.  Since -- I been here about 14 years.
7      Q.  Do you currently live with anybody else at
8  that address?
9      A.  No, but I have a companion who has a
10 different address so I spend some time with her.
11     Q.  All right. Are you currently married?
12     A.  No. I never been married.
13     Q.  And do you have any other residences
14 besides the Upper Arlington residence?
15     A.  Yeah, in Philadelphia, 1829 Delancey
16 Place.
17     Q.  Any others?
18     A.  Not that I know.
19     Q.  Okay. You'd probably know.
20         You don't have a residence in Italy?
21     A.  I did, but I don't have it anymore.
22     Q.  All right. If you could just review your
23 degrees for me, where you got them, when you got
24 them, what they are.
25     A.  I am an MD. I got my degree in 1969 at

Page 9

1  University of Rome that is now called La Sapienza.
2  Q. Okay.
3  A. I have also an online degree in medicine
4  from the University of Uppsala in Sweden.
5  Q. When did you receive that?
6  A. About 25 years ago, something like that.
7  Q. All right. Any other honorary degrees?
8  A. No.
9  Q. And where did you receive your
10 undergraduate degree?
11 A. We have a different system over in Italy.
12 We go from high school to university, so we don't
13 have the college period, like most of Europe.
14 Q. Okay. It wouldn't be like a bachelor's
15 and then an MD --
16 A. No.
17 Q. -- as you might in the United States.
18 A. No. I go from high school to medical
19 school.
20 Q. Very good.
21    All right. So how old were you when you
22 graduated from medical school?
23 A. I was six year in medical school, I
24 started when I was 18 years old, 24.
25 Q. All right. And when did you move to the

Page 10

1  United States?
2  A. 1970, June the 3rd.
3  Q. And for what purpose?
4  A. I got -- I won a fellowship from a
5  European society to work in United States and I ended
6  up in Philadelphia.
7  Q. Have you lived in the -- has the United
8  States been your primary residence since 1970?
9  A. Correct.
10 Q. And how long did you live in Philadelphia?
11 A. Oh, a long time. Until I came here.
12 Until the end of 2004.
13 Q. In 2004 you moved to Columbus?
14 A. Yes. In October or November.
15 Q. Okay. And why did you move to Columbus?
16 A. Because they offered me a good job.
17 Q. "They" being The Ohio State University?
18 A. Yeah.
19 Q. And you're still employed by Ohio State?
20 A. Yeah.
21 Q. Dr. Croce, I'm going to --
22    MR. NOLAN: If we can go off the record
23 just a second.
24    (Discussion off the record.)
25    MR. NOLAN: Go back on the record.

Page 11

1  Q. Dr. Croce, I'm going to hand you what I'm
2  marking as Exhibit 1.
3     MR. NOLAN: You probably have that.
4     MR. ARNOLD: I've seen it before.
5  Q. Dr. Croce, just for the record we'll make
6  this Defendant's Exhibit 1. That's just some
7  administrative stuff between the lawyers. Do you
8  recognize Defendant's Exhibit 1?
9  A. Yeah, I see it.
10 Q. Have you seen it before?
11 A. I seen it once I think.
12 Q. All right. And I will just represent to
13 you and note for the record that Exhibit 1 refers to
14 some exhibits which are not actually attached to what
15 I've handed you as Exhibit 1; we'll probably look at
16 those later. Are you able to tell me what Exhibit 1
17 is?
18 A. It said that is the second amended
19 complaint from me against the defendant, David A.
20 Sanders.
21 Q. All right. Go to the last page of Exhibit
22 1.
23 A. Last page? Yes.
24 Q. You understand Exhibit 1 was filed on your
25 behalf by --

Page 12

1  A. By Hill.
2  Q. -- your prior law firm?
3  A. Correct.
4  Q. Do you recall, did you review Exhibit 1
5  before it was filed?
6  A. I'm sure I did. I'm sure I did. Tom Hill
7  showed that to me.
8  Q. All right. And I would just like to sort
9  of use Exhibit 1 as a little bit of a road map for
10 questions for a while. So, first of all, before we
11 look at some specifics in the document, just in your
12 own words why did you file a lawsuit against
13 Dr. Sanders?
14 A. Because I was accused of doing things that
15 I never did, and my reputation has been assaulted
16 and -- by a lot of lies, and so for a scientist a
17 reputation is enormously important and I felt
18 extremely bad that my reputation was assaulted when I
19 did all the time all my jobs.
20    I carry out science for a long time, very
21 successfully, and all my publication have been
22 confirmed. I am one of the most cited scientists in
23 the entire world, and do you know this so-called H
24 index, which is a measurement of impact, I have one
25 of the greatest impacts in the world. I have the

