**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CARLO M. CROCE** | : | |
| | : | **Case No. 2:17-cv-00338** |
| **Plaintiff,** | : | |
| | : | **Judge James L. Graham** |
| **vs.** | : | |
| | : | **Magistrate Judge Preston Deavers** |
| **DAVID A. SANDERS** | : | |
| | : | |
| **Defendant.** | : | |

_____

# Exhibit 3 to Defendant's Appendix in Support of Motion for Summary Judgment – Excerpts of Deposition of David Sanders

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

1       IN THE UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF OHIO
2           EASTERN DIVISION

3

CARLO M. CROCE,        )
4                  )
      Plaintiff,    )
5                  )
      vs.          )  Civil Action No.
6                  )  2:17-cv-00338
DAVID A. SANDERS,    )
7                  )

8      Defendant.    )

9

10

11               DEPOSITION

12          of DAVID SANDERS

13

14        Taken at the offices of

15        BARNES & THORNBURG, LLP
     41 South High Street, Suite 3300
16        Columbus, Ohio  43215

17     on March 28, 2019, at 9:02 a.m.

18

19   Reported by: Angela R. Starbuck, RDR/CRR/CRC

20

21           -=0=-

22

23

24





Page 2

APPEARANCES:

James E. Arnold
Damion Clifford
Jaime L. Glinka
JAMES E. ARNOLD & ASSOCIATES LPA
115 West Main Street, 4th Floor
Columbus, Ohio 43215
614.460.1600
jarnold@arnlaw.com
dclifford@arnlaw.com
jglinka@arnlaw.com

    on behalf of the Plaintiff.

William A. Nolan
BARNES & THORNBURG, LLP
41 South High Street, Suite 3300
Columbus, Ohio 43215
614.628.1401
bill.nolan@btlaw.com

    and

Kara M. Kapke
BARNES & THORNBURG, LLP
11 South Meridian Street
Indianapolis, Indiana 46204
317.231.6491
kara.kapke@btlaw.com
    on behalf of the Defendant.

                -=0=-

Page 3

STIPULATIONS

1   It is stipulated by and among counsel
2  for the respective parties that the deposition
3  of DAVID SANDERS, the Defendant herein, called
4  by the Plaintiff under the applicable Rules of
5  Federal Civil Court Procedure, may be taken at
6  this time by the notary pursuant to notice and
7  by agreement; that said deposition may be
8  reduced to writing in stenotypy by the notary,
9  whose notes thereafter may be transcribed out of
10 the presence of the witness; and that the proof
11 of the official character and qualification of
12 the notary is waived.
13                -=0=-

Page 4

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | The New York Times article | 158 |
| 2 | USA Today article | 103 |
| 6 | Defendant's Answers to Plaintiff's First Set of Interrogatories Propounded Upon David A. Sanders | 28 |
| 45 | 2-27-17 e-mail chain, Bates stamped DS00002515 | 220 |
| 64 | E-mail chain, Bates stamped DS00004655 through 4658 with attachments | 158 |
| 66 | 5-20-17 e-mail to David Sanders from Rafaello Mancini | 207 |
| 68 | Document titled, "Falsification Accusations" | 93 |
| 70 | Paper, "A new role for microRNAs as ligands of Toll-like receptors" | 16 |
| 71 | Paper, "WWOX gene restoration prevents lung cancer growth in vitro and in vivo" | 17 |
| 72 | Paper, "In vivo NCL targeting affects breast cancer aggressiveness through miRNA regulation" | 17 |
| 73 | Document titled, "Plagiarism Allegations" | 90 |
| 74 | Cancer Cell article | 132 |

(Confidential portion: Page 184, Line 17
    through Page 199, Line 8)

Page 5

1          DAVID SANDERS
2  being first duly sworn, as hereinafter
3  certified, deposes and says as follows:
4          EXAMINATION
5  BY MR. ARNOLD:
6   Q.  Good morning, Dr. Sanders.  Would you
7  state your name for the record, please.
8   A.  David Sanders.
9   Q.  And, Doctor, have you ever been deposed
10 before?
11  A.  I have not.
12  Q.  Like you saw Bill Nolan yesterday tell
13 Dr. Croce, there's a few ground rules I want to
14 make sure that I reinforce with you.
15  A.  Yes.
16  Q.  If I ask you a question at any time that
17 you don't understand, it's because I may not be
18 as in depth with the subject matter as you.
19 Just tell me and I'll try to reframe it.  Okay?
20  A.  Yes.
21  Q.  As happened several times yesterday,
22 it's not intended to be rude, but if I need to
23 prompt you to give a verbal response, don't be
24 offended.

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 10

1    A.  Sure.  Richard Mulligan.
2    Q.  Was that the same throughout your period
3  at Whitehead?
4    A.  Yes.
5    Q.  What type of degree does Dr. Mulligan
6  have?
7    A.  He's a Ph.D.
8    Q.  Do you know in what?
9    A.  No.
10   Q.  Okay.  I understand you were looking at
11  retrovirus entry?
12   A.  Correct.
13   Q.  Into what?
14   A.  Into cells.
15   Q.  Into cells.
16      Why did your participation at Whitehead
17  end?
18   A.  I received a faculty position at Purdue
19  University.
20   Q.  What year was that, David?
21   A.  1995.
22   Q.  And you've remained there continuously
23  ever since?
24   A.  That's correct.

Page 11

1    Q.  I understand you're an associate
2  professor today?
3    A.  That's correct.
4    Q.  What position did you enter at Purdue in
5  1989?
6    A.  Assistant professor.
7    Q.  What are your -- let's start in 1995.
8  What were your responsibilities at Purdue in
9  1995?
10   A.  Teaching and conducting research.
11   Q.  What were you teaching?
12   A.  Well, I -- actually they give you a year
13  off from teaching the first year.
14   Q.  All right.  I take it you conducted
15  research the first year?
16   A.  Yes.
17   Q.  All right.
18   A.  Set up the lab, conducted research.
19   Q.  All right.  What did you start teaching
20  then in 1996?
21   A.  How amino acids dictate the function of
22  proteins.
23   Q.  We were just talking about that at
24  breakfast this morning.

Page 12

1      Was there anything else you were
2  teaching other than how amino acids dictate --
3    A.  That was my first teaching assignment.
4    Q.  All right.  How has that evolved from
5  1995 to today?
6    A.  I have taught undergraduate virology,
7  graduate virology, protein structure,
8  microbiology, protein expression lab.
9    Q.  Have you ever taught a class in
10  scientific ethics?
11   A.  Taught a class, no.
12   Q.  Seminar?
13   A.  I have been often invited to speak in
14  them when other people have those classes.
15   Q.  How many times have you been invited to
16  speak on the subject of scientific ethics?  In a
17  range, if you're comfortable.
18   A.  Just in classes or in general?
19   Q.  Both.
20   A.  In classes, 10 times.  Scientific ethics
21  in general, 20 times -- I mean, 20 additional
22  times besides the classroom.
23   Q.  So total, 30?
24   A.  Something like that.

Page 13

1    Q.  Okay.  I don't want to jump off of
2  getting a final progression of the classes that
3  you teach, but let's move to the classes of
4  scientific ethics first.  Do you provide
5  students in those classes with written material?
6    A.  No.
7    Q.  What -- are they provided any material?
8    A.  No.
9    Q.  Textbooks?
10   A.  Well, they -- I mean, I'm just doing one
11  class.  They're normally provided with
12  instructions on the NIH or NSF responsible
13  conduct of research.  So they are provided with
14  those sorts of materials, but I don't provide
15  them.  I'm just a guest lecturer.
16   Q.  Understood.  That's available online?
17   A.  Yeah, those are available online.
18   Q.  Sure.  In your 20 other invitations to
19  speak on scientific ethics, do you distribute
20  any literature?
21   A.  No.
22   Q.  Do you have a PowerPoint presentation
23  that you use to -- to --
24   A.  In general, yes.

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 14

1    MR. NOLAN:  Remember to let him finish
2 his question.
3    THE WITNESS: I'm sorry.  Thank you.
4 BY MR. ARNOLD:
5    Q.  You're doing great.
6    What do you call that PowerPoint
7 presentation?
8    A.  Well, there was one where I was talking
9 about the arsenic bacteria case --
10    Q.  I'm familiar.
11    A.  And then now it'll be -- tends to be
12 like ethics in scientific publication.
13    Q.  So there are two PowerPoints?
14    A.  Yeah.
15    Q.  All right.  Do either of those mention
16 Dr. Croce?
17    A.  No.
18    Q.  Do any of them refer to any of the
19 papers Dr. Croce has written?
20    A.  So the arsenic will not.  The other one,
21 it will never refer to the papers, but there are
22 images.
23    Q.  That come from his papers?
24    A.  That come from his papers, yes.

Page 15

1    Q.  Do you remember what papers they come
2 from?
3    A.  It will be the Fabbri, et al.
4    Q.  Is that the WWOX paper?
5    A.  Correct.
6    Q.  2005?
7    A.  Correct.
8    Q.  Any others?
9    A.  Pichiorri in JEM.
10    Q.  What is JEM?  I forget.
11    A.  Journal of Experimental Medicine.
12    Q.  What year was that?  The Pichiorri -- if
13 you remember.
14    A.  2013.
15    Q.  Are there any other -- strike that.
16    Are the WWOX 2005 and the Pichiorri 2013
17 matters that you discuss in your PowerPoints
18 dealing with images?
19    A.  Yes.
20    Q.  Do any of the PowerPoint discussions
21 deal with plagiarism?
22    A.  Yes.
23    Q.  Is that the Pichiorri?
24    A.  No, I -- thank you.  It's also Fabbri,

Page 16

1 et al. It's the RNA biology paper.
2    Q.  So there's another Fabbri paper?
3    A.  It's Fabbri.
4    Q.  Thank you.  And what year is that paper?
5    A.  Don't know.
6    Q.  Do you know what the subject matter of
7 the paper --
8    A.  It's RNA biology.  It's about -- I think
9 it's about TLR, Toll-like receptors.
10    Q.  I'm going to hand you a document I'm
11 going to mark as Exhibit 70.
12    -=0=-
13    (Exhibit 70 marked.)
14    -=0=-
15 BY MR. ARNOLD:
16    Q.  David, I'm putting in front of you what
17 I've now marked as Plaintiff's Exhibit 70 and
18 ask you to share that with your counsel, and let
19 me know if that's the paper you're referring to
20 in your last answer.
21    A.  Yes.
22    Q.  Very good.  Thank you.
23    What is the year of that paper?
24    A.  2013.