Page 13

1   highest H index of any Italian scientist ever.  Okay?
2   Which indicate that my science has been very
3   successful and, in fact, it has.
4           I receive a lot of prizes and recognition,
5   and I always believe in integrity of science and so I
6   felt that this was an attack on my reputation and I
7   think on science because the way that's been done has
8   been very disgraceful.
9           Did I answer your question?
10      Q.   You did.  Thank you.
11          And when you say, you say the way "this"
12  has been done was very disgraceful.  When you say
13  "this," what do you mean by "this"?
14      A.   The accusation.  The accusation by The
15  New York Times and Dr. Sanders.
16      Q.   I just want to step back a minute.  Fair
17  to refer to you as a cancer researcher?
18      A.   I would say that's correct.
19      Q.   That's a good --
20      A.   I am a geneticist who spend most his time
21  in cancer genetics.
22      Q.   When did you first become a geneticist
23  spending most of your time in cancer genetics?
24      A.   So when I was -- can I -- I would not be
25  that brief --

Page 14

1       Q.   That's okay.
2       A.   -- so if we start from Adam and Eve.  When
3   I was in medical school, I wanted to become a
4   neurobiologist.  Went to medical school and I started
5   to be interested really in medicine and particularly
6   I was fascinated by the beginning of molecular
7   biology.
8           And it turned out that I develop a great
9   interest in cancer biology generally and I was very
10  like it because all my life I work in cancer biology
11  and genetics.  And the thing I love the most is
12  discovery, you know?  I think I am completely good at
13  discovering important things.  That's all.
14      Q.   All right.  That wasn't so long.  Thank
15  you for that.
16          And do you, I mean, do you think you've
17  had an impact on treating cancer?
18      A.   Oh, of course.  I think I have a huge
19  impact.  Some of my work is in medical textbook.  I
20  changed the way of thinking in several area of cancer
21  research.  I give you an example.  The work, probably
22  my first great success was a discovery of how
23  chromosomal translocation cause cancer, the Burkitt
24  lymphoma, that changed the way we think about cancer,
25  just to give you an example.

Page 15

1           Those experiment has the result showing
2   that the specific gene is genetically altered and
3   cause cancer for the first demonstration of the
4   involvement of the specific human gene in cancer
5   biology, you know.
6           What we call today a targeted therapy, you
7   know everybody talks about targeted therapy and
8   cancer, depend essentially on the discovery that you
9   have a driver, a driver gene that cause cancer.
10  Naturally, if you inhibit the cancer gene, you might
11  be able to have a huge impact on therapy.  So that
12  was my first big success, and I got many prizes with
13  that including the Mott, General Motors, one of the
14  most -- of the biggest international prizes.
15          A few years after -- so that was I believe
16  '82.  In '84 I made one of the most outstanding
17  discoveries that has a huge impact overall now, I
18  discover, again by studying chromosomal translocation
19  in cancer, I discovered a gene that I named BCL2 for
20  B-cell leukemia/lymphoma 2.  Okay?
21          The gene is phenomenally interesting
22  because it inhibit the process called "apoptosis."
23  Before people thought that all the cancer gene
24  affected only proliferation.  This affect survival.
25          So I discovered this gene that worked in a

Page 16

1   completely different way and it was found to be
2   involved in follicular lymphoma, and later on it was
3   found to be involved in chronic lymphocytic leukemia.
4   And then I used a similar approach to discover many
5   cancer genes.  I would be too long to describe all of
6   them.  Okay?
7           And so I discovered several cancer gene
8   and I was interested mainly in tumor initiation.
9       Q.   Tumor?
10      A.   Initiation.  How the cancer start.
11      Q.   I see.
12      A.   Okay?  Because it became very clear the
13  cancer is the result of multiple genetic alteration
14  but it has to start somewhere.  And the gene that are
15  changed at the beginning are very critical, very
16  likely during all process of carcinogen- -- I'm
17  sorry.
18      Q.   That's all right.
19          (Interruption.)
20      A.   So we discover many genes which are
21  involved in initiation, or the early stages of
22  carcinogenesis.  Most of my early work is in leukemia
23  and lymphoma, and in fact I am considered like the
24  Pope of the genetics of leukemias and lymphomas in
25  the -- I understand the solid tumor.