Page 17

1    -=0=-
2    (Exhibit 71 marked.)
3    -=0=-
4 BY MR. ARNOLD:
5    Q.  And just for the sake of completeness,
6 I'm going to mark the WWOX paper as Exhibit 71,
7 David, and ask you if that's the one you were
8 referring to earlier as being part of your
9 PowerPoint presentation.  The substance of it --
10 or the images, rather, not necessarily the text.
11    A.  Yes.
12    Q.  All right.  I'm just trying to get
13 clarity with respect to which documents we're
14 talking about.
15    MR. ARNOLD:  Can I see that back there,
16 Bill?
17    MR. NOLAN:  What do you want, 71 or --
18    MR. ARNOLD:  71.  I think I've got my
19 notes attached to it, too.
20    -=0=-
21    (Exhibit 72 marked.)
22    -=0=-
23 BY MR. ARNOLD:
24    Q.  And this -- I'm putting in front of you

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 22

1    Q.  The other images to which you may refer
2  in the PowerPoint presentations are in
3  Exhibit 71?
4    **A.  Correct.**
5    Q.  Could you tell me which images of
6  Exhibit 71 you refer to in your PowerPoint
7  presentation?
8    **A.  1-B.**
9    Q.  Okay.  So on Exhibit 71, on exhibit page
10  number 15612, you're referring to Figure 1,
11  letter B?
12    **A.  Figure 1, letter B, correct.**
13    Q.  Okay.  Any others in Exhibit 71 to which
14  you refer --
15    **A.  No.**
16    Q.  -- in your PowerPoint presentation?
17    **A.  No.**
18    Q.  What is the purpose for which you point
19  those out in your presentations?
20    **A.  I'm illustrating the nature of image**
21  **duplication that occurs in articles.**
22    Q.  Do you keep a compilation of the places
23  where you have given these lectures?
24    **A.  No.**

Page 23

1    Q.  It would be impossible to put together a
2  list other than referring to your calendar?
3    **A.  Yes.**
4    Q.  Over what period of time have you given
5  these lectures?
6    **A.  This particular one has just been**
7  **relatively recent.  I was mostly giving -- yeah.**
8    Q.  You were mostly giving what?
9    **A.  The one on arsenic.**
10    Q.  All right.  That has nothing to do with
11  Dr. Croce?
12    **A.  Nothing to do with Dr. Croce.**
13    Q.  To finish off this topic then, let's go
14  to Exhibit 70, and if you would, please tell me
15  the portion of Exhibit 70 that you reference in
16  your PowerPoint presentations.
17    **A.  This paragraph beginning with**
18  **"increased."**
19    Q.  Can I just get you to mark that, David,
20  so I can then put it in the record.
21    (Witness complied with request.)
22  BY MR. ARNOLD:
23    Q.  Okay.  So in Exhibit 70 --
24    **A.  Yeah.**

Page 24

1    Q.  -- correct?
2    **A.  Yeah.  To the best of my recollection.**
3    Q.  Sure.  Exhibit 70, we're looking at
4  article page number 171 and you've identified in
5  the center column, beginning at "increased
6  scientific and clinical interest in TLR7," and
7  ending in the third column that says high
8  concentrations (that is greater than or equal to
9  3 milligrams per milliliter) also activates
10  TLR8.
11    I can't pronounce the one word I
12  omitted, so I didn't say it.
13    MR. NOLAN:  Veteran move.
14  BY MR. ARNOLD:
15    Q.  Are there any other papers that have any
16  association with Dr. Croce that are part of your
17  PowerPoint presentations we haven't covered?
18    **A.  No.**
19    Q.  And we've covered all of the
20  presentations that you may give as it pertains
21  to any paper in which Dr. Croce was associated?
22    **A.  That is correct.**
23    Q.  All right.  Thank you.  Are any of the
24  classes that you lecture in videotaped or

Page 25

1  recorded in any way with respect to the
2  scientific ethics?
3    **A.  Not that I'm aware.**
4    Q.  Are you aware of whether or not any of
5  the lectures that you've given with respect to
6  scientific ethics outside of your classroom have
7  been videotaped?
8    **A.  Not that I'm aware.**
9    Q.  I want to finish with your background.
10  Are you a member of any professional societies,
11  David?
12    **A.  I am on the -- I'm a member of The**
13  **Protein Society and I represent them on the**
14  **FASEB science policy committee.**
15    Q.  You're going to have to tell me --
16    **A.  FASEB, Federation of American Societies**
17  **of Experimental Biology.**
18    Q.  Thank you.
19    **A.  I'm also a national council member of**
20  **the American Association for University**
21  **Professors.  Maybe it's of university**
22  **professors.**
23    Q.  Okay.  How did you become a member of
24  the first society that you mentioned, The

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 34

1  only one person?
2  **A. Correct.**
3  Q. And when there are multiple -- and
4  understand I'm groping along in the dark here,
5  too. When there are multiple people who review
6  the same article, I assume they decide on the --
7  who will be first, middle, and last, if there's
8  three, among themselves?
9  **A. Yes.**
10  Q. How -- how is that decision made? Is
11  there a protocol or policy that is generally
12  followed?
13  **A. Not necessarily.**
14  Q. All right.
15  **A. Some -- for review -- so -- I would say**
16  **no.**
17  Q. Okay.
18  **A. There's -- people have different**
19  **approaches to that particular --**
20  Q. Again, I preface everything by saying I
21  don't know the answer. That's not why I'm
22  asking. I'm asking because I don't.
23  **A. Sure.**
24  Q. In the -- sticking with Attachment B,

Page 35

1  article Number 1 --
2  **A. Yes.**
3  Q. -- it appears have an individual by the
4  name of D.E. Koshland, Jr.
5  **A. Correct.**
6  Q. Is that a man or woman?
7  **A. Man.**
8  Q. A man, I suppose, being junior.
9     What was his participation in that
10  publication?
11  **A. He was my graduate advisor and we wrote**
12  **the article together.**
13  Q. You were still a student at this time?
14  **A. That's correct.**
15  Q. Where is the first paper in here where
16  you were not a student and wrote it as a matter
17  of academic interest?
18  **A. That's a difficult question. Could you**
19  **rephrase it, please.**
20  Q. Sure. And thank you for doing that.
21  I'm trying to find a paper in here that
22  has you advanced beyond your fellowship and you
23  performed an experiment because you intended to
24  write or publish a paper about it.

Page 36

1     MR. NOLAN: I'm going to object to the
2  form.
3     Go ahead.
4  **A. So which -- when I'm an assistant**
5  **professor -- I'm trying to understand when --**
6  **what are we talking about.**
7  Q. Let's start with each one. When you
8  were first an assistant professor.
9  **A. Assistant professor -- I didn't conduct**
10  **the experiments as an assistant professor. My**
11  **graduate students and post-docs actually did the**
12  **experiments.**
13  Q. Appreciate that then. Thank you.
14     Once they conducted the experiments as
15  an assistant professor, who wrote the article?
16  **A. I would -- so wrote the article --**
17  **actually wrote the actual text, is that the**
18  **question?**
19  Q. Yeah.
20  **A. So writing the text. My policy was to**
21  **ask the students to write the text and then I**
22  **would revise it.**
23  Q. That's fairly common?
24  **A. Fairly common, yes.**

Page 37

1  Q. To do it in that manner?
2  **A. Yes.**
3  Q. They'll conduct the experiment, you'll
4  oversee their conduct of that experiment, and
5  once you see the results, if you think it's
6  worthy of publication, you'll ask them to create
7  the first draft?
8  **A. That's correct.**
9  Q. Would item Number 32 on Attachment B of
10  Exhibit 6 reflect a publication that was done in
11  that manner?
12  **A. Yes.**
13  Q. All right. Are any of the articles or
14  publications we see on Attachment B something in
15  which images were created?
16  **A. Images are present in many of these**
17  **articles, yes.**
18  Q. Do you know if images are created in
19  association with item Number 32 of Attachment B?
20  **A. 32? I believe there's a graph in 32.**
21  Q. All right. Can you pick out any one of
22  these in which you know that images were created
23  as part of the experiment?
24     MR. NOLAN: Just pick out one?

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 102

1 what appears on Exhibit 68?
2 **A. Yes.**
3 Q. Is it the same problem that we're
4 running into with Exhibit 73?
5 **A. Yes.**
6 Q. When were the allegations of
7 falsification that are the subject of a
8 nondisclosure agreement made?
9 Because you told me in connection with
10 the plagiarism, the last accusation was made on
11 February 2019.
12 **A. Yes, that isn't what you just asked me.**
13 Q. I'm asking when you last made an
14 allegation of falsification against Dr. Croce's
15 papers. Would it have been the same date?
16 **A. Yes.**
17 Q. All right. Tell me if I'm wrong, but
18 you probably made these allegations in a single
19 document and sent it to the university?
20 MR. NOLAN: I'm going to object there
21 and ask him not to answer until we talk to the
22 Court about it.
23 MR. ARNOLD: But I haven't -- okay. All
24 right. We'll do that.

Page 103

1 MR. NOLAN: Since we're going to anyway.
2 MR. ARNOLD: That's fine. I'm dancing
3 around what I thought was the issue, but if you
4 want to do it wholesale, I'm good with that,
5 too, Bill.
6 Let's go off the record for a second.
7 (Discussion off the record.)
8 BY MR. ARNOLD:
9 Q. Let's go to Exhibit 2.
10 Dr. Sanders, I'm going to put in front
11 of you what's marked as Exhibit 2 on the bottom.
12 It says Exhibit B, but it just says that on the
13 top because it came from a pleading.
14 MR. NOLAN: Plaintiff's Exhibit 2?
15 MR. ARNOLD: Plaintiff's Exhibit 2, yes.
16 BY MR. ARNOLD:
17 Q. Understanding you may not recognize it
18 in the format in which it appears, do you
19 recognize the article itself?
20 **A. Yes, I do.**
21 Q. All right. Appears to be an article
22 from USA Today?
23 **A. Yes.**
24 Q. On the very bottom of Page 1 of

Page 104

1 Exhibit 2, below the words in bold that say,
2 "They continued to do it over and over again,"
3 it says "Sanders was tipped off to possible
4 discrepancies within some of Croce's articles
5 and started to dig in from there."
6 Do you see that?
7 **A. Yes, I do.**
8 Q. Was that the -- first of all, is that
9 true?
10 **A. Yes.**
11 Q. Who was it who tipped you off --
12 **A. I do not know.**
13 Q. You don't know?
14 **A. I do not know.**
15 Q. Was it anonymous?
16 **A. No.**
17 Q. How would you not know who it is if it's
18 not anonymous? Explain to me how this came to
19 you.
20 **A. I give talks on the arsenic bacteria**
21 **case. People come up to me and say, you should**
22 **look into this. I do not know who they are.**
23 **Someone mentioned Dr. Croce.**
24 Q. What else did this person say to you?