Page 17

1  Now, so I discover many other gene and the
2  mechanism involved in carcinogenesis and then, more
3  recently, I don't know if it was ability or luck,
4  probably a combination of both, I came to another
5  phenomenal discovery which is having a huge impact.
6  I discovered that in the most common human leukemia,
7  which is called chronic lymphocytic leukemia, which
8  is the most common adult leukemia, there was a loss
9  of two microRNA genes, which are close to each other.
10 Okay?
11     And there was this phenomenal discovery
12 because before this discovery people thought that all
13 the genes which are involved in cancer pathogenesis
14 are genes that they include four proteins. Okay?
15     So everybody knew that this so-called
16 oncogene, gene that has to be activated in order to
17 be involving cancer, or tumor suppressor genes in
18 order to be inhibited, they shut off the others and
19 are protein-coding genes. Okay?
20     My discovery beginning in 2002 showed that
21 in fact genetic alteration in the non-coding genome,
22 in gene that do not include the four protein, can be
23 involved in cancer pathogenesis. Okay? That was
24 outstanding discovery. Nobody thought that gene that
25 do not include four protein would be involved in

Page 18

1  anything. Okay?
2      In fact, that is strange because we know
3  that the coding genome, the genome that include four
4  protein, represent something like 2 percent of the
5  human genome. So if you look at your DNA and my DNA,
6  okay, 98 percent of the genome is non-coding. Why?
7  Okay. So it became obvious after this discovery that
8  in fact the non-coding genome was are very important
9  for a lot of mechanism.
10     So that was I think a discovery that
11 changed the field, not only of oncology, it changed
12 medicine. Yeah?
13     And then more recently, and that was when
14 I was here at OSU, we made another discovery that
15 makes things very clear. We discovered that this
16 microRNA that are deleted in chronic lymphocytic
17 leukemia, target the gene that I discovered in 1984,
18 BCL2. Okay?
19     So microRNA are negative regulator gene
20 expression, they are very small RNA molecule, and
21 they are negative regulators. So the expression of
22 the microRNA shut off the expression of the
23 target genes. Okay? So the function of this
24 microRNA discovered to keep certain gene in check
25 including BCL2. When the negative regulator are

Page 19

1  lost, BCL2 is expressed at a high level and that is a
2  driver for molecular transformation. Okay?
3      So after I discovered this gene and a lot
4  of, I mean, this is one of the most studied genes now
5  in the world, pharmaceutical companies started to be
6  interested in developing inhibitors of this gene.
7  Consider the concept of a driver, okay, the
8  expression of the gene that drive, the expression of
9  malignant gene. So if you have a molecule that
10 inhibit the driver, that might have a huge impact in
11 therapy. In therapeutics.
12     So we all thought that that would be the
13 case, but to make a drug takes millions and millions
14 of dollars. They claim that to make a drug approved
15 by FDA cost a billion dollars. Okay?
16     So at the beginning a company called
17 Abbott in Chicago had a scientist called Fesik who
18 believed that he could make small molecule to inhibit
19 protein-protein interaction, and everybody at that
20 time thought it would be impossible to make small
21 molecules that inhibit protein-protein interaction.
22     Instead, Steve Fesik believed that was
23 possible and by determining the three-dimensional
24 structure of protein known as BCL2 family, he was
25 able to design his small molecule that inhibit BCL2.

Page 20

1  But there is a caveat, and the caveat is that BCL2
2  has other family members that do different things,
3  but which are structurally related.
4      So the first drug that Abbott developed
5  against BCL2, which affected other BCL2 family
6  members that were discovered after BCL2, in
7  particular it inhibited a product called BclX Long,
8  which is critical for the survival of platelets.
9      So when Abbott gave this drug to patient,
10 it became clear that the drug kill also the
11 platelets, all the platelets, so it could not be
12 used. So they, to make a long story short, after
13 several years Abbott developed a small molecule that
14 is specific only for BCL2.
15     Q.  Okay.
16     A.  The approval was I believe in April 2016.
17 So the gap between discovery of the target and
18 discovery of the -- and the approval by FDA was 32
19 years. And all my patent on BCL2 were expired
20 because I developed the patent a long time ago.
21     So Abbott now has a drug that is called
22 venetoclax, or ABT-199. This drug is phenomenal.
23 Okay? This drug is absolutely phenomenal. And --
24     MR. ARNOLD: Stop there. Let's sprinkle a
25 question in every now and then. Okay?