Page 105

1 **A. I believe they referred to the WWOX**
2 **paper.**
3 Q. Do you recall what they said?
4 **A. "You should look into this."**
5 Q. Anything more than that?
6 **A. I don't recall.**
7 Q. Where were you when you had this
8 conversation with this person?
9 **A. In a seminar room.**
10 Q. Where?
11 **A. I do not know.**
12 Q. Was it a man or a woman?
13 **A. It was a man.**
14 Q. And did he introduce himself and you've
15 forgotten his name or he never introduced --
16 **A. Probably introduced himself, but I can't**
17 **be sure of that.**
18 Q. Didn't give you a business card or
19 anything --
20 **A. No.**
21 Q. -- of that nature?
22 MR. NOLAN: Remember to let him finish
23 the question.
24 MR. ARNOLD: He's harder on you than I

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 122

1    Q.  But you didn't when you had no reason to
2  think that there was a problem before it was
3  published in the Journal of Virology?
4    A.  Yes.
5    Q.  That's a correct statement?
6    A.  That is a correct statement.
7    Q.  You were identified in the Journal of
8  Virology paper as the last author?
9    A.  Correct.
10    Q.  What responsibility does that assign to
11  you as the last author with respect to those
12  images?
13    A.  I'm responsible for them.  I didn't
14  create them.
15    Q.  Well, you did more than not create them,
16  you -- they were created in a different lab,
17  weren't they?
18    A.  That's correct.
19    Q.  So you hadn't -- did you have the images
20  available to you to review before it was
21  published?
22    A.  I did not have the primary data.  I did
23  have the images to review, yes.
24    Q.  And when you looked at the images, you

Page 123

1  didn't see they were the same images being used
2  for two different purposes in the same article?
3    A.  I don't recall.
4    Q.  When you realized that the same image
5  had been used for two different purposes in the
6  same article, did you contact all of the other
7  authors of the paper to inform them of that?
8    A.  I don't know where they currently are.
9    Q.  Does that mean you didn't try?
10    A.  I talked to Pinter, who would have been
11  the person who would know them.
12    Q.  Okay.  Did you attempt to contact --
13    A.  I did not.
14    Q.  -- any of the other authors?
15    A.  I did not.
16    Q.  Let's go back to Exhibit 2, please,
17  David.  On Page 2 of Exhibit 2, very top, it
18  says, "The New York Times article said an
19  anonymous critic also contacted Ohio State and
20  federal authorities in 2013 with allegations of
21  falsified data in more than 30 of Croce's
22  articles."
23    The 2013, 2014 time frame is when you
24  were first contacted by somebody --

Page 124

1    A.  That's correct.
2    Q.  -- about the PNAS article?
3    Have you ever made any anonymous
4  allegations of plagiarism or falsification
5  against Dr. Croce?
6    A.  I have not.
7    Q.  Do you know of anybody who has made
8  allegations of falsifications or plagiarism
9  against Dr. Croce anonymously?
10    A.  Not personally.
11    Q.  Personally or otherwise, do you know?
12    A.  I have been presented with discovery
13  that Clare Francis has made allegations.
14    Q.  Anonymously because he or she is using a
15  pseudonym?
16    A.  Yes.
17    Q.  Do you know who Clare Francis is?
18    A.  I do not.
19    Q.  Have you made any attempt to determine
20  who it is?
21    A.  I have not.
22    Q.  Have you had any communication with
23  Clare Francis directly?
24    A.  No.

Page 125

1    Q.  The third section down on Page 2 of
2  Exhibit 2 it says, in quotes, if you wanted to
3  just make up data, you could do it in a way
4  that's much more difficult to detect, but they
5  didn't because they were able to get away with
6  this relatively simple manipulation, close
7  quote, Sanders said.  Quote, they continued to
8  do it over and over again, close quote.
9    Do you see that?
10    A.  Yes.
11    Q.  We see that those words are in
12  quotations.
13    A.  Yes.
14    Q.  And we see that they're attributed to
15  you.
16    A.  Yes.
17    Q.  Did you say those words?
18    A.  Yes.
19    Q.  When you were interviewed by the --
20  strike that.
21    When you communicated with the USA Today
22  reporter --
23    A.  Yes.
24    Q.  -- did you record the conversation?

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 126

1  A. I did not.
2  Q. Do you know if he or she did?
3  A. I do not.
4  Q. Did you take any notes?
5  A. I did not.
6  Q. Did you make any after the
7  communication?
8  A. I did not.
9  Q. Regarding the communication, that is.
10  A. I did not.
11  Q. Okay. When I look at the quoted section
12  of Exhibit 2, it says "If you wanted to just
13  make up data, you could do it in a way that's
14  much more difficult to detect."
15  What are you referring to? What data
16  are you referring to?
17  A. Pichiorri, Journal of Experimental
18  Medicine.
19  Q. Let's see if we can find that article.
20  Is that the image manipulation or --
21  A. It's image manipulation.
22  Q. What magazine or article was that?
23  A. Experimental Medicine, JEM.
24  Q. JEM? Is that item 10 on Exhibit 68?

Page 127

1  A. Correct.
2  Q. And what was the data that you were
3  referring to in connection with the Pichiorri
4  article?
5  A. I think I have to provide an
6  explanation.
7  MR. NOLAN: Go ahead. I'm sorry.
8  A. This version is the corrected article.
9  Q. Which version are we looking at,
10  article -- or Exhibit 72?
11  A. Yes.
12  Q. Okay. So Exhibit 72 isn't the article
13  of which you were critical, it's the corrected
14  article?
15  MR. NOLAN: Answer his question.
16  A. It's the corrected article, yes.
17  Q. All right. Because I want to be -- I
18  want to be clear about this. So the images that
19  you identified earlier when we asked about which
20  ones you were critical of are in the -- are in
21  those locations but they're not the ones we're
22  looking at here in Exhibit 72?
23  A. They are both in the original -- there
24  are images both in the original and in the

Page 128

1  corrected that are problematic.
2  Q. Okay. So in both the original article
3  and the correction there are problems, from your
4  perspective?
5  A. Yes.
6  Q. All right. In the original article --
7  A. Yes.
8  Q. -- it was image duplication?
9  A. Correct.
10  Q. In the corrected article that we see
11  identified -- or allegedly corrected article --
12  as Exhibit 72, image duplication as well?
13  A. Yes.
14  Q. All right. Explain to me what happened
15  in Exhibit 72 which did not correct the original
16  article.
17  A. I need to explain what happened
18  originally.
19  Q. Please do.
20  A. But I don't have the images in front of
21  me.
22  Q. I didn't know there was a difference.
23  A. These three lanes in 1-E were inverted
24  in the original from what they currently are

Page 129

1  now. There was a 180-degree flip.
2  Q. So they were flipped?
3  A. Yes.
4  Q. Okay.
5  A. And they were repeated in that
6  180-degree flip in the last three lanes over
7  here.
8  Q. Okay. That was in the original article?
9  A. In the original article.
10  Q. All right. And so I assume what you
11  would have expected would be to have the E image
12  inverted 180 degrees to be accurate?
13  A. No.
14  Q. No?
15  A. What I would expect is these shouldn't
16  look anything like these. They're totally
17  separate samples. They have completely
18  different origins. They are labeled
19  completely -- these should not resemble these in
20  any way, shape, or form.
21  Q. I understand that, but what I'm saying,
22  in order to get the article corrected the way
23  you would have expected, since the image --
24  since the figures in B were flipped 180 degrees,

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 130

1 to correct that problem you would have flipped
2 them back 180 degrees to start? No?
3    A. I don't know why they were subsequently
4 flipped. That wasn't the issue. The issue was
5 that these were the same as these in the
6 original article.
7       I have no idea why they would have
8 flipped them in the correction. That doesn't
9 actually correct anything.
10    Q. Yeah, I agree. And maybe I
11 misunderstood you. Are you saying they got
12 flipped 180 degrees in the correction --
13    A. Yes.
14    Q. -- but in the original article they were
15 properly placed?
16    A. I don't know.
17    Q. You have no idea?
18    A. I do not know.
19    Q. Okay. And in any event, whether they
20 were flipped or not, they shouldn't appear in
21 the image we see as the second image on the --
22 of F?
23    A. Correct. But not only did this get
24 flipped for some reason that is unexplained, but

Page 131

1 these originate from a 2010 paper with Pichiorri
2 as the first author, and I believe Dr. Croce as
3 the last author. It is Number 8.
4    Q. Okay. Thank you. So Number 8 was
5 published in Cancer Cell 2010?
6    A. Correct.
7    Q. And it looks like Number 10 of
8 Exhibit 68 was published in the Journal -- in
9 JEM in April of 2013?
10    A. Correct.
11    Q. When --
12    A. If I'm not mistaken, these are, in fact,
13 flipped from -- 180-degree flipped from that
14 image, but I'm not certain.
15    Q. Okay. For purposes of the record, we'll
16 have no idea what you just referred to, so can
17 you refer to it?
18    A. These -- this bottom panel of 1-F, those
19 bands -- that image is present in -- I don't
20 recall which figure but it is present in the
21 2010 article. I believe it's 180-degree
22 flipped. Once again, this is a totally separate
23 experiment -- you know, it's a totally separate
24 experiment from the 2010 article.

Page 132

1    Q. This may be the article.
2            -=0=-
3        (Exhibit 74 marked.)
4            -=0=-
5 BY MR. ARNOLD:
6    Q. Dr. Sanders, I've marked now Plaintiff's
7 Exhibit 74 as a Cancer Cell article that looks
8 like it was, on the bottom, published October
9 19, 2010. Is that the article to which you're
10 referring?
11    A. Yes, this is.
12    Q. And that's the article identified on
13 Exhibit 68 as Number 8?
14    A. I'm sorry?
15    Q. That's the one that's identified as
16 Number 8 on Exhibit 68?
17    A. Oh, yes. Yes.
18    Q. I know sometimes it's laborious, but
19 when we have to go back and read this, we have
20 to --
21    A. Yes.
22    Q. Now having Exhibit 74 in front of you,
23 can you show me the images?
24    A. So it is this and this and it is

Page 133

1 180-degree flipped.
2    Q. How, if you know, are four lanes copied
3 into or from an image that has five lanes?
4    A. It was only these four lanes that are
5 copied.
6    Q. It's not -- I guess what I'm saying, are
7 these images finite or is it possible to take
8 only the four lanes and then reuse them
9 someplace else?
10    A. Yes, it is possible to take just the
11 four lanes.
12    Q. Okay. I'm just naive about it.
13    A. That's okay.
14    Q. How is that accomplished, do you know?
15 Is it Photoshop?
16    A. Your guess is as good as mine.
17    Q. Is there a -- a preferred falsification
18 software?
19    A. Photoshop makes things easy.
20    Q. Okay. I'm assuming it's Photoshop, but
21 if there are other programs, I'm unaware of
22 them. You don't either?
23    A. I don't know how they did this.
24    Q. Okay.