**Page 29**

1  through to yourself if you would.
2      A.   Six?  What do you want to know about 6?
3      Q.   Just go ahead and read through 6 and 7 to
4  yourself and let me know when you're done.
5      A.   All right.  Looks correct.
6           They're fine.
7      Q.   Okay.  You see across the very top of
8  every page of Defendant's Exhibit 1 is sort of a
9  stamp that says, "Filed: 5/5/18"?  Do you see that?
10     A.   This one?
11     Q.   Yes.
12     A.   Yes.
13     Q.   I'll just represent to you that the court
14  puts that on there.  So since -- and I apologize,
15  this is 4/21/2018.  I was looking at something else.
16  Across the top of the page it says "4/21/2018."  I
17  misspoke.
18     A.   Yeah.  4/21/2018.
19     Q.   So I'm just going to use that date as a
20  reference point.
21     A.   Okay.
22     Q.   Have you received awards since April 21,
23  2018?
24     A.   I don't know.
25     Q.   Okay.  Isn't there, and I may not get this

**Page 30**

1  right, a Dan David Prize or something?
2      A.   Yeah.  I got it about a year ago, yes.
3  Dan David Prize.  One of the most prestigious prize
4  in the world.
5      Q.   Tell me what that prize means.  What's
6  that about?
7           They give this prize for thing that they
8  believe are very important in three areas, one is
9  medicine and biology, and for every year would
10  essentially give it to targeted therapy and how on
11  the base of the target, gene target you develop
12  therapy.  And I shared this prize.  That prize was a
13  million dollars.
14          I shared this prize with two outstanding
15  people, one was Bert Vogelstein, one of the people
16  with major impact in cancer genetics, and the other
17  one Mary-Claire King, the lady who discovered BRCA1,
18  the gene which is involved in breast cancer
19  pathogenesis.  So we shared this prize.  It was given
20  in Jerusalem I believe in March of last year.
21     Q.   Given where?
22     A.   Jerusalem.
23     Q.   Okay.
24     A.   In Tel Aviv.  In Tel Aviv.  And I also
25  went to Jerusalem, but the ceremony was in Tel-Aviv.

**Page 31**

1      Q.   I see.
2           Look at Paragraph 10 of Defendant's
3  Exhibit 1 on page 5, please, again just read that to
4  yourself and let me know when you're done.
5      A.   From the top?
6      Q.   Yes, please.
7      A.   Yes, I read it, 10 and 11.
8      Q.   You see there are a couple of things in
9  quotation marks in Paragraph 10?
10     A.   Yes.
11     Q.   Do you know what scientist made those
12  statements about you?
13     A.   Probably a lot of scientists made that
14  statement.
15     Q.   Okay.  You don't recognize those
16  particular quotes from something specific?
17     A.   They could be --
18          MR. ARNOLD:  Well, you don't need to
19  guess.  If you know who it is, tell him.
20          THE WITNESS:  Huh?
21          MR. ARNOLD:  If you know who it is who
22  said that, then tell him.  If you don't know --
23     A.   Now I don't remember.
24     Q.   That's okay.
25          Dr. Croce, I'm just looking at a couple --

**Page 32**

1  I looked up your bios of course, you also received
2  something, I may not say this right, the Cavaliere di
3  Gran Croce?
4      A.   Is the title that the president of the
5  Republic give to me.
6      Q.   What Republic?
7      A.   Italian.
8      Q.   The president of Italy.
9      A.   Ciampi.  I have a diploma in my office and
10  also I have also a cross and a --
11     Q.   All right.  Is that prestigious in Italy?
12     A.   I suppose.  I don't care that much about
13  those kind of honors, but was nice because I like
14  Ciampi, the former president of Italy.
15     Q.   I see.
16     A.   It was a nice ceremony.
17     Q.   I see.  When was that?
18     A.   God knows.  In the '90s I think.
19     Q.   Been a while ago.  Okay.
20     A.   It is like to be knighted, but not by the
21  Queen of England, but in this case by the Italian
22  president.
23     Q.   All right.
24     A.   And there are various degrees.
25     Q.   I see.  Okay.

Page 45

1  lab work.
2      Q.   Tell me, if you would, and it's referenced
3  briefly in the complaint, what is a review paper?
4      A.   The review paper is when some journal asks
5  you to write -- which in my case I never ask to write
6  the review. In general, I am asked to write reviews.
7  Okay? So a journal know that you are an expert in a
8  certain field and, let's say microRNA, okay,
9  "Dr. Croce, can you write an article on microRNA or
10 microRNA and this disease?" Okay?
11          So I hate to write review article because
12 I care about one thing, which is discovery, you know?
13 That's what I love. Okay? So I hate to write review
14 article. So if The New England Journal of Medicine
15 ask me to write a review article, I say "Yes," and I
16 write it myself. Okay? Because the huge impact, I
17 have to be extremely -- put every idea I think are
18 important to be cited and so on. So in those -- in
19 that case I write the article myself, but there are
20 very few of those.
21          In general, when somebody asks me to write
22 a review article, I -- since the productivity of my
23 people is important to me, and also I want them to
24 mature and they have to be able to write the review
25 and to think in the way to write the review, so I ask