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 134

1    A.  I only feel confident that it happened.
2    Q.  How did you detect the image
3 manipulation between these two papers?
4    A.  I'm embarrassed to say some part of my
5 brain has blots permanently burned into them.
6    Q.  So I take it from what you just said,
7 you just looked at it and remembered it as being
8 an image you'd seen someplace else?
9    A.  Vaguely, yes.
10   Q.  Are you --
11   A.  Perhaps I should say this is one of the
12 ones where I found other issues, so I was
13 familiar with this paper.
14   Q.  Okay.  When you're referring to this
15 paper, by exhibit number --
16   A.  I apologize.  Number 74, this is on your
17 list as Number 8, so I was familiar with the
18 paper because of -- yes, other -- other images.
19   Q.  Okay.  What other images of Exhibit 74?
20   A.  I recall this one is problematic.
21   Q.  You have to identify it by --
22   A.  3-E.
23       MR. NOLAN:  Is there a page number?
24   A.  Page 372.

Page 135

1    Q.  Thank you.
2    A.  Figure 4-A.  It's hard to see in this
3 image but there were other ones -- there are
4 other images here as well.
5    Q.  In Exhibit 74?
6    A.  Yes.
7    Q.  Exhibit 74 is the Cancer Cell 2010?
8    A.  Correct.
9    Q.  How did that come to your attention in
10 the first place?
11   A.  Once I saw the issue with WWOX, I
12 started looking at a small number of other
13 papers that had Dr. Croce as an author and I
14 would find these sorts of issues.
15   Q.  How many of Dr. Croce's papers have you
16 examined for image duplication or manipulation?
17   A.  I do not know.
18   Q.  Is it your intent to examine them all?
19   A.  No.
20   Q.  How many of Dr. -- how many of the
21 papers on which Dr. Croce's identified as an
22 author have you examined for purposes of
23 determining if there's any plagiarism?
24   A.  I do not know.

Page 136

1    Q.  Is there a range with which you're
2 comfortable?
3    A.  Over 30.
4    Q.  Same question for the image duplication
5 or manipulation, is there a range with which
6 you're comfortable with the number of papers
7 you've examined or had examined of Dr. Croce's?
8    A.  Over 30.
9    Q.  That only means it's less than 30.  Have
10 you looked at 100, 200, do you have any idea?
11   A.  I do not know.  I know over 30.  That I
12 can say confidently.
13   Q.  Referring then to Cancer Cell 2010 --
14   A.  Yes.
15   Q.  -- those images?
16       Do you know who actually prepared those
17 images before they were published?
18       MR. NOLAN:  Do you know?  Answer that.
19   A.  No.
20   Q.  Do you know if they were prepared in
21 Dr. Croce's lab or another lab?
22   A.  Yes, I know.
23   Q.  Were they prepared in Dr. Croce's lab?
24   A.  Yes.

Page 137

1    Q.  By whom?
2    A.  I do not know.
3    Q.  What makes you think those images were
4 created in Dr. Croce's lab?
5       MR. NOLAN:  Is that --
6       THE WITNESS:  Yes.
7       MR. NOLAN:  I instruct him not to answer
8 until we sort out our issue.
9       MR. ARNOLD:  Okay.
10 BY MR. ARNOLD:
11   Q.  Do you have any information that
12 Dr. Croce saw the images that appear in Cancer
13 Cell 2010 before they were published?
14   A.  No.
15   Q.  Did you ever attempt to contact
16 Dr. Croce or any of the authors of Cancer Cell
17 2010 before you registered your complaints about
18 it?
19   A.  I did not.
20   Q.  Once again, because you just didn't know
21 any of the authors?
22   A.  That's correct.
23   Q.  Do you know if Dr. Croce even
24 participated in the preparation of those images

David Sanders
March 28, 2019

Page 138
1 before they were published in Cancer Cell 2010?
2 **A. I do not.**
3 Q. Have you made any accusation of image
4 manipulation or duplication against any of the
5 other authors of Cancer Cell 2010?
6 MR. NOLAN: Other than as it relates
7 to --
8 **THE WITNESS: You have to rephrase that.**
9 BY MR. ARNOLD:
10 Q. Other than Dr. Croce, have you made any
11 allegation of image manipulation or duplication
12 arising out of the images we see in Exhibit 74?
13 **A. I have not made any allegation against**
14 **Dr. Croce with regard to the images in this**
15 **paper.**
16 Q. I thought we had agreed that Exhibit 68,
17 Number 8, Cancer Cell 2010, was one where you
18 had made -- oh, that's falsification?
19 **A. No, I have not made any allegations**
20 **against Dr. Croce for falsification or**
21 **fabrication. I have said that there is**
22 **fabrication or falsification in these papers.**
23 Q. Have you had any communication with
24 Dr. Pichiorri about the images in Exhibit 74?

Page 139
1 **A. I have not.**
2 Q. Have you had any communication with any
3 institution about the images that we see in
4 Exhibit 74?
5 **A. Yes.**
6 Q. Which institution?
7 MR. NOLAN: I'm going to instruct him
8 not to answer.
9 MR. ARNOLD: Bill, all due respect, it
10 doesn't go to the communication; it's the author
11 and recipient of a communication.
12 MR. NOLAN: I understand, Jim, and I'm
13 not -- I'm not -- but we've got an instruction
14 from Ohio State that concerns me without court
15 direction.
16 MR. ARNOLD: All right. Let's do this:
17 Why don't we take a break --
18 MR. NOLAN: And lunch is here, by the
19 way.
20 MR. ARNOLD: Let's do that. Let's take
21 some lunch and see if we can get some time with
22 Magistrate Judge Deavers and see if we can sort
23 that out.
24 MR. NOLAN: Okay. Understood.

Page 140
1 -=O=-
2 Thereupon, the luncheon recess was taken
3 at 12:08 p.m.
4 -=O=-
5 MARCH 28, 2019
6 THURSDAY AFTERNOON SESSION
7 1:02 P.M.
8 -=O=-
9 BY MR. ARNOLD:
10 Q. We're back on the record. Dr. Sanders,
11 I want to look at Exhibit 68 again, if you
12 wouldn't mind.
13 **A. Yes.**
14 Q. I'm going to try to do this in a
15 broad-brush fashion so we don't have to go
16 through each and every one of these pages.
17 These are at least my compilation of those
18 allegations that there has been image
19 manipulation or duplication as we talked about
20 earlier.
21 In connection with any of the
22 manipulations we see identified on Exhibit 68,
23 do you know who actually prepared the images
24 that are the subject of the allegation?

Page 141
1 **A. Two things. One is, I'm not sure that**
2 **actually this list is all my accusations as it**
3 **happens. Some of them I simply don't recall.**
4 **That's first.**
5 Q. Let me stop you there, then. I
6 apologize for interrupting. Which ones do you
7 identify --
8 **A. I don't recall 24.**
9 Q. I take it since you don't have any
10 recollection of 24, you wouldn't know who
11 prepared those images?
12 **A. No.**
13 Q. Any others that you can identify for me
14 that are not yours?
15 **A. You know, I -- I mean, I don't recall**
16 **some of them, but -- like I don't recall 21.**
17 Q. And, again, for any one that you don't
18 recall, I assume you wouldn't know who --
19 **A. No.**
20 Q. -- prepared the images; would that be
21 correct?
22 **A. That's correct.**
23 Q. Any others that you --
24 **A. I don't recall -- I mean, there were --**

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 150

1    Q.  Why not?
2    A.  As I mentioned before, what we were
3  discussing was the Pichiorri paper.  If you
4  would have asked me Pichiorri, I would have said
5  I'm not sure.  I may have mentioned Pichiorri.
6    Q.  Okay.  I appreciate you saying that.
7       Other than Pichiorri, do you have a
8  recollection of mentioning any other author?
9    A.  I do not believe so.
10   Q.  And putting aside Pichiorri, why didn't
11 you mention the other authors?
12   A.  Because the issue that we were focused
13 on was the JEM article.
14   Q.  JEM was --
15   A.  Pichiorri, et al., 2013.  I don't recall
16 the number.  I'm sorry.
17      MR. NOLAN:  That's fine.  He'll ask
18 you --
19      MR. ARNOLD:  That's more than I could
20 expect of you.
21 BY MR. ARNOLD:
22   Q.  Was that plagiarism or falsification, do
23 you remember?
24   A.  Falsification.

Page 151

1    Q.  Number 10.  You didn't discuss any other
2  articles with the USA Today reporter --
3    A.  No, not that I recall.
4    Q.  -- other than the JEM article of '13?
5    A.  Not that I recall.  I may have alluded
6  to the Cancer Cell Pichiorri, because that was
7  where the image originated, as I was showing you
8  before.
9    Q.  Sure.
10   A.  I may have -- I don't know -- I don't
11 know that I did, but that -- that would have
12 been the only other thing I would have referred
13 to.
14   Q.  Was this communication you had with the
15 USA Today reporter over the telephone?
16   A.  No, I believe it was in person.
17   Q.  Where at?
18   A.  I believe it was in my office.
19   Q.  At Purdue?
20   A.  Yes.
21   Q.  Did you tell me how long it lasted?
22   A.  30 minutes.
23   Q.  Was anyone else present?
24   A.  No one else was present.

Page 152

1    Q.  Was it with Meghan Holden?
2    A.  Yes.
3    Q.  Did you know Miss Holden before this
4  interview?
5    A.  I did.
6    Q.  How did you and she come in contact
7  before the day you had the interview?
8    A.  I think she contacted me and said, "I'd
9  like to interview you about this.  I read -- I'd
10 like to have an interview with you."
11   Q.  You didn't contact her, she contacted
12 you?
13   A.  I believe that she contacted me.
14   Q.  Let's go to the second page of
15 Exhibit 2, please.  I think we started down on
16 the third paragraph.  It says -- you told me
17 that you did say this quote, if you wanted to
18 just make up data, you could do it in a way
19 that's much more difficult to detect.
20      What did you mean by that?
21      MR. NOLAN:  See where he is?
22      THE WITNESS:  Yes, I see now.
23   A.  The data in the corrected version of
24 1-F --

Page 153

1    Q.  I follow.
2    A.  -- is taken from 2010 Cancer Cell.  They
3  could have put some other random bands from some
4  other thing that they had never used before and
5  one would not have been able to detect it.
6    Q.  Who are you suggesting was making up
7  data?
8    A.  Whoever submitted the correction.
9    Q.  It says, "But they didn't because they
10 were able to get away with this relatively
11 simple man manipulation."
12   A.  Yes.
13   Q.  To whom were you referring when you
14 referred to "they"?
15   A.  The co-authors who were responsible for
16 this correction.
17   Q.  Do you know who that was?
18   A.  Only by inference.
19   Q.  Who do you infer it was?
20   A.  Pichiorri.
21   Q.  Do you see Pichiorri's name anywhere in
22 the USA Today article mentioned -- or identified
23 as Exhibit 2?
24      MR. NOLAN:  Do you want him to read it?