Page 46

1  the most appropriate postdoc whether they would like
2  to write the review. Okay? If they say yes and they
3  are committed to do that, I write to the journal and
4  say, "Yes, we will write this review." That's all.
5      Q.   Okay. And you may have said this and I
6  just missed it, so what's the kind of determining
7  factor as to whether you write it yourself versus ask
8  a postdoc?
9      A.   Impact.
10     Q.   Impact. Okay. So it would depend on the
11 journal?
12     A.   Yes.
13     Q.   I see. And you mentioned New England
14 Journal of Medicine. That's a very impactful
15 journal, right?
16     A.   Yes. Or one of the big, Nature Genetics,
17 for example, it has a huge impact so I write it.
18 Okay? For less -- since I hate to write review as I
19 mentioned, I ask my -- since it would be good for
20 them, I ask my postdocs if they would like to.
21     Q.   And typically in that case, if you ask a
22 postdoc, you do it together, the review?
23     A.   No. In general, they write it. Okay?
24 They know what the idea of the lab, what the lab is
25 doing. Okay? And then I check whether the article

Page 47

1  may make sense and say what the lab say, you know?
2      Q.   And in that case would your name go on the
3  review as well as the postdoc?
4      A.   Of course.
5      Q.   Both names.
6      A.   Because is essentially the postdoc say
7  what the position of the lab is in that specific
8  area.
9      Q.   So is it an accurate summary by me that
10 you don't enjoy writing reviews but you think it's
11 important that you do so?
12     A.   Well, it's important, at least from my
13 point of view, it's important that the young people
14 are able to write the review because it is important.
15     Q.   And do reviews ultimately factor into your
16 H index?
17     A.   I'm sure it does.
18     Q.   Because a review would get cited?
19     A.   The review are cited -- the review -- my
20 review that are most cited are some that I wrote
21 myself.
22     Q.   And fair to say the H index is important
23 to you?
24     A.   Not really.
25     Q.   Do you --

Page 48

1      A.   I mean, it is an indication of
2  productivity. But, you know, I've been cited 220,000
3  times, so impact is very important. Okay? But the
4  most important thing, in my view, is the impact of
5  discovery, why the discovery is important. We will
6  be remembered for the impact of our discovery, not
7  for that they made 3,000 paper, they make some paper
8  which have really changed the field.
9      Q.   In your lab do you talk about the H index?
10     A.   We might. But, in general, when I review
11 people, I always look at not only a discovery but
12 also the H index because it's an index of impact. Is
13 not a perfect index of the impact but it's something
14 that you can measure. And, in general, people, at
15 least as far as I know, people who have high impact,
16 high H index, are people who have quite a bit of
17 impact.
18     Q.   Okay. And so just so I understand what
19 you just said, if you are reviewing another
20 scientist, you check that scientist's H index?
21     A.   In general I do. Not done that much in
22 United States, although is becoming. In Europe they
23 do it all the time. For example, in Europe if you
24 apply for a grant, the first thing you put down is
25 what is your H index because that will give you an

Page 129

1  A. Yes.
2  Q. Okay. Are there scientific norms other
3  than what is set forth by ORI?
4  A. Yeah. But we can see that it's --
5  MR. ARNOLD: Objection. Scope.
6  A. -- maybe a gold standard, what I -- a gold
7  standard --
8  Q. All right.
9  A. -- that the federal government said was
10 right.
11 Q. But you've been a scientist a long time.
12 There are -- are there scientific norms other than
13 what ORI writes down?
14 A. But that wouldn't count. Of course. You
15 may have your own beliefs but we have to follow the
16 rules, and there are some very precise rules as
17 defined by ORI and by the National Institute of
18 Health and by the U.S. government.
19 Q. Now, Dr. Croce, the complaint starts on
20 page 16, you don't need to read anything right now
21 but there's a heading "USA TODAY Article." Do you
22 see that?
23 A. USA TODAY. Where is it?
24 Q. Bottom of 16.
25 A. Yes.