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 154

1    MR. ARNOLD:  Sure.
2    (Pause in proceedings.)
3    A.  No, I do not.
4    Q.  Do you see any of the authors of that
5 particular manuscript name appearing in this
6 article other than Dr. Croce's?
7    A.  I do not.
8    Q.  Let's go to Page 3 of Exhibit 2, please.
9    Several paragraphs down it says, in
10 quotes, the fact that they're getting grants,
11 having engaged in this activity, means somebody
12 else who is honest is not receiving them, close
13 quote, Sanders said.
14    Do you see that?
15    A.  Yes.
16    Q.  Did you say that?
17    A.  I have no reason to believe that I did
18 not.
19    Q.  Who were you referring to when you said
20 "they are getting grants"?
21    A.  The authors of these -- of these papers.
22    Q.  A couple paragraphs above it says,
23 "Croce has received more than 6 million in
24 federal grants as a principal investigator,

Page 155

1 according to the Times investigation."
2    Do you see that?
3    A.  Yes.
4    Q.  Do you see reference to any of the other
5 co-authors of this article having received
6 grants other than Croce?
7    A.  No.
8    Q.  Did you say the fact that the co-authors
9 are getting grants?
10    A.  I used the word "they."
11    Q.  And you were referring to Dr. Croce,
12 weren't you?
13    A.  No, I was not.
14    Q.  You were referring to someone other than
15 Dr. Croce?
16    A.  Dr. Croce was one of the people.
17    Q.  And then it goes on to say, "On top of
18 that, acts of fraud and dishonesty undermine
19 public trust in science."
20    Do you see that?
21    A.  I'm sorry, I do not see that.
22    Q.  It's just below the phrase we were
23 looking at where it says, "who is honest is not
24 receiving them."

Page 156

1    A.  Yeah.
2    MR. NOLAN:  Do you see it was the
3 question.
4    A.  I see it, yes.
5    Q.  All right.  Did you say that?
6    A.  It's not in quotations, so it suggests
7 that I said something like that but not
8 necessarily that.
9    Q.  Okay.  In form or substance, did you say
10 something like that?
11    A.  I would -- I would say yes.
12    Q.  And when it talks about acts of fraud
13 and dishonesty, to whom were you referring?
14    A.  It's a general statement.
15    Q.  Well, whose acts were you referring to?
16    A.  People who violate public trust.
17    Q.  Including Dr. Croce?
18    A.  I don't know.  I don't know, you know,
19 what this -- and it's hard to know what this is.
20 It's not even a quotation, it's just sort of a
21 general thing.  I was probably talking in a
22 general sense.
23    Q.  Yeah, in a general sense, where
24 Dr. Croce's the only one who's being discussed

Page 157

1 about receiving grants, then you say grants are
2 being given to people who are not honest.  And
3 then it says on top of that, acts of fraud and
4 dishonesty.
5    Do you see anybody's name in the several
6 paragraphs that I just paraphrased other than
7 Dr. Croce's?
8    A.  No.
9    MR. NOLAN:  Object to form.  Give me a
10 chance -- object to form.  You can answer.
11    A.  No.  I did not write the article.
12    Q.  Farther below, couple paragraphs, it
13 says Sanders has a, quote, wait and see
14 attitude.  Do you see that?
15    A.  Yes.
16    Q.  Did you say that?
17    A.  Let me read what it says here.
18    Wait and see is not a quotation from me.
19 I believe that's just a -- I think that's just
20 a -- it's in quotations because it's a phrase.
21 I don't think that's a quotation of me.
22    Q.  All right.  I just want to be sure -- I
23 realize you didn't write this.
24    A.  Yes.

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 158

1    Q.  But sometimes we see quotations around
2  your words, and you agree that you did speak
3  them?
4    **A.  Yes.**
5    Q.  And then we see quotations around other
6  words that are words you're not sure or you
7  didn't speak?
8    **A.  Yes.**
9    Q.  Okay.
10   **A.  So -- yes.**
11   Q.  Let's go to Exhibit 1, please.  I don't
12  think you have that yet.
13      And, Doctor, if you wouldn't mind, take
14  a moment and read Exhibit 64 and let me know
15  when you're done.
16      (Pause in proceedings.)
17   **THE WITNESS:  Yes.**
18  BY MR. ARNOLD:
19   Q.  Do you recognize Exhibit -- Exhibit 64,
20  please?
21   **A.  Yes.**
22   Q.  This appears to be an exchange of
23  several e-mails with Mr. Glanz?
24   **A.  Correct.**

Page 159

1    Q.  And I assume when I see, From David A.
2  Sanders, you would agree that you obviously
3  wrote the text of that message?
4    **A.  Yes.**
5    Q.  If you wouldn't mind, go back to -- oh,
6  four or five pages back where the Bates stamped
7  number is DS1917.
8    **A.  Yes.**
9    Q.  And on the top of that page it says box
10  score.  Do you see that?
11   **A.  Yes.**
12   Q.  What did you mean by that?
13   **A.  I do not believe that's my box score.  I**
14  **believe that's Jim Glanz's box score.**
15   Q.  Do you know what he intended to convey
16  to you by using the term "box score"?
17   **A.  I think it was his list that he**
18  **generated.**
19   Q.  If we go to the first page of
20  Exhibit 64 --
21   **A.  Yes.**
22   Q.  -- it says, "Jim, I have attached my
23  list of 23 in which I have been involved along
24  with some comments."

Page 160

1      Do you see that?
2    **A.  Yes.**
3    Q.  Now, the 23 to which that refers is the
4  list of publications we see attached to this?
5    **A.  It could be.  I didn't -- if it -- what**
6  **I would have done is -- I did not generate this**
7  **list.  I might have said as a -- I think I**
8  **ticked off some things for him, but I didn't**
9  **actually generate these -- this information.**
10   Q.  Did Glanz provide it to you?
11   **A.  Yes.**
12   Q.  And then you just checked it for
13  validity?
14   **A.  I don't even -- I mean, I don't recall,**
15  **but this is -- I didn't write this -- you know,**
16  **the -- all these things here.**
17   Q.  Okay.  I appreciate that.  So the list
18  that starts at what says box score at the top is
19  a list that you --
20   **A.  You know, what may have -- may have**
21  **happened, he sent it to me and then I sent, you**
22  **know, there's this and this -- I think what**
23  **probably happened -- I don't know.  What**
24  **probably happened is he sent me a list, I marked**

Page 161

1  **off some ones that were, and maybe I may have**
2  **added some more.  But, for example, I had, you**
3  **know, nothing to do with this retraction that's**
4  **listed here.**
5    Q.  What are you referring to, David?
6    **A.  On Page 1921, this retraction, Are**
7  **circRNAs -- so I'm not sure -- I had nothing to**
8  **do with that and never claimed to have.**
9    Q.  Okay.  Slow down, if you wouldn't mind,
10  just one second.  What are you referring to on
11  Page 1921?
12   **A.  The last one, retraction, Genetics: Are**
13  **circRNAs involved in cancer pathogenesis?**
14      **I mean -- I think that's -- I had**
15  **nothing to do with that.**
16   Q.  Okay.
17   **A.  I don't -- several of these, I don't**
18  **recall any involvement.  I'm pretty sure this is**
19  **not my list.**
20   Q.  Okay.
21   **A.  That I did not generate that list.**
22   Q.  When did you first meet Mr. Glanz?
23   **A.  He came and visited me at Purdue.  I**
24  **don't recall the dates.  I don't recall.**

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 162

1    Q.  That's the question.  When?
2    **A.  I don't recall the date.**
3    Q.  Do you recall the year?
4    **A.  2016.**
5    Q.  Do you have Exhibit 6 yet?  If not, I'll
6    give that to you.
7    **A.  2015 or 2016.**
8    Q.  Okay.  Let me refer you to Exhibit 6,
9    Page 3.  And you'll see in the answer to
10   interrogatory Number 2, it says you met only
11   with Mr. Glanz and other individuals named or
12   understands to be affiliated with The New York
13   Times once in West Lafayette, Indiana, on
14   September 26-27, 2016, and once in New York
15   City.
16   **A.  It was 2016.**
17   Q.  Okay.
18   **A.  Those are -- those seem like the correct**
19   **dates.**
20   Q.  I hope so.  That's what you said they
21   were.
22       Was it a two-day conference with you and
23   Mr. Glanz; is that why it spanned 26-27?
24   **A.  I believe so, yes.**

Page 163

1    Q.  I assume he flew into -- at Indiana?
2    **A.  I do not know.**
3    Q.  When did you first meet him in Indiana?
4    I realize this is September 26th, according to
5    this answer, but where in West Lafayette?
6    **A.  I would have met him at my office, I**
7    **believe.  I -- I mean, I don't recall whether --**
8    **I don't recall when exactly.**
9    Q.  I assume you and he spoke on at least
10   several occasions before he came to West
11   Lafayette to meet with you?
12   **A.  Yes.**
13   Q.  Generally, what were those discussions
14   leading up to September 26th?
15   **A.  I mean, most of the exchange is by**
16   **e-mail.  The telephone were just things like**
17   **clarification or --**
18       (Telephone ringing.)
19   MR. NOLAN:  This is the Court.
20   MR. ARNOLD:  Go off the record.
21       (Discussion off the record.)
22   BY MR. ARNOLD:
23   Q.  I'm not sure exactly where we left off,
24   David, but I think we started with September

Page 164

1    26th and Glanz's arrival in West Lafayette.
2    When you first met with him, I think you said it
3    was at your office?
4    **A.  Correct.**
5    Q.  How long did you two meet the first time
6    you met each other at your office?
7    **A.  We probably spent the whole day -- I'm**
8    **not sure whether he came in the evening or came**
9    **in the evening and crashed before my actually**
10   **meeting him.  I don't recall.  But we spent much**
11   **of the day.**
12   Q.  Was it during the work week?
13   **A.  Yes.**
14   Q.  Okay.  Did you spend two days with
15   him -- because I see it says 26, 27 -- or did
16   you spend one day with him?
17   **A.  As I said, I think I recall a single day**
18   **that he came in, maybe late in the afternoon or**
19   **something like that, and I -- you know, didn't**
20   **actually see him, but that's when he came.**
21   Q.  Understood.  Okay.
22   **A.  Best of my recollection.**
23   Q.  All right.  I take it if you met most of
24   the day, you probably got together sometime in

Page 165

1    the morning --
2    **A.  Yeah.**
3    Q.  -- at your office?
4        And what was the purpose of your
5    meeting?
6    **A.  He wanted to see how western blots were**
7    **done.**
8    Q.  Did you show him?
9    **A.  Yes.**
10   Q.  How did you show him?
11   **A.  Well, I showed him the apparatus that**
12   **was used.  I had gels, I had paper, sort of**
13   **showed him all the steps and explained to him**
14   **how -- how it runs, what you do, where you**
15   **incubate things, stuff like that.**
16   Q.  That's a process that can take several
17   days or longer to create the form that will
18   ultimately result in western blots?
19   **A.  Normally one day.**
20   Q.  One day?
21   **A.  Yeah.**
22   Q.  Okay.  I've only watched it on YouTube.
23   **A.  Yeah?**
24   Q.  Yeah.  So he traveled a long way if

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 166

1  that's what he needed to do.
2      Was there anything else you and he did
3  other than you showed him how to make western
4  blots?
5      MR. NOLAN:  Let him finish.
6  **A. Yes.**
7  Q. What else?
8  **A. We discussed some of the images.**
9  Q. Do you recall what images?
10 **A. The WWOX.**
11 Q. Would it be appropriate for me to assume
12 that most of your conversation was about WWOX
13 with Mr. Glanz, in terms of specific papers?
14 **A. Yes, in terms of specific papers, yes,**
15 **that would be WWOX.**
16 Q. What did you and he discuss, best you
17 can recall?
18 **A. We discussed how I looked at the**
19 **figures. I mentioned to him that I used one of**
20 **the figures in a class and I had a PowerPoint,**
21 **and I showed him that PowerPoint. And he asked**
22 **me how would you describe this PowerPoint, and I**
23 **told him.**
24 Q. What did you tell him?