Page 130

1  Q. My question to you is: Do you recall an
2  article in USA TODAY about you?
3  A. I remember that there was. I don't recall
4  that article now.
5  Q. All right. Do you recall reading it?
6  A. I must have read it.
7  Q. Do you recall anybody telling you about
8  it?
9  A. For sure my lawyer mentioned it to me.
10 Q. And do you, I think I know the answer but
11 I'll ask you, do you have any firsthand knowledge of
12 any communications Dr. Sanders would have had with
13 USA TODAY reporters?
14 A. No.
15 Q. Is it an accurate statement that anything
16 you know about what Dr. Sanders said or did not say
17 to USA TODAY would come from your reading the USA
18 TODAY article?
19 A. Correct.
20 Q. You haven't sued USA TODAY, have you?
21 A. Excuse me?
22 Q. You have not sued USA TODAY, have you?
23 A. Not that I know. Maybe you can give me
24 some good clue.
25 Q. I'm on the wrong side for that.

Page 131

1  Do you, again I don't want to know about
2  conversations with your lawyers, but do you have an
3  understanding, why didn't you sue USA TODAY?
4  A. Ask my lawyer.
5  Q. You don't have an understanding?
6  MR. ARNOLD: Well, if you have one
7  independent of what your lawyers have told you, you
8  can tell him.
9  THE WITNESS: Huh?
10 MR. ARNOLD: I said if you have an
11 understanding independent of what your lawyers have
12 told you, then you can answer the question.
13 MR. NOLAN: Well, I think if he has an
14 understanding that may or may not --
15 MR. ARNOLD: No, he's not going to answer
16 based -- you can't cloak a question by saying I want
17 your understanding when the basis of the
18 understanding is an attorney-client communication.
19 MR. NOLAN: I don't think that --
20 MR. ARNOLD: So if you have an --
21 MR. NOLAN: I disagree.
22 MR. ARNOLD: -- understanding outside of
23 that, then you can tell him. If not, then you tell
24 him that you cannot.
25 MR. NOLAN: All right. Well, I will note

Page 132

1  on the record that I disagree with that instruction
2  and, I mean, we don't have to -- I mean, we've stated
3  what we think. I think if you have an understanding,
4  you have an understanding. It's not an
5  attorney-client communication.
6  MR. ARNOLD: Yeah, but if the
7  understanding is premised upon something your lawyer
8  told you and that's the only basis upon which you can
9  have the understanding, it's a backdoor way of saying
10 "Tell me what your lawyer told you." He's not going
11 to respond to those questions.
12 MR. NOLAN: I don't think so.
13 Q. (By Mr. Nolan) All right. Dr. Croce, do
14 you feel that you were wronged by USA TODAY? Do you
15 feel that you were wronged by USA TODAY?
16 A. Of course.
17 Q. You feel you were wronged by The New York
18 Times?
19 A. Yes, big time.
20 Q. All right. Do you feel that one or the
21 other wronged you more than the other?
22 A. I mean, The New York Time, everybody in
23 the world reads it. The USA TODAY, maybe some people
24 in the bathroom on the airplane read it, or the other
25 papers. New York Time is a big journal. At least in

Page 165

1  Q. Okay. And did that article --
2  approximately, the best you can recall, when did the
3  article in Nature run?
4  A. A few years ago. Five, six years ago.
5  Q. Five or six years ago.
6  A. Maybe ten.
7  Q. And did that article mention you by name?
8  A. No. It was pre-New York Times.
9  Q. All right.
10 A. Oh, this Clare Francis was in business
11 already.
12 Q. Sure. But did the article in Nature
13 mention your name?
14 A. No. No. No.
15 Q. Okay.
16 A. I know a lot of people who have been
17 denounced by Clare Francis.
18 Q. I understand. No, I just want to
19 understand --
20 A. Always -- most of them are western blots
21 and plagiarism.
22 Q. So most of the concerns that Clare Francis
23 has raised concerned western --
24 A. Concerned western blot.
25 Q. Let me finish.

Page 166

1  -- western blots and plagiarism, correct?
2  A. Uh-huh.
3  Q. Is that a yes?
4  A. That is correct.
5  Q. Okay.
6  A. At least if I remember well the article in
7  Nature.
8  Q. Right. Okay.
9     So what, as far as anything you know
10 about, how did Clare Francis express concerns about
11 you?
12 A. How do I know? I know only from what the
13 university tells me, you know. Clare Francis made
14 the denunciation either to the university or to the
15 journal or to both and then they come to me.
16 Q. Let's talk about the journal first. Are
17 you talking about Nature or something else?
18 A. No. No. Many different journal.
19 Q. Clare Francis, as far as --
20 A. Clare Francis logged in a lot of journal.
21 Q. All right.
22 A. Including PNAS.
23 Q. So Clare Francis expressed concerns about
24 you to multiple journals. True?
25 A. Of course. Yes.