Page 167

1  **A. I told him I would put it up and ask**
2  **people to take a look at this, see if they saw**
3  **anything interesting.**
4  Q. And you do this in a sophomore biology
5  class?
6  **A. Yeah, it was -- I think it was my**
7  **protein expression class that -- oh, I don't**
8  **recall what years they are, but it was a -- it**
9  **was an undergraduate class.**
10 Q. I'll represent to you that the Times
11 article says your sophomore class.
12 **A. I can't be sure of that.**
13 Q. Don't know? Did you show him the
14 PowerPoint?
15 **A. Yes.**
16 Q. Do you still have the PowerPoint?
17 **A. Yes, I believe we've provided it in**
18 **discovery.**
19 Q. All right. Very good. What else, after
20 you talked about the PowerPoint and looked at
21 the PowerPoint, did you and Mr. Glanz do?
22 **A. You know, it's hard to understand how we**
23 **occupied the day, but we just talked about**
24 **that -- you know, we talked about other**

Page 168

1  unrelated things, but...
2  Q. Did you go to dinner together?
3  **A. I don't think so.**
4  Q. Did you go anyplace other than your
5  office with Mr. Glanz?
6  **A. We went to a classroom so we could show**
7  **a PowerPoint, and we went to my laboratory.**
8  Q. Did you exchange any documents with
9  Mr. Glanz when you met with him in West
10 Lafayette?
11 **A. I don't believe so. We exchanged quite**
12 **a few documents by --**
13 Q. E-mail?
14 **A. -- electronic mail, yes.**
15 Q. Did you spend two days with Mr. Glanz,
16 I'm unclear on that, or did you spend one day
17 with Mr. Glanz in West Lafayette?
18 **A. I recall one day. I cannot say there**
19 **weren't parts of a second day, but I recall one**
20 **day.**
21 Q. I heard you say earlier that most of
22 your communications with Mr. Glanz were via
23 e-mail?
24 **A. Correct.**

Page 169

1  Q. Since this litigation by Dr. Croce was
2  filed against you, have you spoken to Mr. Glanz
3  about the litigation?
4  **A. I have not -- yes, I spoke to him**
5  **immediately after the litigation.**
6      MR. NOLAN:  Answer the question.
7  **A. Yes.**
8  Q. I know you said immediately after the
9  litigation, but I assume -- was it by e-mail,
10 telephone call, personal --
11 **A. Telephone.**
12 Q. Did you call him?
13 **A. I don't recall.**
14 Q. What did you and he discuss?
15 **A. I believe I saw that -- that The**
16 **New York Times was being sued also.**
17 Q. Okay.
18 **A. And so he just said yep, you know, we're**
19 **being sued also. We don't think he has a case.**
20 Q. Anything else that you can remember in
21 that conversation that you can relate to me
22 today?
23 **A. No.**
24 Q. And you haven't spoken to him since that

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 170

1  conversation on the telephone?
2     A. No.
3     Q. We've mentioned PowerPoint presentations
4  a couple times. Once in connection with the
5  lectures outside of the university and now
6  you've mentioned one that you've given to a
7  class at the university.
8     A. Correct.
9     Q. Are -- is the PowerPoint presentation
10  the same for both or are they two different?
11     A. They're two different.
12     Q. Are there more than two, or are those
13  all of the PowerPoint presentations on images
14  that you are giving?
15     A. So -- yes, there are not more than two,
16  there's just -- there's two.
17     Q. Are you still giving that --
18     A. Yes.
19     Q. -- PowerPoint presentation to your
20  class?
21     A. No, no, I don't use it in my classes.
22     Q. Okay. Was there a reason you stopped
23  using it?
24     A. The classes that I'm teaching, that's

Page 171

1  not the relevant thing.
2     Q. Gotcha. All right.
3     Your answer to interrogatory 2, I think
4  it is in Exhibit 6, says you also met with
5  Mr. Glanz in New York City?
6     A. That's correct.
7     Q. And it indicates you were there for
8  other reasons on December 22, 2016?
9     A. That's correct.
10     Q. Why were you in New York?
11     A. I have family in New York.
12     Q. All right. Where did you -- did you
13  meet with Mr. Glanz personally?
14     A. Yes.
15     Q. Where at?
16     A. A restaurant.
17     Q. Which one?
18     A. I don't recall.
19     Q. I assume he picked it --
20     A. Yes.
21     Q. -- being a New York native?
22     A. Yes.
23     Q. Was it just for lunch or dinner?
24     A. It was dinner.

Page 172

1     Q. Did you and he discuss Dr. Croce in any
2  respect during that conversation?
3     A. I don't know. That wasn't -- I don't
4  know.
5     Q. You don't remember?
6     A. I don't remember.
7     Q. Tell me what you do remember about what
8  you and he discussed on December 22nd in
9  New York City.
10     A. He was there with his girlfriend and we
11  discussed Purdue Pharma I recall.
12     Q. Oxycodone?
13     A. Yes.
14     Q. Oxycodone?
15     A. Yes.
16     Q. Anything else that you can remember?
17     A. Probably my involvement in politics.
18     Q. Anything that I would care about?
19     A. I'm thinking -- I'm thinking. You know
20  my --
21     MR. NOLAN: Objection to form, and
22  foundation.
23     A. The most -- if there were anything, it
24  would be about if and when there was going to be

Page 173

1  an article published.
2     Q. Do you remember the date on which the
3  article was published?
4     A. It was in March 2017.
5     Q. Was it March 6th? Let's go to
6  Exhibit 1 -- I don't think we've got -- oh, we
7  do have 1. Okay. It's too small for me to
8  read. It might be March 8th.
9     A. Yes, that's right.
10     Q. How did you first become aware that the
11  article came out on March 8th?
12     A. I don't know.
13     Q. The New York Times has a daily report,
14  for lack of a better way to describe it, that I
15  get each morning about the news in the paper
16  that day. Do you get that?
17     A. I do not.
18     Q. And you have no recollection today as we
19  sit here how you first became aware that it got
20  published that day?
21     A. I do not.
22     Q. Do you remember understanding that it
23  came out on March 8th, whether or not you read
24  it that day?

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 198

1 published?
2   **A. I think the -- no, I don't. I don't.**
3   Q. Have I exhausted you about any
4 information with respect to passages that may
5 have been written by Dr. Croce that you believe
6 may have been plagiarized?
7   **A. I -- yes, I think so, yes.**
8        (Recess taken.)
9 BY MR. ARNOLD:
10   Q. Dr. Sanders, would you take Exhibit 1,
11 please. And I think I had asked you earlier
12 that you did not see any drafts of article [sic]
13 1 before it was published --
14   **A. No.**
15   Q. -- that's correct?
16   **A. That's correct.**
17   Q. We've talked about when you received it,
18 what you did with it after you did receive it.
19      I want to go through the article on
20 several locations to see what information you do
21 have about it. Let's turn to Page 2 of
22 Exhibit 1. And at the very top of the page it
23 says, quote, it's a reckless disregard for the
24 truth, close quote, Dr. Sanders said in an

Page 199

1 interview.
2      Do you see that?
3   **A. Yes.**
4   Q. Did you say that to Mr. Glanz?
5   **A. Yes.**
6   Q. What is "it's," when it says "it's a
7 reckless disregard for the truth?"
8   **A. That 3, 4, and 5 are not duplicated in**
9 **6, 7, and 8 in that figure.**
10   Q. That's the WWOX paper?
11   **A. Yes, the one that's right here.**
12   Q. Okay. After -- I assume you read this
13 article several times?
14   **A. Only once.**
15   Q. The original time you got it on March
16 8th?
17   **A. Yes.**
18   Q. Okay. Do you recall seeing the name of
19 any of the other research scientists in this
20 article other than Dr. Croce in connection with
21 the WWOX paper?
22   **A. I don't recall. I don't recall.**
23   Q. All right. There are photographs of
24 only Dr. Croce in this article, correct?

Page 200

1 Insofar as researchers are concerned.
2   **A. There's one of me, but yes.**
3   Q. Well, you're a research scientist, too,
4 aren't you?
5   **A. Yes, so it's --**
6   Q. All right. I stand corrected. Where
7 did -- where was that photo taken? It's on
8 Page 12 of Exhibit 1.
9   **A. New York City.**
10   Q. By whom?
11   **A. Victor Blue.**
12   Q. Was that somebody associated with
13 Mr. Glanz?
14   **A. He was associated with The New York**
15 **Times.**
16   Q. Okay. And Glanz is part of The Times?
17   **A. Yeah.**
18   Q. All right. This is the page where I see
19 it says, on the second sentence down, "He
20 teaches one of them to his sophomore biology
21 students as an example of scientific
22 misconduct."
23      That's where I picked up that it was to
24 your sophomore class. Would that be accurate or

Page 201

1 inaccurate?
2   **A. I -- I'm not sure it would be sophomore.**
3   Q. Okay. It says, as a predicate to that,
4 Dr. Croce's papers in a particularly direct
5 way -- well, let's start at the beginning.
6      "Dr. Sanders, the Purdue virologist,
7 tests his analysis of data falsification in
8 Dr. Croce's papers in a particularly direct way:
9 He teaches one of them to his sophomore biology
10 students as an example of scientific
11 misconduct."
12      Are those sentences sentences or
13 statements that you made to Dr. -- or to
14 Mr. Glanz?
15   **A. Those -- I mean, those aren't --**
16   Q. Not verbatim --
17   **A. -- quotations but I -- yes, I -- yes.**
18   Q. At any time when you spoke to Mr. Glanz
19 about this article did you ask him to include
20 the identity of some or all of the other
21 researchers who had also participated in the
22 authorship of these papers?
23   **A. I didn't make any requests to Mr. Glanz.**
24   Q. Did you use -- in the reverse of that,