Page 167

1  Q. And Clare Francis communicated to Ohio
2  State about you?
3  A. I'm sure they did.
4  MR. ARNOLD: Well, do you know? Do you
5  know?
6  THE WITNESS: I know for sure in certain
7  cases, yes.
8  MR. ARNOLD: All right.
9  Q. All right. Tell me what you recall about
10 how Ohio State dealt with concerns raised about you
11 by Clare Francis.
12 A. They do an investigation. Every time they
13 got the denunciation they made an investigation.
14 Q. And you would have to respond?
15 A. Of course. Yes.
16 Q. Okay. Did you get legal counsel for that
17 one?
18 A. No.
19 Q. And how did Ohio State resolve its
20 investigations?
21 A. The one that were resolved, they look into
22 it and say that they look at everything that was
23 mentioned and it was fine, and I did not have any
24 responsibility for that.
25 Q. Ohio State didn't have you do anything

Page 168

1  differently in response to those concerns?
2  A. Only in two cases of two postdoctors of
3  mine, one was Garofalo and the other one Pichiorri,
4  that said in their investigation they found some
5  degree of sloppiness in the work of these two ladies.
6  We had to make sure that that sloppiness would not
7  happen again.
8  Q. And what did you -- well, first of all,
9  who did you say? Garofalo and Pichiorri?
10 A. Yes. Correct.
11 Q. Do either of those still work in your lab?
12 A. No. No. They are gone.
13 Q. Did you tell them to leave?
14 A. No.
15 Q. Okay. They left as a natural --
16 A. One got a very good job in Manchester,
17 that's Garofalo, and the other one got a job at City
18 of Hope in California.
19 Q. So you said Ohio State concluded there was
20 sloppiness?
21 A. Yes, some degree of sloppiness and we had
22 to fix it.
23 Q. Did you agree there was some degree of
24 sloppiness?
25 A. Oh, yes, I agree with them.

Page 189

1  Q. So, Dr. Croce, would you -- how would you
2  characterize concerns raised by Dr. Sanders in the
3  categories you just talked about, discover some
4  mistakes, mostly wrong? All wrong? None wrong? Do
5  you have a -- can you characterize those?
6      A. Yeah. In my small experience --
7      Q. Yes.
8      A. -- in the case of the thing I know is by
9  Sanders, I know that some allegation are wrong and
10 some allegation brought to the discovery of some
11 mistakes.
12     Q. Do you, and I know there are a lot of
13 articles and a lot of documents, but just sitting
14 here talking can you recall a specific allegation or
15 concern raised by Dr. Sanders that you think is
16 wrong?
17     A. I think there are several allegation. I
18 will have to look at the thing, but there were
19 several, uh-huh.
20     Q. And is it possible that with respect to
21 some concerns, that you and Dr. Sanders would have
22 different opinions as to whether it was right or
23 wrong?
24     A. That is always possible to have a
25 difference of opinion.

Page 190

1      Q. Doing okay?
2      A. Yeah.
3      Q. All right. Dr. Croce, I don't remember if
4  we've talked about PNAS specifically. That's a
5  journal, right?
6      A. Yes.
7      Q. What does "PNAS" stand for?
8      A. Proceedings of the National Academy of
9  Sciences of the United States of America.
10     Q. All right. And, if I recall from your
11 complaint, you are a member of the National Academy
12 of Sciences?
13     A. I am.
14     Q. And have been for quite some time?
15     A. Since in the middle '90s.
16     Q. And that's pretty selective?
17     A. Yes. But not selective enough.
18     Q. Everybody who's already in says that.
19         (Laughter.)
20     A. That's true.
21     Q. All right. If you know, approximately how
22 many scientists are in the National Academy of
23 Sciences?
24     A. About 2,000.
25     Q. About 2,000?

Page 191

1      A. In all sciences.
2      Q. In all sciences. Okay.
3      A. Some are decrepit. A few are young.
4      Q. All right. So PNAS, and forgive me if you
5  already said this one, PNAS's index?
6      A. Ten. Around ten.
7      Q. Okay.
8      A. But it's a good journal. The problem is
9  they tend to publish too many article.
10     Q. Oh, so maybe not selective enough as far
11 as the articles.
12     A. Yeah. But you always find something very
13 good.
14     Q. And you've published in that journal, I
15 trust?
16     A. Yeah. I publish a lot of paper in PNAS.
17     Q. Okay. I sort of grouped a handful of
18 things related to PNAS which I don't think they all
19 relate to the same thing, but --
20         MR. ARNOLD: Are we on 20 here?
21     Q. -- I'd just like to sort of run through
22 them with you.
23     A. Okay.
24     Q. All right. Dr. Croce, do you recognize
25 Defendant's Exhibit 20?