PORTIONS CONFIDENTIAL

David Sanders
March 28, 2019

Page 214

1 a celebration, without regard to the level?
2 Only because I don't know.
3     **A. Is this on the record or off the record?**
4     Q. We can go off the record.
5     **A. Well, I prefer.**
6     Q. Okay. That's fine. Let's just go off.
7         (Discussion off the record.)
8 BY MR. ARNOLD:
9     Q. Understanding that this is a minor,
10 minor celebration, how was it that you ended up
11 in the same place with Mr. Weitzman? I mean are
12 there a connection or a relationship somewhere
13 that brought you both to the same barbecue?
14     **A. I guess we have mutual friends.**
15     Q. Okay. Is that what the connection was?
16     **A. Yeah.**
17     Q. All right. Can you recall anything else
18 that Mr. Weitzman said to you at that barbecue
19 about Dr. Croce?
20     **A. That's pretty much the -- the crux of**
21     **the matter.**
22     Q. Okay. Thank you. Do you know what
23 Mr. -- or Dr. Weitzman teaches at Penn State?
24     **A. He's at University of Pennsylvania, not**

Page 215

1 at Penn State.
2     Q. Oh, I'm sorry. That will really offend
3 someone.
4     **A. Yes.**
5     Q. What does he teach -- what's he a
6 professor of? Don't know?
7     **A. I don't know.**
8     Q. Okay. Is that a complete summary of all
9 the people from whom you've gotten what
10 Mr. Glanz refers to as tips about Dr. Croce?
11     **A. Yeah.**
12     Q. The seminar and Professor Weitzman?
13     **A. Yeah.**
14     Q. Okay. It goes on to say, in quotes, a
15 lab that is engaging in violating scientific
16 norms is being rewarded for that very effort.
17         Do you see that?
18     **A. Yes.**
19     Q. Did you say those words?
20     **A. I believe so, yes.**
21     Q. And to whom -- whose lab were you
22 referring?
23     **A. I was referring to the people -- the**
24     **co-authors of Dr. Croce.**

Page 216

1     Q. Which co-authors?
2     **A. On the papers that I was concerned**
3     **about.**
4     Q. At the time, was it just WWOX?
5     **A. Oh, no.**
6     Q. By that time, it had grown?
7     **A. That's correct.**
8     Q. Can you give me the names of the
9 co-authors that you were referring to when you
10 said, "A lab that is engaging in violating
11 scientific norms is being rewarded for that very
12 effort?"
13     **A. I was concerned about obviously the**
14     **Fabbri paper, Garofalo papers, Pichiorri papers,**
15     **Iorio papers.**
16     Q. Okay. When you said that, did you
17 intend to imply Dr. Croce's lab?
18     **A. Yes. I mean -- yes.**
19     Q. Okay. So it wasn't just the co-authors
20 that you just identified, it was Dr. Croce as
21 well?
22     **A. I'm talking about the lab. I -- when we**
23     **talk about the lab, it includes all the -- the**
24     **co-authors, too. I didn't -- I, for example,**

Page 217

1 **would not have known Iliopoulos was not a member**
2 **of his lab.**
3     Q. Fabbri wasn't part of it either, was he?
4     **A. Fabbri was part of the lab.**
5     Q. Was?
6     **A. Yes. Huebner is not part of the lab.**
7     **I -- you know, you see authors that are**
8     **associated over and over again, they all say**
9     **Ohio State, you sort of make the assumption that**
10     **these are --**
11     Q. All right. Well, so --
12     **A. -- lab members. Whether or not it's all**
13     **under Dr. Croce's control, but these are lab**
14     **members.**
15     Q. Okay. And were all the coauthors
16 that you just identified part of Dr. Croce's
17 lab? Fabbri, Garofalo, Iorio, and Pichiorri?
18     **A. I know that three of them are, but**
19     **according to -- according to the OSU documents,**
20     **Iorio spent a substantial amount of time in --**
21     **in Croce's lab.**
22     Q. They all did, didn't they, spend time --
23     **A. Oh, yes. Yes.**
24     Q. So the lab to which you're referring is

PORTIONS CONFIDENTIAL

Page 218

1  Dr. Croce's lab?
2     **A. These are co-authors of Dr. Croce. As I**
3  **said, we have Iliopoulos, we have Huebner, we**
4  **have Semba also. I didn't know that -- you**
5  **know, these were the people -- what I mean by**
6  **the lab is the people who are common co-authors**
7  **at Ohio State with Dr. Croce.**
8     Q. And it was Dr. Croce's lab?
9     **A. I don't know.**
10    Q. You don't know that those individuals
11 worked in what was known as Dr. Croce's lab?
12    **A. No, I don't know. I don't know.**
13    Q. About midway down on Page 13, it says,
14 "The Times showed the paper to four experts in
15 the forensic analysis of images in research
16 papers, and all agreed that the blots had almost
17 certainly been duplicated by the authors."
18       Do you see that?
19    **A. I do, thank you.**
20    Q. Do you know who the experts were to whom
21 The Times showed the papers?
22    **A. I do not.**
23    Q. Have you ever seen their analyses of
24 those images?

Page 219

1     **A. I have not.**
2     Q. Did Glanz ever tell you about the
3  results of those analyses other than what we see
4  here on Page 13 of Exhibit 1?
5     **A. I believe -- yes.**
6     Q. Would -- would that have been via
7  e-mail, or did you have an oral communication?
8     **A. I don't recall.**
9     Q. Do you know to whom he was referring
10 here on Page 13 as the authors in that
11 paragraph?
12    **A. I'm sorry, where are we?**
13    Q. "The Times showed the paper to four
14 experts."
15    **A. Ah.**
16    Q. And in the last part it says have been
17 duplicated by the authors.
18    **A. I don't know what he means by that.**
19    Q. Okay. Did he ever tell you?
20    **A. No.**
21    Q. Let's go to Page 14, please, Doctor.
22 There's a paragraph that starts with Dr. Bik,
23 B-I-K.
24    **A. Do you want me to take a look at it?**

Page 220

1     Q. Please.
2     **A. Yes.**
3     Q. In the second sentence of that paragraph
4  it refers to a box score. Do you see that?
5     **A. Yes.**
6     Q. We've seen papers from Glanz referring
7  to your box score as well. Was that his
8  terminology?
9     **A. It's his box score and his terminology,**
10 **correct.**
11    Q. All right. You did not create what you
12 thought was a box score of the allegations
13 against Dr. Croce?
14    **A. I did not.**
15    Q. All right. Let's go on to Exhibit 2.
16 I'm sorry, we're going to go to Exhibit 45
17 first. Do you recognize Exhibit 45?
18    **A. No, but...**
19    Q. At least the beginning e-mail appears to
20 be from you, from your Purdue e-mail address,
21 and sent to Mr. Glanz.
22    **A. The e-mail at the bottom, yes.**
23    Q. Yes. It says, "Jim, something will be
24 coming from me from a different address in a

Page 221

1  moment as you requested. David."
2     **A. Yes.**
3     Q. What was the different address?
4     **A. I assume it's my political address or**
5  **my --**
6     Q. Do you have a --
7     **A. Or my city council address.**
8     Q. Oh, different e-mail addresses depending
9  upon the station that you're occupying?
10    **A. Correct.**
11    Q. What was it that he had requested that
12 you were sending from a different address?
13    **A. It was some sort of resolution having**
14 **nothing to do with this. It's -- I forgot**
15 **whether -- it may even have been a Senate**
16 **resolution for all I know.**
17    Q. He does mention in his response
18 something about a resolution.
19    **A. Yes. So that was -- that's what**
20 **we're -- that's why it would have come from**
21 **another address. It would have come -- yes.**
22    Q. From your city council address?
23    **A. Yes.**
24    Q. What was that?

David Sanders
May 06, 2019



Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3           CAUSE NO. 2:17-cv-00338

4    CARLO M. CROCE,                    )
                                        )
5           Plaintiff,                  )
                                        )
6           -vs-                        )
                                        )
7    DAVID SANDERS,                     )
                                        )
8           Defendant.                  )

9

10

11             DEPOSITION OF DAVID SANDERS

12

13       The deposition upon oral examination of
     DAVID SANDERS, a witness produced and sworn before me,
14   Megan M. Bowman, Notary Public in and for the County of
     Marion, State of Indiana, taken on behalf of the
15   Plaintiff, at at WEST LAFAYETTE PUBLIC LIBRARY, 208 West
     Columbia Street, Board Room, West Lafayette, Indiana, on
16   Monday, May 6, 2019, scheduled to commence at 9:00 a.m.,
     pursuant to the Federal Rules of Civil Procedure with
17   written notice as to time and place thereof.

18

19

20

21

22

23

24

25

David Sanders
May 06, 2019

**Page 2**

```
 1        A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
 3
            James E. Arnold
 4       JAMES E. ARNOLD & ASSOCIATES, LPA
         115 West Main Street
 5       Suite 400
         Columbus, Ohio 43215
 6       614.460.1610
         jarnold@arnlaw.com
 7
 8   FOR THE DEFENDANT:
 9
            Kara M. Kapke
10       BARNES & THORNBURG, LLP
         11 South Meridian Street
11       Indianapolis, IN 46204
         317.236.1313
12       kara.kapke@btlaw.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                  INDEX OF EXAMINATION
 2
 3   DIRECT EXAMINATION.......................   4
        Questions by James E. Arnold
 4
 5
 6                  INDEX OF EXHIBITS
 7
     Exhibit No.:
 8
 9   Exhibit  4 - Questions for Prof Carlo Croce & .   43
                  Ohio State University, 11/23/16
10   Exhibit  7 - Email from David Sanders to .....   61
                  Dr. Fedor, 6/6/14
11   Exhibit 15 - Email from Ivan Oransky to David .   63
                  Sanders, 4/16/15
12   Exhibit 20 - Email from David Sanders to ......   65
                  Alexandra Newton, 5/1/15
13   Exhibit 23 - Email from David Sanders to ......   66
                  Young Ren, 9/18/16
14   Exhibit 25 - Email from David Sanders to ......   69
                  James Glanz, 11/9/16
15   Exhibit 28 - Email from David Sanders to ......   71
                  Hasem Habelhah, 7/25/16
16   Exhibit 41 - Email from David Sanders to ......   73
                  James Glanz, 1/9/17
17   Exhibit 51 - Email from David Sanders to ......   40
                  Rafaello Mancini, 5/24/17
18   Exhibit 52 - Email from Willem Stoorvogel to ..   38
                  David Sanders, 6/15/17
19   Exhibit 53 - Email from David Sanders to ......   37
                  Renee Schroeder, 6/16/17
20   Exhibit 55 - Email from David Sanders to ......   36
                  Tycho Jupiter Jaquish, 11/20/16
21   Exhibit 57 - Email from Daivd Sanders to ......   28
                  "someone", 12/1/16
22   Exhibit 58 - Email from David Sanders to ......    5
                  "someone"
23   Exhibit 59 - Email from Jeff Settlement to ....   59
                  David Sanders, 7/18/15
24   Exhibit 63 - Email from Ronald Kalil to David .   57
                  Sanders, 3/15/17
25   Exhibit 67 - Email with subject line "Bruno ...   12
                  Calabretta Research"
```