Page 192

1      A. Yes, I do.
2      Q. What is it?
3      A. It's a letter from Muller Fabbri to me
4  concerning a paper in PNAS.
5      Q. First of all, who is Dr. Fabbri?
6      A. A former postdoc of mine who is now, he
7  went to University of Southern California and just a
8  year ago went to University of Hawaii.
9      Q. Just looking at his email address here at
10 the time of Exhibit 20 it looks like he was at the
11 University of Southern California?
12     A. Correct.
13     Q. All right. And summarize what this
14 situation is, please.
15     A. This is a long story concerning a paper in
16 PNAS. The blot -- the Dimitrios deal, he was the
17 second author of that paper on western blot.
18     Q. What was the issue?
19     A. It was against the western, whether a band
20 was derived from another band or was the original
21 band.
22     Q. Okay.
23     A. And we could not find the original, the
24 authority of this. So, again, one of those loading
25 band, they all look alike.

## Page 217

1   Q.  It could be honest error that they were
2   duplicated.
3   A.  Yes.
4   Q.  Okay.
5   A.  So in order to be sure, you have to have
6   the raw data.  Raw data, you are sure.
7   Q.  All right.  But without the raw data you
8   can't --
9   A.  You are not sure.
10  Q.  Dr. Croce, I'm going to hand you what I'm
11  marking as Defendant's Exhibit 25, ask you to take a
12  look.  I'm not going to ask you to read the entire
13  thing, translate the entire thing, I'll just give you
14  that assurance first.
15  A.  I did not read this before so I had to
16  laugh.
17  Q.  You've never seen it before?
18  A.  I don't believe so.
19  Q.  All right.
20  A.  You know why I laugh?
21  Q.  Why do you laugh?
22  A.  That is a championship of the 3,000
23  Italian scientists, the stars of the research.
24  Q.  All right.
25  A.  And who is the number one?

## Page 218

1   Q.  You.
2   A.  Yeah.
3   Q.  All right.
4   A.  So I was having a laugh.
5   Q.  It appears to me -- you read Italian, I
6   don't -- look at the first page, does it appear to
7   you this was published on December 7, 2018?
8   A.  December 7, 2018, in Apulia, University of
9   Bari, Italy.
10  Q.  All right.  Do you remember being
11  interviewed for this article at all?
12  A.  For sure not.
13  Q.  Okay.
14  A.  I don't remember.
15      MR. NOLAN:  All right.  I don't think I
16  have anything else.  Appreciate your time today.
17      THE WITNESS:  Thank you very much for your
18  time.  It's been a very pleasant experience.
19      MR. ARNOLD:  He'll read.
20      (Whereupon, at 3:59 p.m., the deposition
21  was concluded and signature was not waived.)
22              --|--

## Page 219

1               AFFIDAVIT
2   State of Ohio      )
                       ) SS:
3   County of _____ )
4       I, CARLO M. CROCE, MD, do hereby certify that
    I have read the foregoing transcript of my deposition
5   given on Wednesday, March 27, 2019; that together
    with the correction page attached hereto noting
6   changes in form or substance, if any, it is true and
    correct.
7
8       _____
            CARLO M. CROCE, MD
9
10      I do hereby certify that the foregoing
    transcript of the deposition of CARLO M. CROCE, MD
11  was submitted to the witness for reading and signing;
    that after he had stated to the undersigned Notary
12  Public that he had read and examined his deposition,
    he signed the same in my presence on the _____ day
13  of _____, 2019.
14
15      _____
            Notary Public
16
17  My commission expires _____, _____.
18              --|--

## Page 220

1               CERTIFICATE
2   State of Ohio      )
                       ) SS:
3   County of Franklin )
4       I, Maria DiPaolo Jones, RDR and CRR, the
    undersigned, a duly qualified and commissioned notary
5   public within and for the State of Ohio, do certify
    that, before giving his deposition, CARLO M. CROCE,
6   MD was by me first duly sworn to testify to the
    truth, the whole truth, and nothing but the truth;
7   that the foregoing is the deposition given at said
    time and place by CARLO M. CROCE, MD; that I am
8   neither a relative of nor employee of any of the
    parties or their counsel and have no interest
9   whatever in the result of the action.
10      IN WITNESS WHEREOF, I hereunto set my hand and
    official seal of office on this 5th day of April,
11  2019.
12
13      _Maria DiPaolo Jones_____
        Maria DiPaolo Jones, RDR, CRR,
        and Notary Public in and for the
14      State of Ohio.
15  My commission expires:  June 19, 2021.
16  (2799-MDJ)
17              --|--