**Page 4**

1  (Time noted:  9:02 a.m.)
2       DAVID SANDERS,
3  having been duly sworn to tell the truth, the whole
4  truth, and nothing but the truth relating to said
5  matter, was examined and testified as follows:
6
7      (All exhibits had been previously marked.)
8  DIRECT EXAMINATION
9      QUESTIONS BY JAMES E. ARNOLD:
10 Q   Dr. Sanders, welcome back.
11 A   Thank you.
12 Q   I'm just going to try to pick up where we left off
13     so that we can be as efficient as possible.  I've
14     put in front of you what's already been marked as
15     Exhibit 58, which appears to me to be an email from
16     someone to you; correct?
17 A   Correct.
18 Q   And we see two blacked-out portions there, which
19     I'm assuming were the names of the person or
20     persons to whom it was -- or from whom it came?
21 A   Correct.
22 Q   Do you know who it was who sent this to you?
23 A   I'm not sure.
24 Q   Was there -- all right.  Let's go back then.  How
25     many people did you have review images and/or text

**Page 5**

1      in connection with your work with Dr. Croce's
2      papers?
3  A   Two.
4  Q   Would I be correct that this would have come from
5      one of those two people?
6  A   Yes.
7  Q   What are the names of the two people?
8  A   I --
9      THE WITNESS:  Did the Court finally decide?
10     MS. KAPKE:  Yes.
11     MR. ARNOLD:  Yes.
12 A   Okay.  I didn't know that.  So it was Tyler Jaquish
13     and Sofronici -- what's her first name?  It escapes
14     me.
15 Q   How do you spell her last name?
16 A   S-O-F-R-O-N-I-C-I.
17 Q   Sofronici?
18 A   Yeah.
19 Q   We'll just call her "Ms." for now.
20 A   Yeah.
21 Q   Did you have anybody other than Mr. Jaquish and
22     Ms. Sofronici examine any text or images on your
23     behalf that were in any way related to Dr. Croce's
24     papers?
25 A   You know, as I've mentioned, I've displayed things

Page 46

1  experiment in figures for unrelated experiments,
2  exercises little oversight when colleagues engage
3  in those practice for papers on which Dr. Croce is
4  an author."
5 A  **I'm sorry. I'm lost here.**
6 Q  It starts with the paragraph that says
7  "considering."
8 A  **Okay. Yes.**
9 Q  And then the last phrase says, "And routinely
10  plagiarizes or allows to be plagiarized, text from
11  papers written by other authors."
12  Did you provide any of that information to him?
13 A  **No. I didn't write this.**
14 Q  I understand you didn't write it, but did you
15  provide the source of the information from which
16  this was written?
17  MS. KAPKE:  Object to form.
18 A  **I did not write this.**
19 Q  Did you tell him that Dr. Croce routinely
20  plagiarizes or allows to be plagiarized text from
21  papers written by other authors?
22 A  **I provided information on images and text.**
23 Q  **What information did you provide Glanz on images?**
24 A  **That'd be in a number of papers there were**
25  **duplications or manipulations.**

Page 47

1  MS. KAPKE:  Aren't we getting into a lot of
2  stuff we've already covered?
3  MR. ARNOLD:  No.  I've never talked about
4  Exhibit 4 before today.
5  MS. KAPKE:  Yeah.  But you talked in length
6  about what he talked about with Glanz.
7  MR. ARNOLD:  Yeah.  And I've got more to ask
8  about what he talked about to Glanz with this paper
9  specifically.  I'm not trying to re-ply ground.
10 BY MR. ARNOLD:
11 Q  Did you ever tell Mr. Glanz that Dr. Croce's
12  laboratory routinely handles experimental data
13  improperly in form or substance?
14 A  **No.  I -- no.**
15 Q  Did you ever tell him that Dr. Croce's laboratory
16  routinely uses data duplicated from one experiment
17  in figures for unrelated experiments?
18 A  **No.**
19 Q  In the next paragraph, it says, "Dr. Sanders
20  argues, because in his observation the image
21  fabrication, duplication and mishandling, and
22  plagiarism in Dr. Croce's papers is routine."
23  Did you, in form or substance, say something
24  like that to Mr. Glanz?
25 A  **In form or substance?**

Page 48

1  MS. KAPKE:  Do you understand the question?
2 A  **I understand.  The problem is that there are**
3  **multiple phrases.**
4 Q  That's fair.  Let me break it up.  Did you ever say
5  that, in your observation, image fabrication in
6  Dr. Croce's papers is routine?
7 A  **As a quotation?  Or as -- I'm trying to understand**
8  **here.**
9 Q  You know what I'm asking.  I don't need the precise
10  words.  But did you suggest --
11 A  **I -- I.**
12 Q  Let me finish.
13  That Dr. Croce engages in routine image
14  manipulation or fabrication?
15 A  **No.  I did not say that.**
16 Q  So when Mr. Glanz says that you argue that, he's
17  lying?
18 A  **I'm answering the question you asked precisely.**
19 Q  Then Mr. Glanz, when he says you argue that
20  Dr. Croce engages in image fabrication routinely,
21  is not being truthful?
22  MS. KAPKE:  I'll object to form because I think
23  it misstates --
24 A  **It isn't what it says.**
25 Q  Tell me what you think it says.  How do you read

Page 49

1  the words, "Dr. Sanders argues in his
2  observations --
3 A  **Okay.  So I read, "Dr. Sanders argues."  And then**
4  **that "Dr. Croce is knowing."  That's the sentence,**
5  **and then there's a parenthetical part in the middle**
6  **of it.**
7  **So the sentence actually says, "Dr. Sanders**
8  **argues that Dr. Croce...is knowingly engaged in**
9  **scientific misconduct and fraud."  That's the**
10  **actual statement.**
11 Q  Did you say that?
12 A  **I did not say that.**
13 Q  What did you say then that would lead him to write,
14  "Dr. Sanders argues that Dr. Croce...is knowingly
15  engaging in scientific misconduct and fraud"?
16 A  **I have argued that, when one is presented with**
17  **evidence of -- when one is responsible for an**
18  **article and presented with evidence that there is**
19  **data manipulation or fabrication or duplication, if**
20  **one does -- denies that against the evidence, that**
21  **that is a new form of misconduct.**
22 Q  So defending oneself against an allegation of
23  significant misconduct is itself a violation of
24  scientific misconduct?
25 A  **When the evidence is overwhelming, yes.**

David Sanders
May 06, 2019

Page 50

1  Q    So each time an allegation of plagiarism is made
2    and one denies it, that constitutes a new event of
3    scientific misconduct?
4  A    In the case that there is actually plagiarism.
5  Q    So if there are repeated denials of plagiarism in
6    the face of accusations, then each one of those
7    constitutes a new event of misconduct; is that
8    correct?
9  A    If it is a false -- if one is saying something
10    falsely.  If one's -- if there is a new false
11    statement, it is a new form of misconduct.
12  Q    No.  I'm talking about the same statement.  Let's
13    assume phrase one is what you allege is plagiarism.
14    And one of the authors is accused of plagiarism in
15    connection with phrase one and the denial.  That
16    constitutes a new event of research misconduct,
17    according to you?
18        MS. KAPKE:  Object to form.
19  A    If it's not -- if it is untrue -- if there is
20    plagiarism, then yes.  It is a new form of
21    misconduct.
22  Q    Okay.  And repeated denials of it being plagiarism
23    in and of itself creates new events of misconduct?
24  A    Yes.
25  Q    Okay.  When it says, "Dr. Sanders argues that

Page 51

1    Dr. Croce has knowingly engaged in scientific
2    misconduct and fraud," did you argue that with
3    Mr. Glanz?
4  A    I'll just repeat my statement.  I made the
5    statement that, if you are presented with, you
6    know, incontrovertible evidence of an image
7    duplication and you were responsible, to, you know,
8    deny it is a new form of misconduct.
9  Q    Did you accuse any of the other authors of
10    Dr. Croce's -- strike that.
11        Did you accuse any of the other authors
12    identified as authors of papers in which Dr. Croce
13    was also identified as an author of having engaged
14    in scientific misconduct or fraud?
15  A    I believe everybody on the paper is responsible.
16  Q    Do you know why it was only Croce's name that
17    appears in Exhibit 4?
18  A    No.  I do not know.
19  Q    Do you recall specifically naming any of the other
20    authors of a paper in which Dr. Croce was
21    identified as an author in any conversation you had
22    with Mr. Glanz?
23  A    Yes.
24  Q    Which ones?
25        MS. KAPKE:  We're retrying old ground.

Page 52

1        MR. ARNOLD:  I read the deposition transcript
2    this morning.
3  A    Fabri, Pichiorri, Garofalo, Gaspreni, Gian,
4    Kondereli.
5  Q    You mentioned all of these people to Glanz?
6  A    Yes.
7  Q    Do you ever wonder why he didn't mention any of
8    them in this paper?
9  A    No.
10  Q    By the paper I mean the New York Times article?
11  A    No.
12  Q    If you turn the page to page 2 of Exhibit 4,
13    numbered paragraph four where it says, "In one
14    case, Dr. Sanders alleged that Dr. Croce and
15    collaborators committed extensive plagiarism."
16        Did you say that to Glanz?
17  A    I allege that there was extensive plagiarism in
18    that article.
19  Q    To Glanz?
20  A    Yes.
21  Q    Okay.  Numbered paragraph six.  It says Mr. --
22    three lines down, it says, "I have consulted two
23    experts in forensic analysis of scientific images
24    who agree that this is probably correct."
25        Do you know the identity of the experts

Page 53

1    consulted by Mr. Glanz?
2  A    I do not.
3  Q    Next page, on page 3, paragraph 11, it says, "In
4    the 'Alternate Resolution' described in a letter to
5    Dr. Whitacre from Dr. Robert Bornstein in
6    July 2013, it is noted that the first authors
7    (under Dr. Croce's supervision) of the following
8    two papers admitted to widespread mishandling,
9    mistakes, duplication and other problems with the
10    published data."
11        Did you provide him any information regarding
12    those authors in the mishandling or mistakes or
13    duplication?
14  A    2013, no.
15  Q    Do you know how -- strike that.  Did Mr. Glanz ever
16    tell you how he got a letter from Dr. Bornstein
17    written to Dr. Whitacre?
18  A    No.
19        MS. KAPKE:  Do you want a break?
20        THE WITNESS:  No.
21  Q    You know the rules.  If you ever need one, just say
22    so.
23  A    No.  I'm fine.
24  Q    Of the two students you had reviewing articles of
25    which Dr. Croce was identified as an author, do you