# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **CARLO M. CROCE** | : | |
| | : | **Case No. 2:17-cv-00338** |
| **Plaintiff,** | : | |
| | : | **Judge James L. Graham** |
| **vs.** | : | |
| | : | **Magistrate Judge Preston Deavers** |
| **DAVID A. SANDERS** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT DAVID A. SANDERS'
## MOTION FOR SUMMARY JUDGMENT
———————————————————————

Defendant David A. Sanders respectfully moves this Court for summary judgment on all claims raised by Plaintiff Carlo M. Croce.  For the reasons set forth in the accompanying Memorandum In Support and exhibits thereto, Sanders is entitled to judgment as a matter of law on all of Plaintiff's claims and to the recovery of attorneys' fees.

Respectfully submitted,

*/s/ William A. Nolan*
William A. Nolan (No. 0041891)
Barnes & Thornburg LLP
41 S. High Street, Suite 3300
Columbus, Ohio  43215
(614) 628-0096
(614) 628-1433 (facsimile)
bill.nolan@btlaw.com

Kara Kapke (*Admitted Pro Hac Vice*)
11 South Meridian Street
Indianapolis, Indiana  46204
(317) 231-6491
(317) 231-7433 (facsimile)
kara.kapke@btlaw.com

*Attorneys for David A. Sanders*

**COMBINED TABLE OF CONTENTS AND SUMMARY OF ARGUMENT
PURSUANT TO LOCAL RULE 7.2(a)(3)**

Page

I.  **Undisputed Material Facts**.................................................................................................. 1

II.  **Argument**............................................................................................................................. 6

Sanders is entitled to judgment in his favor because Croce cannot satisfy the elements of a defamation claim with respect to any of the statements he alleges Sanders made.  The complained-of statements represent Sanders' opinion, are capable of an innocent construction, are true or substantially true, and were not made with actual malice. Further, under the Indiana anti-SLAPP statute, meant to protect free speech, Sanders is entitled to attorneys' fees.

A.  **Choice of Law**............................................................................................................. 7

Ohio and Indiana law are very similar with respect to defamation claims in most material respects, and Sanders is entitled to summary judgment under either state's law. Regardless of the state law applying to Croce's defamation claim, however, Indiana's anti-SLAPP statute applies to Sanders' defense under the doctrine of dépeçage, which provides "different issues within a single case may be governed by the laws of different States." *C.B. Fleet Co. v. Colony Specialty Ins. Co.*, 2013 U.S. Dist. LEXIS 64961, at *22 (N.D. Ohio May 7, 2013); *see also Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1035 (N.D. Ill. 2013), *aff'd*, 791 F.3d 729 (7th Cir. 2015) (citing cases and explaining that "the plaintiff's defamation claims and defendant's anti-SLAPP defenses need not be governed by the same state's laws"). Indiana, where Sanders resides and where his speech originated, has a strong interest in having its own anti-SLAPP law applied to protect the speech of its own citizens.

B.  **Standard of Review**.................................................................................................... 10

Summary judgment is a particularly important tool in cases involving the freedom of speech; it is "especially appropriate in the First Amendment area."  *See, e.g., Dupler v. Mansfield*

*Journal Co.*, 413 N.E.2d 1187, 1191 (Ohio 1980). Indeed, the issues here, like whether a statement

is a verifiable fact or protected as an opinion, present a questions to be resolved as a matter of law.

**C. None of the statements Croce alleges against Sanders represent actionable defamatory statements of fact. ......................................................................................................... 11**

    **1. Glanz Letter............................................................................................................. 11**

        **a. Statement 1a: "routine" image fabrication, duplication and mishandling ....... 12**

Image fabrication, duplication and mishandling, and plagiarism undoubtedly *did* occur

within Croce's papers. *Croce v. New York Times Co.*, 345 F. Supp. 3d 961 (S.D. Ohio 2018),

*aff'd*, 930 F.3d 787, 795 (6th Cir. 2019), ("Although the article notes instances of corrections to

Dr. Croce's articles due to, for example, errors in data, those statements are true."). Croce admits

as much. The reasonable reader would take Statement 1a to mean that these problems occurred in

Croce's papers more than a few times—and the evidence shows it happened nearly two dozen

times. In any event, Sanders' use of the word routine reflects his opinion, not a verifiable or

quantifiable fact. *Wampler v. Higgins*, 752 N.E.2d 962, 979-80 (Ohio 2001).

        **b. Statement 1b: misconduct ...................................................................................... 15**

Statement 1b is not a statement of fact, but rather represents a statement of opinion about

what constitutes scientific misconduct. The way Glanz posits the question to Croce confirms this:

Glanz says: "Dr. Sanders argues – because [A] and [B] – that Dr. Croce knowingly engaged in

scientific misconduct and fraud." The phrasing "Dr. Sanders argues" is significant; Glanz does not

claim Sanders is making a *statement* that there was misconduct, but rather that Sanders is *arguing*

that there is misconduct. *See, e.g.*, *Trebilcock v. Elinsky*, 2006 U.S. Dist. LEXIS 6495, at *17-18

(N.D. Ohio Feb. 21, 2006) ("use of the word 'contended' renders the statement an opinion").

Additionally, the reasonable reader would not understand Sanders' references to "misconduct" or

"fraud" as pointing to specific research misconduct standards from the federal government, but rather as Sanders' rhetorical hyperbole, frustration, and opinion.

**2.** *New York Times* **article** ............................................................................................ **21**

**a. Statement 2a: reckless disregard** ........................................................................ **21**

In claiming that "it's" a reckless disregard for the truth, Sanders was referring specifically to the PNAS paper's duplication of images in Figure 1*B*, and how the authors of that paper refused to retract it when confronted with the duplication. Sanders Dep., Vol I at 199:6-11; Glanz Decl. at ¶ 8. Sanders did not single out Croce here, but rather was speaking about the paper, including all individuals who were listed as authors. *E.g.*, Glanz Decl. at ¶ 8; Sanders Dep., Vol. II, at 51:15 ("I believe everybody on the paper is responsible."). In this sense, Sanders' statement is capable of an innocent construction that he is *not* defaming Croce specifically. *See, e.g.*, *Conway v. Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers*, 209 F. Supp. 2d 731, 759 (N.D. Ohio 2002) (charges of corruption against a union are not defamatory against the union's leader because the statement can be innocently construed to refer to someone other than the union's leader), *aff'd*, 93 F. App'x 780 (6th Cir. 2004). In any event, what constitutes a "reckless disregard for the truth" is not a verifiable statement of fact, but a legal opinion from a non-lawyer that is non-actionable. *E.g.*, *Scotts Co. LLC v. Liberty Mut. Ins. Co.*, 606 F. Supp. 2d 722, 772 (S.D. Ohio 2009) (insurer's statements on a legal question were "in the nature of an expression of [its] position or opinion regarding the completeness of the policies, not statements of fact").

**b. Statement 2b: scientific norms** .......................................................................... **23**

Here again, Sanders is not speaking about Croce specifically, but about practices within a laboratory, and therefore the statement is capable of an innocent construction—that individuals under Croce who produced papers with errors were violating scientific norms and being rewarded for that effort, even though Croce himself did not contribute to those errors. Moreover, this

statement is substantially true, and it represents Sanders' opinion that errors matter, and results should not overshadow sloppiness.

**3.      Local article** ................................................................................................... **24**

Given the prior *New York Times* publication, any harm that resulted from the *challenged* statements Sanders made to the local reporter was nominal or non-existent, and not actionable because of the incremental harm doctrine. *See Ferreri v. Plain Dealer Publishing Co.*, 756 N.E.2d 712, 723 (Ohio Ct. App. 2001).

**a.      Statement 3a** ............................................................................................ **28**

This statement is not a direct quote from Sanders. After a lede about how whistleblowers may face repercussions, the reporter writes, "But that didn't stop Sanders from alleging that Dr. Carlo Croce, a prominent cancer researcher at Ohio State University, falsified data or plagiarized text in more than two dozen articles Croce has authored." Aside from the fact that many articles in which Croce is listed as a co-author *do* contain plagiarism or data manipulation, Sanders' view— that Croce is responsible for plagiarism or data manipulation occurring in papers in which he is a co-author, even if he did not directly commit the act—constitutes non-actionable opinion.

**b.      Statements 3b, 3c, and 3d** ...................................................................... **28**

These statements all relate to the 2013 JEM article and come from the following: "If you wanted to just make up data you could do it in a way that's much more difficult to detect, but they didn't because they were able to get away with this relatively simple manipulation. They continued to do it over and over again." Sanders' point is that whoever is responsible for the duplication— using the same image four times in what was supposed to be different experimental conditions— could have used a control from an unpublished experiment and gone completely undetected. "They" does not refer specifically to Croce; it refers to the authors of the paper. Given the retraction

iv

and correction of the original paper and additional confirmation of separate image errors, these statements are substantial true, and reflect Sanders' opinion about the image manipulation.

**D. Sanders did not act with the requisite level of fault.................................................... 30**

As a limited purpose public figure, Croce must prove that Sanders acted with *actual malice*. "A defamation plaintiff who is required to show actual malice must demonstrate, with convincing clarity, that the defendant published the defamatory statement either with actual knowledge that the statement was false, or with a high degree of awareness of its probable falsity." *Varanese v. Gall*, 518 N.E.2d 1177, 1180 (Ohio 1988). Sanders has never harbored doubt that what he said is true, which warrants dismissal. *See Underwager v. Salter*, 22 F.3d 730, 735-736 (7th Cir. 1994) ("Scientific controversies must be settled by the methods of science rather than by the methods of litigation. More papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us.").

**E. Indiana law similarly provides for the dismissal of claims against Sanders. ............ 33**

Indiana law is similar to Ohio's, with one distinct exception: Indiana's Anti-SLAPP statute provides that Sanders may recover attorneys' fees. *See* IND. CODE § 34-7-1-1 to -10. Indiana courts have awarded defendants in defamation cases hundreds of thousands of dollars in attorneys' fees where a defendant lawfully raises an issue of public concern. *See, e.g.*, *Containment Techs. Group, Inc. v. Am. Society of Health Sys. Pharmacists*, 2009 U.S. Dist. LEXIS 76270 at *20 (S.D. Ind. Aug. 26, 2009) (awarding attorney fees to academic journal and authors of peer-reviewed article critiquing plaintiff's product). Talking with reporters about errors in scientific publications such as those found in JEM 2013 or PNAS is undoubtedly an act in furtherance of constitutional free speech on an issue of public interest, *i.e.*, scientific integrity and analysis about cancer research.

**Conclusion .......................................................................................................................... 35**

### *UNREDACTED* MEMORANDUM IN SUPPORT[1]

Dr. Carlo M. Croce, a cancer researcher at The Ohio State University and the plaintiff in *Croce v. New York Times Co.*, 345 F. Supp. 3d 961 (S.D. Ohio 2018), *aff'd*, 930 F.3d 787 (6th Cir. 2019), brings this defamation action against Dr. David Sanders, one of the sources *Times* reporters used for the article.  Croce's claims against Sanders fare no better than his claims against the *Times* did.  Sanders is entitled to judgment in his favor because Croce cannot satisfy the elements of a defamation claim with respect to any of the statements he alleges Sanders made.

### I.    Undisputed Material Facts

As this Court is familiar with the basic outline of facts involving Croce and the *Times* article, the following undisputed material facts represent an abbreviated overview of the litigation.  Additional facts are provided within each argument.

Dr. Carlo M. Croce is a prolific cancer researcher, self-described as a "pioneer of research" responsible for "revolutionary innovations" in cancer treatment.  *See* Second Amended Complaint, Dkt. 21 ("SAC"), ¶ 5.  His work has brought him "generational fame" and numerous prestigious awards.  *Id.* ¶¶ 6, 48; *see also id.* ¶ 71.  He is "one of the most cited scientists in the entire world" through what is known as the "H index," and he has the highest H index of any Italian scientist ever.  Excerpts from Deposition of Carlo Croce, attached as Ex. 1 ("Croce Dep."), at 12:20 to 13:3;

---

[1] Defendant David A. Sanders, pursuant to Southern District of Ohio Local Rule 5.2.1(a) and the parties' Agreed Protective Order (Dkt. 18), has sought leave from the Court to, at least conditionally, submit under seal this *unredacted* Memorandum In Support of Motion for Summary Judgment and certain exhibits attached thereto.  Contemporaneous with this filing, Sanders is serving this unredacted version and exhibits on Croce, and will await direction as to how Sanders should submit the same to the Court.  Sanders has not taken a position on whether the subject exhibits—which were designated confidential by Croce—are actually worthy of being maintained under seal.  If the Court finds they are not, he asks that the exhibits be permitted to be filed publicly.  In any event, regardless of whether the Court ultimately considers the exhibits Croce has designated as confidential, Sanders' Motion for Summary Judgment should be granted based upon the public and undisputed evidence as set forth herein, establishing that Sanders is entitled to judgment as a matter of law.

1

*see also id.* at 47:22 to 49:7. Croce's work "changed the way of thinking" about cancer research, *id.* at 14:19-21, which led to not only changing the field of oncology, but "it changed medicine," *id.* at 18:10-12. He has received the Dan David Prize, splitting a million dollars, which is "[o]ne of the most prestigious prize[s] in the world." *Id.* at 30:2-20. He received the title "Cavaliere di Gran Croce" from the President of Italy, which is like being knighted. *Id.* at 32:1-25. He has been identified as "the number one" of the "stars of the research" among Italian scientists in published articles depicting his legacy and work. *Id.* at 217:10 to 218:14.

Dr. David Sanders is an Associate Professor at Purdue University in the Department of Biological Sciences. For many years, a major focus of his research and speaking has been the ethics of scientific publication and strengthening peer review of grant applications and journal articles. Declaration of David Sanders, attached as Ex. 2 ("Sanders Decl."), at ¶ 2; *see also* Excerpts from the Deposition of David Sanders, attached as Ex. 3 ("Sanders Dep."), at Vol. I, 13:1 to 14:14, 23:4-12, 104:20-22 (mentioning his lectures on the arsenic bacteria case, which involved a criticized paper Sanders argued should have been retracted); David Sanders, *Despite refutation, Science arsenic life paper deserves retraction, scientist argues*, RETRACTION WATCH (July 9, 2012), https://retractionwatch.com/2012/07/09/despite-refutation-science-arsenic-life-paper-deserves-retraction-scientist-argues/. Sanders scrutinizes publications that come to his attention as possible instances of duplication, data manipulation, and/or plagiarism and, where appropriate, raises these issues through the appropriate channels with the publications. Sanders Decl. at ¶ 2.

Specific to papers in which Croce is a co-author, Sanders has notified journals of instances of possible duplication, data manipulation, and/or plagiarism within about two dozen papers. As Croce admits, by the end of 2017, withdrawals or corrections had been made in 13 papers that report scientific research done in his laboratory and which were written by him or those performing

research under his supervision. *See* Croce Interrogatory Responses, attached as Ex. 4 ("Croce Rog."), at p. 5, Ex. A. Additionally, another 15 papers in which Croce is also listed as a co-author have had retractions, withdrawals, or corrections. *Id.* at 5, Ex. B. At least one correction has occurred after Croce submitted his interrogatory responses. *See* Correction, *CpG island hypermethylation-associated silencing of non-coding RNAs transcribed from ultraconserved regions in human cancer*, ONCOGENE (2019) 38:765-766, attached as Ex. 5. Further, twice journals have issued "expressions of concern" regarding papers in which Croce is a co-author. Croce Rog. at 6, Ex. D.

One of those "expressions of concern" relates to what is known as the "WWOX" paper, published in PNAS in 2005, for which Croce is listed as the last author. *See* Fabbri et al., *WWOX gene restoration prevents lung cancer growth in vitro and in vivo*, PNAS 102(43):15611-6, attached as Ex. 6 (original paper) and PNAS 114(16):E3365, attached as Ex. 7 (expression of concern). The journal editors noted, "Fig. *1B*, B-actin panel, appears to have duplicated bands." *Id.*, Ex. D. The *New York Times* specifically referenced this paper in its story about Croce as well, including a graphic that overlayed lanes 3, 4, and 5 of Fig. 1*B* on top of lanes 6, 7, and 8 of Fig. 1*B* to illustrate the duplication. The printed version of the *New York Times* article is available at Docket 11-1 and attached as an Exhibit to the Declaration of James Glanz, which is attached hereto as Ex. 8 ("*Times* article"). The online version of the article is available at https://www.nytimes.com/2017/03/08/science/cancer-carlo-croce.html and includes a dynamic graphic with movement.

Notably, in response to numerous questions about the WWOX paper—including from people other than Sanders—Croce and his co-authors urged PNAS, the journal in which the article was published, *not* to include "editorial expressions of concern" related to the paper. Croce's

position, through his lawyers, was that the experiment in the PNAS paper, specifically Figure 1B, had been reproduced; therefore, "even if there were an error in the construction of the control/beat-actin panel, it was harmless."  Feb. 2, 2017 Letter, attached hereto as Ex. 9.  Before the *New York Times* article had been published, but after Glanz had sent Croce a letter requesting his response to various allegations, including those from Sanders (*see* Nov. 23, 2016 Letter, attached hereto as Ex. 10), Croce corresponded with his co-authors about the WWOX paper, noting how Sanders "has no H index (I have H index of 201 and am one of the most cited scientists in the world)."  Dec. 5, 2016 Email, attached hereto as Ex. 11, at 1.  Another response similarly mentioned Sanders and Croce's H indexes, noting that "the paper is just fine!!" and should not be withdrawn or corrected.  Dec. 12, 2016 Letter, attached hereto as Ex. 12.  His co-author Fabbri noted that "every so often someone goes back to this allegation," that the image was duplicated, so he proposed a letter to the journal.  *Id.*  In fact, allegations had been made about the WWOX paper in 2014, well before Sanders spoke with Glanz.  June 28, 2014 Email, attached hereto as Ex. 13; *see also* Dec. 5, 2019 Email at 4.  Croce responded to earlier anonymous criticisms about possible image duplication in a separate article by noting to the editor, "Clearly we are dealing with a mentally deranged person who should be recovered in a mental institution.  I suggest Editors should request the authorities, FBI in USA and comparable organization in UK to do an investigation."  Dec. 3, 2012 Email, attached hereto as Ex. 14, at 2.

Following the publication of the *New York Times* story, Sanders spoke with a local reporter at the Lafayette Journal-Courier, Meghan Holden, for about thirty minutes.  Sanders Dep., Vol. I, at 151:14 to 152:13.  Holden published her story in the Lafayette Journal-Courier on or about March 23, 2017 (two weeks after the *New York Times* article); the Journal-Courier is an affiliate of the USA Today network.  The article is available at Docket 11-2 and attached as Exhibit 15; it

is available online at https://www.jconline.com/story/news/college/2017/03/22/purdue-biologist-calls-out-cases-scientific-misconduct/99449866/.

The bulk of Sanders' conversation with the Journal-Courier reporter concerned a second article with image duplication in which Croce is listed as the last author, referred to as "2013 JEM." *See* Pichiorri et al., *In vivo NCL targeting affects breast cancer aggressiveness through miRNA regulation*, J. EXPERIMENTAL MED. 210(5) 951-68, attached as Ex. 16 (original article) and J. EXPERIMENTAL MED. 214(5):1557, attached as Ex. 17 (correction).  As noted in the correction, "the RNU6 loading control panels shown in Fig. 1 (E and F) were incorrect as a result of an error in figure presentation during the final production process."  *Id.*  Specifically, the lanes in the RNU6 blot in Figure 1E are identical to lanes 2-4 in the RNU6 blot in Figure 1F, even though Figures 1E and 1F are purported to represent different experimental conditions.  Sanders discussed with Holden how he believed there were additional errors, even in the correction.  Specifically, he believed that the corrected Figure 1E reused the same data, but just flipped it horizontally, so that in the original the lanes were in 1-2-3 order, but in the corrected Figure 1E, they are now 3-2-1.  Sanders believed the corrected Figure 1F in 2013 JEM is identical to the left four lanes of the RNU6 blot in Figure 1E of a different paper—Pichiorri et al., *Downregulation of p53-inducible microRNAs 192, 194, and 215 impairs the p53/MDM2 autoregulatory loop in multiple myeloma development*, CANCER CELL 18(4):367-81, attached as Ex. 18 (original article) and Cancer Cell 30(2):349-351, attached as Ex. 19 (correction).  As Sanders explained, whoever submitted the correction "could have put some other random bands from some other thing that they had never used before and one would not have been able to detect it," but because Sanders is, as he admitted, "embarrassed to say some part of [his] brain has blots permanently burned into them," he noticed

the image duplication.  Sanders Dep., Vol. I, at 134:4-5, 154:3-8; *see generally id.* at 126:11 to 135:8; 150:2 to 153:20 (discussing Pichiorri articles).

Sanders relies on his visual observation and good memory to notice errors in scientific papers like those in which Croce is listed as an author.  Beyond that, Sanders professes strong opinions that the types of errors that warranted corrections in those papers violate scientific norms. Sanders Decl. at ¶ 3.  He also believes that the type of data manipulation seen in, for example, Pichiorri JEM and the WWOX paper, combined with the authors' response to the journals raising issues with the papers, is itself a new form of misconduct.  *See* Sanders Dep., Vol. II, at 49:16-21; Sanders Decl. at ¶ 10.

In speaking with reporters about the papers in which Croce is listed as an author, Sanders never claimed that Croce himself manipulated an image or wrote plagiarized text.  Sanders Dep., Vol. I, at 124:3-6, 138:19-22; Sanders Dep., Vol. II, at 48:4 to 49:21; Sanders Decl. at ¶ 7.  Rather, Sanders believes all co-authors are responsible for errors in published papers.  To the reporters he spoke with, Sanders expressed his opinions based on his visual observation of errors and his beliefs relating to scientific integrity.  Sanders Decl. at ¶ 10.  Sanders did not say anything he believed to be false, and he had no reason—and still has no reason—to believe that anything he said was false, nor did he suspect or have any indication that any of the statements he made to them may have been false.  *Id.* at ¶¶ 11-12.

## II.    Argument

Croce's claims against Sanders fail as a matter of law for numerous reasons, including that the complained-of statements represent Sanders' opinion, are capable of an innocent construction, or are true or substantially true.  Additionally, Croce does not present any evidence—much less the required clear and convincing evidence—that Sanders acted with any fault, let alone the actual

malice necessary in this case because Croce is a public figure. Finally, Sanders is entitled to attorneys' fees under the Indiana Anti-SLAPP Act.

### A. Choice of Law

At the outset, both Ohio and Indiana law may govern this action. To determine what state's laws govern an issue, Ohio looks to the state with the "most significant relationship." *Curl v. Greenlee Textron, Inc.*, 404 F. Supp. 2d 1001, 1007 (S.D. Ohio 2005). The court begins with the presumption that "the law of the place of injury controls," and that presumption is rebutted where "another jurisdiction has a more significant relationship to the lawsuit." *Sirlouis v. Four Winds Int'l Corp.*, 2012 U.S. Dist. LEXIS 43347, at *15 (N.D. Ohio Mar. 29, 2012) (quoting *Morgan v. Biro Mfg. Co.*, 15 Ohio St. 3d 339, 474 N.E.2d 286 (1984)). It considers principles under Section 6 of the Restatement: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."

In Croce's prior lawsuit against the *New York Times*, Ohio law applied. *See, e.g.*, *Croce v. New York Times Co.*, 930 F.3d 787, 792 (6th Cir. 2019). The choice-of-law analysis is more difficult as to Croce's claims against Sanders, as Sanders' actions took place in Indiana, not Ohio. Sanders is a professor at Purdue University in Indiana. *New York Times* reporter Jim Glanz came to Purdue to meet Sanders, visiting his laboratory, learning about Western blots, and discussing the WWOX paper. Sanders Dep., Vol. I, at 161:22 to 166:19. Other than that meeting in Indiana, Sanders primarily corresponded with Glanz over email or the telephone—from his home or office in Indiana. *Id.* (Glanz and Sanders also met socially for dinner once in New York City when

Sanders was there for other reasons; this conversation was *after* Glanz had sent Croce the letter requesting a response to various allegations against Croce and primarily focused on topics unrelated to Croce. *Id.* at 171:3 to 173:4.) From Sanders' perspective, the jurisdiction with the most significant relationship to the lawsuit is Indiana.

Ultimately, because Ohio and Indiana law are very similar with respect to defamation claims in most material respects, and Sanders is entitled to summary judgment under either state's law, the choice-of-law analysis matters primarily with respect to whether Sanders can recover attorneys' fees. Croce's lawsuit is a strategic action against public participation, or SLAPP suit. Indiana, unlike Ohio, has an anti-SLAPP statute with a fee-shifting provision. Indiana courts have awarded defendants in defamation cases hundreds of thousands of dollars in attorneys' fees whenever, like here, a defendant lawfully raises an issue of public concern. *See, e.g.*, *Containment Techs. Group, Inc. v. Am. Society of Health Sys. Pharmacists*, 2009 U.S. Dist. LEXIS 76270 at *20 (S.D. Ind. Aug. 26, 2009) (awarding attorney fees to academic journal and authors of peer-reviewed article critiquing plaintiff's product).

Even if the Court applies Ohio law instead of Indiana law to determine whether Croce has met the elements of his claim of defamation, Indiana's anti-SLAPP statute still applies under the doctrine of dépeçage. Dépeçage allows for the law of two different states to apply to different aspects of claims and defenses. "Ohio apparently recognizes a principle known as 'dépeçage,' which holds that different issues within a single case may be governed by the laws of different States." *C.B. Fleet Co. v. Colony Specialty Ins. Co.*, 2013 U.S. Dist. LEXIS 64961, at *22 (N.D. Ohio May 7, 2013); *see also Bramberger v. Toledo Hosp.*, 897 F. Supp. 2d 587, 597 (N.D. Ohio 2012) ("[C]ase law indicates that 'Ohio law recognizes the doctrine of "depecage" which provides for the application of different states' laws to different claims.'" (quoting *Sirlouis*, 2012 U.S. Dist.

LEXIS 43347, at *4 n.2).  "Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states." *Sirlouis*, 2012 U.S. Dist. LEXIS 43347, at *12 n.2 (quoting Restatement (Second) of Conflict of Law § 145 cmt. d.).

Dépeçage has often been invoked in defamation cases to use the law of the state in which the plaintiff was injured to determine if the plaintiff met the elements of the action, but the law of the defendant's residence to determine what defenses are available.  In other words, Ohio law determines whether Croce has stated a claim, but Indiana law governs Sanders' defenses, including the anti-SLAPP statute.  *See, e.g.*, *Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1035 (N.D. Ill. 2013), *aff'd*, 791 F.3d 729 (7th Cir. 2015) (citing cases and explaining that "the plaintiff's defamation claims and defendant's anti-SLAPP defenses need not be governed by the same state's laws").  For example, in *Diamond Ranch Acad., Inc. v. Filer*, 117 F. Supp. 3d 1313 (D. Utah 2015), a youth facility in Utah brought a defamation suit against a California website creator, who moved to dismiss under California's anti-SLAPP rule.  Because Utah has adopted dépeçage—"the widely approved process whereby the rules of different states are applied on the basis of the precise issue involved"—the court parsed issues, such that Utah law governed whether the plaintiff was defamed, but California law governed whether the speaker's actions were privileged.  Because the speaker resided in California and the speech occurred in California, California had a more significant relationship to the defense, particularly because California, like Indiana, has a strong interest in having its own anti-SLAPP law applied to protect the speech of its own citizens. *Id.* at 1322-23.  This interest is particularly strong when the speech, as it did here, originates in the speaker's state of residence. *Chi v. Loyola Univ. Med. Ctr.,* 787 F. Supp. 2d 797, 803 (N.D. Ill. 2011) (holding same) ("A state has a strong interest in having its own anti-SLAPP

law applied to the speech of its own citizens, at least when, as in this case, the speech initiated within the state's borders.").

## B.  Standard of Review

Summary judgment is a particularly important tool in cases involving the freedom of speech; it is "especially appropriate in the First Amendment area."  *See, e.g.*, *Dupler v. Mansfield Journal Co.*, 413 N.E.2d 1187, 1191 (Ohio 1980); *Fadell v. Minneapolis Star & Tribune Co.*, 425 F. Supp. 1075, 1085 (N.D. Ind. 1976) (summary judgment "is a singularly important factor in the protection of freedom of the press from libel suits"), *aff'd*, 557 F.2d 107 (7th Cir. 1977), *cert. denied*, 434 U.S. 966 (1977).

Croce must establish his defamation claims with clear and convincing evidence.  *See, e.g.*, *Celebrezze v. Dayton Newspapers, Inc.*, 535 N.E.2d 755 (Ohio 1988) (clear and convincing standard applies to all elements of a defamation cause of action).  Even in actions involving private figures, the private-figure plaintiff must prove fault—that the defendant "failed to act reasonably in attempting to discover the truth or falsity or defamatory character of the publication"—with clear and convincing evidence.  *Landsdowne v. Beacon Journal Publishing Co.*, 512 N.E.2d 979, 984 (Ohio 1987).

Many of the issues raised in this motion must be decided by the Court as a matter of law.  For example, whether a statement is a verifiable factual statement or protected as an opinion presents a question of law for the court.  *E.g.*, *Wampler v. Higgins*, 752 N.E.2d 962, 977 (Ohio 2001).  Likewise, whether a person is a limited-purpose public figure within the field of discussion presents a question of law for the court.  *E.g. Young v. The Morning Journal*, 717 N.E.2d 356, 358-59 (Ohio Ct. App. 1998); *see also Falls v. The Sporting News Publishing Co.*, 714 F. Supp. 843, 846-47 (E.D. Mich. 1989), *aff'd*, 899 F.2d 1221 (6th Cir. 1990).  Similarly, application of the

10

incremental harm doctrine is decided as a matter of law. *Ferreri v. Plain Dealer Publishing Co.*, 756 N.E.2d 712, 723 (Ohio Ct. App. 2001). On any factual issues, the existence of a disputed issue of material fact "must be guided by the substantive evidentiary standards that apply to the case." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986) (clear and convincing evidence of disputed fact must be shown in defamation cases governed by actual malice standard). Further, the "question of whether there is sufficient evidence in the record to permit a finding of actual malice is a question of law." *Cobb v. Time, Inc.*, 278 F.3d 629, 637 (6th Cir. 2002).

## C. None of the statements Croce alleges against Sanders represent actionable defamatory statements of fact.

To state a claim for defamation, Croce must prove with "convincing clarity" five elements: "First, there must be the assertion of a false statement of fact; second, that the statement was defamatory; third, that the false defamatory statement was published by defendants; fourth, that the publication was the proximate cause of the injury to the plaintiff; and fifth, that the defendants acted with the requisite degree of fault." *Celebrezze*, 535 N.E.2d at 759. Here, Croce cannot establish a genuine issue of material fact with respect to several of these elements under the ordinary standard of review, let alone the "rigorous constitutional standard of proof by 'clear and convincing evidence'" warranted by protections under the First Amendment to the U.S. Constitution and the Ohio Consititution. *E.g.*, *Kilcoyne v. Plain Dealer Publishing Co.*, 678 N.E.2d 581, 586 (Ohio Ct. App. 1996). As such, Sanders is entitled to summary judgment.

### 1. Glanz Letter

Croce argues that Sanders defamed him to James Glanz, a reporter for the *New York Times*. Sanders admittedly spoke to Glanz about papers in which Croce was listed as a co-author and the obvious mistakes Sanders had found within them, explaining why he believed the actions of the

11

authors of those papers—in particular, in denying the errors to journals—was problematic. Glanz then wrote Croce with the following:

> Dr. Sanders argues – because in his observation the image fabrication, duplication and mishandling, and plagiarism in Dr. Croce's papers is routine, and because the authors routinely dispute those allegations when confronted with them through the journals – that Dr. Croce is knowingly engaging in scientific misconduct and fraud. Does Dr. Croce disagree with the allegation, and if so, why.

Croce first alleges (**Statement 1a**) that "image fabrication, duplication and mishandling, and plagiarism in Croce's papers is routine" is a defamatory false statement of fact. Croce Rog at 3; SAC at ¶ 34. Croce does not claim that "because the authors routinely dispute those allegations when confronted with them through the journals" is a false statement. Croce then alleges that the opinion that Sanders comes to as a result of those two points—a knowing engagement of scientific misconduct and fraud—represents a false statement of fact (**Statement 1b**). Croce Rog. at 3; SAC at ¶ 36. Both statements in the Glanz letter do not give rise to a defamation cause of action because they are either (1) true or substantially true, (2) not statements of fact, but rather opinions, (3) not defamatory and capable of an innocent construction, or (4) not made with actual malice.

### a. Statement 1a: "routine" image fabrication, duplication and mishandling

First with respect to **Statement 1a**, image fabrication, duplication and mishandling, and plagiarism undoubtedly *did* occur within Croce's papers. *See, e.g.*, *Croce,* 930 F.3d at 795 ("Although the article notes instances of corrections to Dr. Croce's articles due to, for example, errors in data, those statements are true."). Croce admits that in this litigation. Croce Rog. at 5-6, Exs. A, B, and D; Croce Dep. at 168:19-25; SAC at ¶¶ 24-31. Even prior to Sanders' discussions with reporters, Retraction Watch and other websites had flagged numerous articles in which Croce is listed as a co-author as being problematic.[2]

---

[2] *See, e.g.*, Ivan Oransky, *Retractions 3 and 4 appear for researcher facing criminal probe; OSU co-author won't face inquiry*, Retraction Watch (May 15, 2014), https://retractionwatch

To the extent that Croce argues he is not "responsible" for the errors in the articles, Sanders did not attribute blame on Croce for the actual image manipulation, data re-use, or plagiarism—he simply noted that Croce was a co-author on the papers or the papers originated out of Croce's lab.  *See* Sanders Decl. at ¶ 7; Sanders Dep., Vol. I, at 138:19-22 ("I have not made allegations against Dr. Croce for falsification or fabrication.  I have said that there is fabrication or falsification in these papers.").  Glanz confirmed that in his discussions with Sanders, Sanders did not single out Croce or any other author as being the person responsible for imagine manipulation or plagiarism.  Glanz Decl. at ¶ 8.  Rather, Sanders opined, consistent with industry norms, that all co-authors who are directors of laboratories and senior researchers have a particular responsibility for an article.  *See id.*; Sanders Dep., Vol. II, at 51:15 ("I believe everybody on the paper is responsible."); *see also* Expert Report of Tiffany McKerahan, attached hereto as Ex. 20 (discussing responsibility of all individuals who agree to be listed as an author of a scientific paper).  Glanz singled out Croce because he was reporting on Croce and his lab, and his letter and eventual reporting included many more things besides Sanders' allegations.  Glanz Decl. at ¶ 10; *see also* Glanz Letter and *New York Times* article, discussed in *Croce,* 345 F. Supp. 3d at 992, and attached as Exs. 10 and 8.

---

.com/2014/05/05/third-and-fourth-retractions-appear-for-cancer-researcher-fusco-facing-criminal-investigation/; Shannon Palus, *When does "overlap" become plagiarism? Here's what PLOS ONE decided*, RETRACTION WATCH (Sept. 16, 2016), https://retractionwatch.com/2016/09/16/when-does-overlap-become-plagiarism-heres-what-plos-one-decided/; Dalmeet Singh Chawla, *Cancer biologist says Nature journal "censored" his News & Views, retracts it*, RETRACTION WATCH (Oct. 10, 2016), http://retractionwatch.com/2016/10/10/cancer-biologist-says-nature-journal-censored-his-news-views-retracts-it/; *see also* Anonymous Comments on *WWOX gene restoration prevents lung cancer growth in vitro and in vivo*, PUBPEER: THE ONLINE JOURNAL CLUB (comments dated Jan 10, 2014, Mar. 10, 2015, Mar. 11, 2015, Nov. 7, 2015), https://pubpeer.com/publications/16223882; Anonymous Comments on *MiR-494 is regulated by ERK1/2 and modulates TRAIL-induced apoptosis in non-small-cell lung cancer through BIM down-regulation*, PUBPEER: THE ONLINE JOURNAL CLUB (comments dated May 13, 2014, May 15, 2014, June 30, 2015, Nov. 7, 2015), https://pubpeer.com/publications/23012423.

The crux of Croce's argument with respect to Statement 1a is that the image fabrication, duplication and mishandling, and plagiarism was excusable, because it did not happen *that* frequently out of the thousands of papers Croce has published.  SAC at ¶ 48.  Croce also argues that the allegations of plagiarism are not *really* plagiarism, because the papers simply copied general text from prior papers coming out of the same lab.[3]  These arguments do not make Statement 1a any less true, and certainly do not rebut the idea that the statement was substantially true.  *See Croce,* 345 F. Supp. 3d at 982-83, 987 & n.5 and cases cited therein (discussing substantial truth).  The reasonable reader would take Statement 1a to mean that image fabrication, duplication and mishandling, and plagiarism had occurred in Croce's papers more than a few times—and the evidence shows it happened more than a dozen times.  The reasonable reader would not do a percentage calculation of the number of papers with errors compared to the total number of papers published, or expect a threshold number to be met before errors are considered "routine."  Or, put another way, the use of the term "routine" can be innocently construed against the actual number of errors within papers in which Croce is listed as a co-author.

Croce's claim against Sanders for Statement 1a fails for two additional reasons.  Sanders certainly believed—whether as a matter of opinion or as a matter of fact—that the errors in Croce's papers were routine.  In this sense, his use of the word "routine" could be considered his opinion.

---

[3] Despite Croce's argument concerning "*self*-plagiarism," certain papers listing him as an author *have* actually been corrected for copying text from papers coming out of *other* labs and not listing Croce as an author.  *See, e.g., Correction: MiR-34a/c-Dependent PDGFR-α/β Downregulation Inhibits Tumorigenesis and Enhances TRAIL-Induced Apoptosis in Lung Cancer*, PLOS ONE (June 25, 2015), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0131729 (acknowledging "overlap in text" from six different prior publications); Correction for Jeon et al., A set of NF-κB–regulated microRNAs induces acquired TRAIL resistance in Lung cancer, PNAS (Mar. 21, 2017), https://www.pnas.org/content/114/12/E2542 (acknowledging "discussion overlap with text from other articles" and citing six different prior publications); *Correction for Gasparini et al., Protective role of miR-155 in breast cancer through RAD51 targeting impairs homologous recombination after irradiation*, PNAS (Mar. 7, 2017), https://www.pnas.org/content/114/10/E2065 (same as to five different prior publications).

His opinion is that a few errors—even out of a large corpus of publishing works from Croce's lab—are nonetheless inexcusable, and thus a few errors can be considered "routine."  Whether something rises to the level of "routineness" is a matter of opinion, not a verifiable or quantifiable fact.  *E.g.*, *Wampler,* 752 N.E.2d at 979-80 ("standardless statements not amenable to objective proof or disproof" represented opinions; noting the "obvious potential for quashing or muting First Amendment activity . . . when juries attempt to assess the truth of a statement that admits of no method of verification" (quoting *Ollman v. Evans*, 750 F.2d 970, 981-82 (D.C. Cir. 1984)).  A grieving widow, victim to medical malpractice, might think a surgeon's errors are routine, even if the surgeon has only erred twice in a distinguished career.  Sanders' opinion is that the errors— which now number about two dozen—in papers in which Croce is listed as an author occur more than one would expect to see.  That the errors occurred is not questioned; that those errors are routine *either* represents Sanders' opinion *or* the statement is substantially true.

Finally, if "routine" somehow did convey an objective fact that were not substantially true, Croce has no evidence that Sanders acted with actual malice or even negligence.  Sanders believes—and continues to believe—that the errors in Croce's papers were routine.  For all of these reasons, Statement 1a is not actionable as a matter of law.

### b.  Statement 1b: misconduct

Sanders is entitled to summary judgment with respect to **Statement 1b** for similar reasons. First, Statement 1b is not a statement of fact, but rather represents a statement of opinion about what constitutes scientific misconduct.  The way Glanz posits the question to Croce confirms this: Glanz says: "Dr. Sanders argues – because [A] and [B] – that Dr. Croce knowingly engaged in scientific misconduct and fraud."  What Croce does not do is challenge [A] and [B]—there *were* errors in his papers, and he *did* argue with journals about some of those errors.  *See* Croce Dep. at

59:17 to 60:3, 81:18 to 82:25, 168:19-25; Apr. 24, 2015 Email, attached hereto as Ex. 21; Jan. 26, 2017 Email, attached hereto as Ex. 22. He takes issue with Sanders' opinion and conclusion as a result of those errors—but that is precisely a matter of opinion.

As this Court knows, whether a statement constitutes protected opinion or actionable fact, depends on the totality of circumstances, including factors such as the specific language used, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared. *E.g.*, *Bentkowski v. Scene Magazine*, 637 F.3d 689, 693 (6th Cir. 2011) (citing *Vail v. The Plain Dealer Publ'g Co.*, 72 Ohio St. 3d 279, 281, 649 N.E.2d 182, 185 (Ohio 1995)). All of these factors suggest the statement represented Sanders' *opinion*.

The specific language used in Glanz's letter supports an opinion. The phrasing "Dr. Sanders argues" is significant; Glanz does not claim Sanders is making a *statement* that there was misconduct, but rather that Sanders is *arguing* that there is misconduct. *See, e.g.*, *Trebilcock v. Elinsky*, 2006 U.S. Dist. LEXIS 6495, at *17-18 (N.D. Ohio Feb. 21, 2006) ("use of the word 'contended' renders the statement an opinion"). Further, Glanz invites Croce to challenge Sanders' opinion about the idea that, in Sanders' view, [A] and [B] combine to constitute scientific misconduct and fraud by asking if Croce "disagrees with" Sanders' opinion. Such framing is an "an implicit acknowledgement that there is room for differing viewpoints." *Croce,* 345 F. Supp. 3d at 992.

Next, the idea that errors, combined with the denial of those errors, constitutes misconduct is not a verifiable statement. Sanders and Glanz do not refer to a specific definition of misconduct here, but rather a value judgment about what is right and wrong in scientific research. Sanders has repeatedly confirmed this position. First, in his answer, he specifically noted that his remarks were his opinions and reflected his "stance" on what constitutes misconduct. *See* Answer ¶ 31, Defenses

¶ 8; *see also Croce,* 345 F. Supp. 3d at 992.  Likewise, during his deposition, Sanders confirmed that he has "argued that, when one is presented with evidence of . . . data manipulation or fabrication or duplication, if one does – denies that against the evidence, that that is a new form of misconduct."  Sanders Dep. Vol. II, 49:16-21.  Further, even beyond the face of the letter, Glanz has confirmed that Sanders was making a value judgment based on Sanders' "own sense of what he believed to be sound, ethical conduct."  Glanz Decl. at ¶ 11.

Value judgments are not verifiable.  *See, e.g.*, *Croce,* 345 F. Supp. 3d at 989-90 (statements that "make judgments about consensus, bounds and norms that aren't well enough defined to prove or disprove" are opinions), *id.* at 992 (imprecise and non-verifiable statements are value-laden opinions); *Adams v. Coughlan*, 2015 U.S. Dist. LEXIS 7278, at *3 (S.D. Ohio Jan. 22, 2015) (letter noting "unprofessional" and "suspect" attorney conduct reflected opinion the conduct was unprofessional); *Roberts v. Murawski*, No. C-060741, 2007-Ohio-3555, at *19 (Ohio Ct. App. July 13, 2007) (statements were opinion because they merely questioned plaintiff's business ethics and professionalism and were not provable); *see also Wampler*, 752 N.E.2d at 965, 974-76 (confirming that nonmedia defendants may invoke the Ohio Constitution's independent protection for opinions).  Likewise, the reasonable reader would not understand Sanders' references to "misconduct" or "fraud" as pointing to specific research misconduct standards from the federal government, but rather as Sanders' rhetorical hyperbole, frustration, and opinion.  He was using the words in their "vernacular, non-legal sense" as a "vigorous epithet"—such words are not actionable defamation.  *E.g.*, *Matalka v. Lagemann*, 486 N.E.2d 1220, 1223 (Ohio Ct. App. 1985).  The Ohio rule protecting opinions is broader than the federal one, but even under the narrower federal rule, courts "have consistently held that when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment."  *E.g.*, *Sarkar v. Doe*, 897 N.W.2d

207, 229 & n. 18 (Mich. 2016) (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995). That is, when a speaker like Sanders outlines the [A] and [B] necessary to support a conclusion [C], the conclusion [C] is considered an opinion protected under the First Amendment.

With respect to the last two factors of the *Vail* test, nothing in the context of the Glanz letter suggests Statement 1b appeared as Sanders making factual assertions rather than his opinion. Statement 1b appeared in a letter asking for Croce's response to Sanders' opinion. It was not published as factual investigative journalism; instead, it was published only to a "targeted audience to gather information" and "seek responses and information." *Croce,* 345 F. Supp. 3d at 991. Sanders did not suggest that he had inside information about the errors within the papers; he just noticed the errors from his visual observation of the immunoblots and made value judgments inviting Glanz and others to draw the same conclusions he did, based on his visual observations and what journals reported to him about the authors denying the errors—precisely the type of factor weighing against actionability. *See Rothschild v. Humility of Mary Health Partners*, 840 N.E.2d 258, 266 (Ohio Ct. App. 2005) (where speaker does not imply he has any undisclosed facts to support his opinion but "leap[s] to the conclusion" based on facts he does disclose, statement is not actionable).

An "author's reputation" should also be considered in evaluating the context of an allegedly defamatory statement, such that an opinion columnist is more likely to offer opinions than statements of fact. *E.g.*, *Vail,* 649 N.E.2d at 186. Sanders has a reputation as scientist-politician who makes broad opinion statements about ethics, personal responsibility, free speech, and scientific norms[4]; he published and spoke about his opinions regarding misconduct in scientific

---

[4] *See, e.g. Random Samples: Three Q's*, 328 SCIENCE 5984 (June 11, 2010), *available at* https://science.sciencemag.org/content/328/5984/r-samples.full; *Sanders makes third run for House seat*, 18 WLFI (Jan. 21, 2010), https://web.archive.org/web/20100128164421/http://www.wlfi.com/dpp/news/local/Sanders-makes-third-run-for-house-seat; David Sanders, *Op-ed: Principles we*

journals before he had ever noticed problems in papers of which Croce is listed as an author.[5] The published *New York Times* article refers to him as a "freelance ethicist," and the local article notes how Sanders had previously accused a different scientist of "bad behavior." Exs. 8, 15. Sanders' first exchange with Glanz notes Sanders' prior history of pointing out when a scientific paper "willfully misinterprets and misreports its own data" in a paper that had nothing to do with Croce. Sanders Dep., Vol. II, at 73:9 to 75:8; Ex. 41 thereto, attached hereto as Ex. 23. Sanders' reputation as a "source" is that of an opinionated scientist prone to speak in value judgments, not an expert on what constitutes misconduct.

When Sanders spoke to Glanz, Sanders made specific claims about certain scientific papers—claims Croce cannot challenge—and then gave broader value-laden opinions to Glanz about what the errors in those papers and the denials of those errors meant. Glanz "understood Dr. Sanders to be expressing his own sense of what he believed to be sound, ethical conduct." Glanz Decl. at 11. The entirety of the context surrounding Sanders' belief confirms that Statement 1b is therefore a non-actionable opinion.

The innocent construction rule also undergirds dismissal of claims relating to Statement 1b. *See Boulger v. Woods*, 917 F.3d 471, 483 (6th Cir. 2019) (relying on innocent construction rule to dismiss claims when none of the factors tipped the scale either to a statement of fact or opinion). Sanders alleged that authors of papers with errors (including Croce) committed violations of Sanders' own personal ethical standards by not forcefully owning up to the errors,

---

*must keep at Purdue*, Journal & Courier (Mar. 3, 2017), http://www.jconline.com/story /opinion/readers/2017/03/03/op-ed-principles-must-keep-purdue/98678406/.

[5] David Sanders, *Despite refutation, Science arsenic life paper deserves retraction, scientist argues*, Retraction Watch (July 9, 2012), https://retractionwatch.com/2012/07/09/despite-refutation-science-arsenic-life-paper-deserves-retraction-scientist-argues/; Carmen Drahl, *Two Studies Rebut Arsenic-Based Life*, 90 Chemical & Engineering News 29 (July 16, 2012), https://cen.acs .org/articles/90/i29/Two-Studies-Rebut-Arsenic-Based.html.

but Sanders never referred to specific standards of misconduct or imputed criminal activity.  *See Holley v. WBNS 10TV, Inc.*, 2002-Ohio-4315, ¶ 35, 149 Ohio App. 3d 22, 28, 775 N.E.2d 579, 584 (2002) (rejecting defendant's argument that word "abduction" necessarily connoted a crime and instead finding the "story taken as a whole is that plaintiff obtained and exercised custody over the boy when he had no right to do so, rather than that plaintiff kidnapped or took the child by force"). As a whole, the gist of Sanders' commentary to Glanz has always been about advocating that all authors bear responsibility for errors in an article, and it is especially problematic when authors deny errors that appear on the face of a scientific article.  The gist of these statements is subject to an innocent construction—especially given that Croce cannot challenge the fact that there were errors in numerous papers in which Croce is a listed author.

If the Court were to disagree with the idea that Sanders' belief is an opinion, Sanders would still be entitled to summary judgment as to Statement 1b because Plaintiff cannot prove actual malice (or even any level of fault) on Statement 1b with clear and convincing evidence, as he would be required to do.  Sanders had no reason to question or dispute his belief that errors, and the denial of those errors, constitutes misconduct and fraud.  He continues to hold that belief today. Sanders Decl. at 10; Sanders Dep., Vol. II at 49:16-21.  Likewise, he continues to hold the belief that all listed authors are responsible for the content of an article.  Sanders Decl. at 7; Sanders Dep., Vol. II at 51:15.  To avoid summary judgment, Croce must come forth with some evidence that Sanders knew or had reason to doubt his claims.  Croce has no such evidence—the only thing he can show is, admittedly, Sanders did not know *who* made the individual errors within various articles.  But Sanders believes *all* persons listed as an author are responsible for its errors, particularly when those authors later deny the errors.  Sanders Decl. at 7-10. As such, Croce cannot prevail.

## 2. *New York Times* article

Croce next challenges two statements attributed to Sanders in the article published in the *New York Times*. Croce claims as defamatory statements of fact the quotes, "It's a reckless disregard for the truth." (**Statement 2a**) and "A lab that is engaging in violating scientific norms is being rewarded for that very effort" (**Statement 2b**). Croce Rog. at 3; SAC at ¶¶ 47, 53. Much like the statements attributed to Sanders in the Glanz letter, these statements are not actionable defamation, because they: (1) are opinions, not verifiable facts; (2) subject to an innocent, non-defamatory construction; and (3) not made with actual malice or any fault on the part of Sanders.

### a. Statement 2a: reckless disregard

In claiming that "it's" a reckless disregard for the truth, Sanders was referring specifically to the PNAS paper's duplication of images in Figure 1*B*, and how the authors of that paper refused to retract it when confronted with the duplication. Sanders Dep., Vol I at 199:6-11; Glanz Decl. at ¶ 8. Sanders did not single out Croce here, but rather was speaking about the paper, including all individuals who were listed as authors. *E.g.*, Glanz Decl. at ¶ 8; Sanders Dep., Vol. II, at 51:15 ("I believe everybody on the paper is responsible."). In this sense, Sanders' statement is capable of an innocent construction that he is *not* defaming Croce specifically. *See, e.g.*, *Conway v. Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers*, 209 F. Supp. 2d 731, 759 (N.D. Ohio 2002) (charges of corruption against a union are not defamatory against the union's leader because the statement can be innocently construed to refer to someone other than the union's leader), *aff'd*, 93 F. App'x 780 (6th Cir. 2004).

Likewise, for the same reasons that Sanders' opinion as to what constitutes "misconduct" was his opinion, so, too, is his belief that refusing to withdraw a scientific paper after evidence of image duplication is a "reckless disregard for the truth." What constitutes a "reckless disregard

for the truth" is not a verifiable statement of fact. It is a legal opinion from a non-lawyer, functionally nothing more than hyperbole. An expression of a legal position or opinion is not a statement of fact. *E.g.*, *Scotts Co. LLC v. Liberty Mut. Ins. Co.*, 606 F. Supp. 2d 722, 772 (S.D. Ohio 2009) (insurer's statements on a legal question were "in the nature of an expression of [its] position or opinion regarding the completeness of the policies, not statements of fact").

Sanders' statement here again represents his value judgment that the PNAS authors should have withdrawn the paper when confronted with the image duplication, and that failing to do so was improper. "Vague[] allu[sions] to improper motives of unfixed meaning . . . might suggest [] a moral failing," but "such obvious speculation as to motivation is not a factual statement." *Murray v. HuffingtonPost.com, Inc.*, 21 F. Supp. 3d 879, 885 (S.D. Ohio 2014); *see also Murray v. Chagrin Valley Publishing Co.*, 25 N.E.3d 1111, 1123 (Ohio Ct. App. 2014). Just as charges that a person fired employees out of spite, to make a political statement, or for immoral reasons do not represent an actionable statement of fact, so, too, does Sanders' charge of a "reckless disregard for the truth" represent an opinion not capable of being verified. This is particularly true given Sanders' reputation as scientist with high ethical standards who seeks to root out data manipulation and plagiarism whenever he can.

In any event, Sanders never harbored doubts about his claims that the duplication in the PNAS paper—especially when considering the authors refused to withdraw the paper—constituted a reckless disregard for the truth. Sanders noticed the duplication in Figure 1*B* of the PNAS paper after someone else brought it to his attention, and he contacted the journal via email. He had information that PNAS had shared with him about how the authors of the paper disputed what he considered to be incontrovertible evidence of an image duplication. To Sanders, that constituted

a reckless disregard for the truth. He cannot have actual malice—or any level of fault—regarding Statement 2a.

### b. Statement 2b: scientific norms

The second Sanders statement in the *New York Times* article that Croce claims is defamatory is: "A lab that is engaging in violating scientific norms is being rewarded for that very effort." Here again, Sanders is not speaking about Croce specifically, but about practices within a laboratory that Croce is a part of. Glanz Decl. at ¶¶ 6-8; Sanders Decl. at ¶¶ 6, 7; Sanders Dep., Vol. I at 215:14 to 218:12. This statement is capable of an innocent construction—that individuals under Croce who produced papers with errors were violating scientific norms and being rewarded for that effort, even though Croce himself did not contribute to those errors. *See, e.g.*, *Conway*, 209 F. Supp. 2d at 759 (charges of corruption against a union are not defamatory against the union's leader because the statement can be innocently construed to refer to someone other than the union's leader).

Croce cannot seriously dispute that papers out of his lab in which he was a co-author "violated scientific norms"—that statement is true or substantially true. Journals have issued about two dozen corrections, retractions, withdrawals, and expressions of concern for papers for which Croce is listed as an author. *See Croce,* 930 F.3d at 795 ("Although the article notes instances of corrections to Dr. Croce's articles due to, for example, errors in data, those statements are true."); *id.* at 797-98 (article's reference to "at least 20, with at least three more on the way" corrections, retractions and editors' notices was substantially true; "[t]o the extent that Dr. Croce disputes the number, any disparity is minor"). Scientific norms do not include "ballooning" corrections, retractions and editors' notices.

Putting aside the substantial truth of Sanders' quote, it represents his opinion about ethics and the end-results of sloppy work.  Sanders' belief that errors matter more than results contrasts with a different quote in the *New York Times* article, from a Nobel Prize-winning biologist: "I would say [Croce] has made some important contributions to the molecular causes of cancer. . . . I can't condone the sloppiness he has in general.  But if I look historically at what [Croce] has done, if I delete [him] from the scientific community, I think the scientific community is a little less, and that isn't true of everybody who publishes papers."  *Times* article, Ex. 8; *see also Croce*, 930 F.3d at 795 (quoting same).  In other words, the gist of Statement 2b is about how much errors matter.  Sanders believes that results should not overshadow sloppiness; the Nobelist looked to Croce's results more so than his sloppiness.  Consistent with Sanders' reputation as a scientist committed to ferreting out image manipulation, Sanders' statement cannot be taken as anything more than his opinion.  There is nothing within Statement 2b that could *actually* be verified as a matter of fact.  And, like the other statements of which Croce complains, Sanders did not make Statement 2b with actual malice or any level of fault, as he had no reason to believe that his statement was anything other than his truthful opinion.

### 3.   Local article

Shortly following publication of the *New York Times* article, a local reporter Sanders knew contacted him to request an interview about the *Times* article.  Sanders spoke with her for about thirty minutes in his office about the 2013 JEM article in which Croce is listed as a co-author, *see* Exs. 16 (original article) and 17 (correction).  Pichiorri was the lead author on this paper.  *Id.*; *see also* Sanders Dep., Vol. I at 150:2 to 152:13.

Not surprising for a hometown paper, the Lafayette Journal-Courier focuses more on the local professor, Dr. Sanders, and the consequences to him of making accusations against a

nationally renowned professor. The paper features seven quoted statements from Sanders, only two of which have anything to do with Croce or his co-authors specifically. The other five statements are broad statements about general ethics in science:

- "There are, and I anticipate there will be additional, consequences for my career."

- He (Sanders) doesn't view the act of calling out his peers as a risk, however. "I see that as an obligation," he said.

- "This isn't to me about personalities — it's about the scientific record and the integrity of the scientific record. That's what I was trying to achieve, and I believe that it is the responsibility of the individual scientist and the journals and institutions to reinforce scientific integrity, and that's what I'm trying to do," Sanders said.

- After the Times article went live on March 8, Sanders said, several scientists have emailed him seeking help on more potential cases of scientific misconduct. "I've received emails from all parts of life, including a number of (researchers) who said, 'Hey, you should look into the following. I haven't had success. Take a look at this article,'" he said.

- "I hope that my experience will encourage others to come forward. That, we'll have to see," he said. "We'll have to see."

Ex. 15. Croce does not claim these general statements are about him or are defamatory.

Given the prior *New York Times* publication, any harm that resulted from the *challenged* statements Sanders made to the local reporter was nominal or non-existent. *See* Croce Dep. at 132:13-25 (describing wrong from the *Times* article as "big time" because "everybody in the world reads it" and it is a "big journal"). Any statements Sanders made to the reporter for the Lafayette Journal-Courier, a USA Today affiliate, are not actionable because of the incremental harm doctrine. *See Ferreri,* 756 N.E.2d at 723. This doctrine measures the "incremental reputational harm inflicted by the challenged statements" beyond the harm imposed by prior publications; "if that incremental harm is determined to be nominal or nonexistent, the statements are dismissed as not actionable." *Id.* Here, any damage to Croce's reputation occurred with the publication of the

*New York Times* article and posts on Retraction Watch; a Lafayette Journal-Courier article mainly profiling David Sanders did not further damage Croce's reputation.

In any event, Croce lists as defamatory a statement from Sanders that is not a direct quotation from him.  After a lede about how whistleblowers may face repercussions, the reporter writes, "But that didn't stop Sanders from alleging that Dr. Carlo Croce, a prominent cancer researcher at Ohio State University, falsified data or plagiarized text in more than two dozen articles Croce has authored."  Croce claims this as **Statement 3a**. Croce Rog. at 3; SAC at ¶ 62. Sanders has denied making any allegations that Croce himself falsified data or plagiarized text, and there is no genuine issue of material fact that Sanders never made such targeted allegations. Sanders Dep., Vol. I, at 124:3-6, 138:19-22; Sanders Dep., Vol. II, at 48:4 to 49:21; Sanders Decl. at ¶ 7.  Sanders, however, did complain to journals about what he considered to be plagiarism or data manipulation in numerous articles in which Croce is listed as an author—issues which prompted two dozen corrections or expressions of concern from journals.  *See, e.g.* Croce Rog. at 5-6, Exs. A, B, and D.

The middle section of the Lafayette Journal-Courier article focuses on the 2013 JEM article.  Sanders discussed this article with the reporter at length. It includes one direct quotation from Sanders, which Croce cuts and pastes, unmoored from its context, to create what he identifies as **Statements 3b, 3c, and 3d**.  Croce Interrogatory Responses at 3; SAC at ¶ 62.  The full context of the discussion of the 2013 JEM article is as follows, with the direct quote and Statements 3b, 3c, and 3d in bold:

> A portion of the issues have to do with the improper manipulation of western blotting, a widely used technique in cell and molecular biology that's used to separate and identify proteins.
>
> **"If you wanted to just make up data you could do it in a way that's much more difficult to detect, but they didn't because they were able**

26

**to get away with this relatively simple manipulation," Sanders said.
"They continued to do it over and over again."**

Croce has denied any wrongdoing.

Sanders is still awaiting the outcome of a complaint he made against an already corrected instance of image manipulation. He's alleging the correction, which was originally prompted by a complaint from Sanders, also includes an image that was duplicated and manipulated.

This original image involved a northern blot, which is used to detect specific RNA molecules among a mixture of RNA, in a 2013 paper by Croce in the Journal of Experimental Medicine. Sanders noticed that two of the images appeared to be strikingly similar. The original figures were replaced in the online article by the now corrected versions. But a screenshot of the images, which Sanders sent to the Journal & Courier, shows that two sets of blots in the article included the same images, with one set of blots enlarged a little.

Sanders contacted the journal about the duplication and a correction by the authors was quickly published. That was in late January. But Sanders still sensed something was off with the corrected images. He said he knew he had seen that same set of blots before. He believes that set appeared in a 2010 article, of which Croce was also an author, in another journal.

The corrected set of blots, Sanders alleges, includes a duplicate, mirror image of a set of blots that were published in a 2010 article in Cancer Cell.

Croce does not claim any other statements as defamatory within his interrogatory responses

(despite requests from Sanders to supplement them) or his complaint.[6]

---

[6] Croce's counsel did ask Sanders about an additional statement within the local article, which is the seventh quoted statement attributed to Sanders: "The fact that they're getting (grants) having engaged in this activity means somebody else who is honest is not receiving them," Sanders said. Ex. 15; *see also* Sanders Dep., Vol. I at 154:9-18 (noting he was referring to the authors of papers with errors). This statement is not actionable for all of the reasons the other statements Croce actually *does* claim to be defamatory are not actionable. Sanders was not talking about Croce specifically, but rather the authors of the paper with image manipulation; the statement reflects Sanders' opinion; the statement is subject to an innocent construction; and Sanders did not make the statement with fault or actual malice. Further, because Croce did not supplement his discovery responses with this statement, he has waived any claims relating to it (or his failure to supplement warrants a discovery sanction that bars consideration of this statement).

Beyond Plaintiff's duty to supplement, Sanders also served Second Sets of Interrogatories and Requests for Production on Croce within the discovery window, on July 23, 2019. Despite defense counsel's repeated attempts to get responses, Croce has failed to provide them. Sanders does not wish

### a. Statement 3a

Statement 3a is not actionable because: (1) there is no genuine issue of material fact that what Sanders did tell the reporter is substantially true—many articles in which Croce is listed as a co-author contain plagiarism or data manipulation; (2) Sanders' opinion that Croce is responsible for plagiarism or data manipulation occurring in papers in which he is a co-author, even if he did not directly commit the plagiarism or data manipulation, is a non-actionable opinion; and (3) Sanders did not act with actual malice or fault with regard to this statement. Although the reporter chose to focus on Croce as the last author and the lab director, particularly after a *New York Times* article focused on Croce, Sanders himself spoke only about problems in articles. Sanders' discussion of errors in scientific papers, as contrasted with individuals responsible for those errors, is precisely the type of activity protected under the First Amendment. *See Stow v. Coville*, 644 N.E.2d 673, 676 (Ohio Ct. App. 1994) (excluding from consideration any statements that were critical of a department but that did not name the individual head of that department).

As even Croce has admitted, there have been about two dozen articles in which he is a named co-author that have had corrections or expressions of concern issued by the journals. Croce Rog. at 5-6, Exs. A, B, and D. Croce has no evidence to suggest that Statement 3a is actionable as a false statement made by Sanders. Further, Croce has no evidence to suggest that Sanders acted with actual malice or any level of fault with respect to this statement.

### b. Statements 3b, 3c, and 3d

Statements 3b, 3c, and 3d all relate to the 2013 JEM article, and, to a lesser extent, an earlier article in Cancer Cell. The claims here relate to blot images used in controls. When various

---

to burden the Court with a motion to compel, since he is entitled to summary judgment as a matter of law regardless of Croce's responses. But, in the event the Court disagrees, Sanders reserves all rights to compel Croce to comply with his long overdue discovery obligations.

figures purport to represent different experimental conditions, the blots should not look similar, because "[t]hey're totally separate samples. They have completely different origins. . . . These should not resemble these in any way, shape, or form." Sanders Dep., Vol I at 129:15-20. Put another way, it is scientifically invalid to reuse a particular blot as a control when the initial experiment purports to represent a different experiment; each experiment needs its own control. Sanders Decl. at ¶¶ 4, 5.

Sanders, who admitted he was "embarrassed to say some part of [his] brain has blots permanently burned into them," visually noticed the similarities in the controls that were supposed to represent different experimental conditions. Sanders Dep., Vol I, at 134:4-5. Lanes 2-4 in the RNU6 blot in Figure 1F of the 2013 paper are identical to the lanes in Figure 1E for the RNU6 blot, even though those figures are purported to represent different experimental conditions. Sanders was further frustrated that the correction issued by the journal itself contained blots he had seen before. The corrected Figure 1E reused the same data, but just flipped it horizontally, so that in the original, the lanes were in 1-2-3 order, but in the corrected Figure 1E, they are now 3-2-1. Likewise, Sanders saw how the corrected Figure 1F in 2013 JEM is identical to the left four lanes of the RNU6 blot in Figure 1E of a different paper, itself with prior corrections. *See* Ex. 16 (original article) and Ex. 17 (correction).

Sanders' point is that the person responsible for the duplication—for using the same image four times in what was supposed to be different experimental conditions—could have used a control from an unpublished experiment and gone completely undetected. He testified: "They could have put some other random bands from some other thing that they have never used before and one would not have been able to detect it." Sanders Dep., Vol. I, at 153:2-5. Again, Sanders did not target Croce specifically when discussing these articles, and he may have even named the

29

lead author, Pichiorri, to the reporter.  Sanders Decl. at ¶ 7; Sanders Dep., Vol. I, at 150:2-13. Sanders noted that Pichiorri was presumably responsible for the correction and was able to "get away with" using the same image as before, even in the correction, by simply inverting the image horizontally.  Sanders Dep., Vol. I, at 153:6-20.

The direct quotation Sanders has with regard to the JEM article is: "If you wanted to just make up data you could do it in a way that's much more difficult to detect, but they didn't because they were able to get away with this relatively simple manipulation.  They continued to do it over and over again."  Ex. 15. Within this quote, "they" does not refer specifically to Croce; it refers to the authors of the paper.  Sanders Dep., Vol. I, at 150:2-13.  Further, this quote is either: (1) true or substantially true, given the retraction and correction of the original paper and additional confirmation of separate image errors associated with JEM 2013; (2) Sanders' opinion about the image manipulation; (3) capable of an innocent construction in light of what *is* true and verifiable; and (4) not stated with actual malice or any level of fault, for all the same reasons discussed above for the previous statements.

### D.  Sanders did not act with the requisite level of fault.

Strict liability is impermissible in defamation actions; the plaintiff must prove fault on behalf of the defendant.  *Landsdowne,* 512 N.E.2d at 983-984.  As noted above, there is *no* evidence that Sanders acted with any degree of fault with respect to any statement Croce alleges Sanders made.  Sanders believed, and continues to believe, that there were numerous errors in papers that Croce is a named author and that as a co-author, Croce bears some responsibility for those errors.  Sanders Decl. at ¶¶ 6, 7.  Croce does not have the clear and convincing evidence he needs to establish *any* type of fault on Sanders' part. *E.g.*, *Brooks v. Am. Broadcasting Cos.*, 999 F.2d 167, 171-72 (6th Cir. 1993) (rejecting private plaintiffs' claimed evidence of fault as

insufficient under the clear and convincing standard and affirming summary judgment in defendants' favor); *Murray,* 25 N.E.3d at 1118 (noting negligence was not substantiated when reporter used Google searches for her story).

But Croce faces an even more difficult burden here. As a limited purpose public figure, Croce must prove that Sanders acted with *actual malice*. Actual malice is based on the defendant's subjective beliefs. "A defamation plaintiff who is required to show actual malice must demonstrate, with convincing clarity, that the defendant published the defamatory statement either with actual knowledge that the statement was false, or with a high degree of awareness of its probable falsity." *Varanese v. Gall*, 518 N.E.2d 1177, 1180 (Ohio 1988). Arguments that a defendant "should have known" of the alleged falsity of statements is not actual malice. *Id.* Failure to investigate is not actual malice. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). The "omission of material does not demonstrate a disregard for the truth." *Perez v. Scripps-Howard Broadcasting Co.*, 520 N.E.2d 198, 204 (Ohio 1988).

Croce cannot establish actual malice, as he cannot establish that Sanders ever "entertained serious doubts as to the truth" of what he was saying. *E.g.*, *Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 412 (6th Cir. 1991). During his interviews with Glanz and Holden, Sanders offered opinions, undergirded by his belief that all authors are responsible for errors in an article and that using blots more than once when the paper represents each blot represents different experimental conditions is data falsification and manipulation. Even if those opinions are considered to be verifiable facts, however, Sanders cannot be said to have acted with knowledge that his opinions were wrong. He has never harbored doubt that what he said is, in fact, true, which warrants dismissal. *See Underwager v. Salter*, 22 F.3d 730, 735-736 (7th Cir. 1994) (affirming dismissal of claims relating to scientific dispute because speakers did not harbor doubts about the truth of

their statements).  "Scientific controversies must be settled by the methods of science rather than by the methods of litigation.  More papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us."  *Id.* at 736; *see also Arthur v. Offit*, 2010 U.S. Dist. LEXIS 21946, *17, 38 Media L. Rep. 1508 (E.D. Va. 2010) ("Courts have a justifiable reticence about venturing into the thicket of scientific debate, especially in the defamation context.")

Nor can Croce challenge that he is not a limited purpose public figure for the purpose of Sanders' allegations.[7]  The allegations Sanders made are in the context of scientific publication, a field in which Croce is of "generational fame."  *E.g.*, SAC ¶¶ 5, 6, 48, 71; Croce Dep. 12:20 to 13:3; 47:22 to 48:49:7; 14:19-21; 18:10-12; 30:2-20; 32:1-25; 217:10 to 218:14.  Croce has attained "general notoriety" in the scientific community and actively participates in the scientific community; as such, he is at least a limited purpose public figure.  *E.g.*, *Kassouf v. Cleveland Magazine City Magazines*, 755 N.E.2d 976, 982 (Ohio. Ct. App. 2001) (business activities thrust individual into public sphere and he was a limited purpose public figure); *see also Waters v. Ohio State Univ.*, 2016 Ohio Misc. LEXIS 94, at *27 (Ohio Ct. Claims 2016) (finding, based on the Ohio State band director's complaint alleging "national—and even international—acclaim," he was a public figure as a matter of law).  Croce continues to be interviewed by the media, has faced challenges to his papers before Sanders, and has easy access to scientific journals.  Croce Dep. at

---

[7] There is no question that under Indiana law, Croce would have to prove actual malice, as Indiana requires proof of actual malice in cases involving private figures who bring a defamation action over a matter of public or general concern, and scientific integrity in research is undoubtedly an issue of public concern. *E.g.*, *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 452 (Ind. 1999) (actual malice standard of *New York Times v. Sullivan* applies to alleged defamatory statements about matters of public interest or concern); *Shine v. Loomis*, 836 N.E.2d 952, 958 (Ind. Ct. App. 2005) ("Both a public figure and a private individual bringing a defamation action over a matter of public or general concern must prove by clear and convincing evidence that the defendant made the alleged defamatory statement with 'actual malice.'").

166:23-25, 191:14-16, 217:10 to 218:14; *see also Top Italian Scientists*, VIA ACADEMY, www.topitalianscientists.org/TIS_HTML/Top_Italian_Scientists_Biomedical_Sciences.htm (last visited Oct. 9, 2019).  Like statements directed toward a restaurant are "public in the context of a restaurant review," so, too, are any comments directed toward the papers in which Croce is listed as an author.  *E.g.*, *Greer v. Columbus Monthly Pub. Corp.*, 448 N.E.2d 157, 162 (Ohio Ct. App. 1982).  Croce's science has won him international prizes, the equivalent of a knighthood, and pervasive fame; his scientific endeavors thrust debates about his science into the public sphere, making him a public figure for purposes of criticizing that science.  *E.g.*, *Hatfill v. The New York Times Co.*, 532 F.3d 312, 322-24 (4th Cir. 2008) (considering the scope of the public controversy "more broadly" in light of the goal "to encourage robust and uninhibited commentary on public issues," and finding scientist was a limited-purpose public figure); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 709 (4th Cir. 1991) (where scientist's research was familiar to public and scientist described himself as "eminent" in his field, he was a limited purpose public figure for purposes of criticizing that science).  "Just as a professional athlete or coach must accept the attendant publicity surrounding his decision to assume his position, so must plaintiff accept the consequences of his decision" to discover and publish groundbreaking science that changed medicine.  *See McDowell v. Paiewonsky*, 769 F.2d 942, 950 (3d Cir. 1985).

**E.  Indiana law similarly provides for the dismissal of claims against Sanders.**

Indiana law is similar to Ohio's, with one distinct exception: Indiana's Anti-SLAPP statute provides that Sanders may recover attorneys' fees.  Given the chilling effect of lawsuits, the Indiana General Assembly provided a statutory shield for the exercise of constitutionally protected free speech.  *See* IND. CODE § 34-7-1-1 to -10.  The "Anti-SLAPP Statute" protects any "act in furtherance of a person's right of petition or free speech under the Constitution of the United States

or the Constitution of the State of Indiana in connection with a public issue or an issue of public interest." IND. CODE § 34-7-7-1. A motion under the Anti-SLAPP Statute "shall be granted" if the act upon which the claim is based is a "lawful act in furtherance of the person's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Indiana." IND. CODE § 34-7-7-9(d).

The Anti-SLAPP statute is designed to combat "meritless suits aimed at silencing a plaintiff's opponents, or at least diverting their resources." *CanaRx Servs., Inc. v. LIN Television Corp.*, 2008 U.S. Dist. LEXIS 42236 at *10 (S.D. Ind. May 29, 2008). Prevailing defendants are entitled to recover costs and attorneys' fees. IND. CODE § 34-7-7-7; *Containment Techs.*, 2009 U.S. Dist. LEXIS 76270 at *20 (awarding attorney fees to academic journal and authors of peer-reviewed article critiquing plaintiff's product); *CanaRx*, 2008 U.S. Dist. LEXIS 42236 at *26 (awarding attorney fees to television station sued for report on counterfeit prescription drugs).

Talking with reporters about errors in scientific publications such as those found in JEM 2013 or PNAS is undoubtedly an act in furtherance of constitutional free speech on an issue of public interest, *i.e.*, scientific integrity and analysis about cancer research. Whether a matter is of public interest or concern is a question of law. *Filippo v. Lee Publications, Inc.*, 485 F. Supp. 2d 969, 973 (N.D. Ind. 2007); *Moore v. Univ. of Notre Dame*, 968 F. Supp. 1330, 1336 (N.D. Ind. 1997). "The public interest is necessarily broad." *Moore*, 968 F. Supp. at 1337 n.11. Certainly scientific research and integrity within that research fits comfortably within the public interest. *E.g.*, *Containment Techs. Group, Inc. v. Am. Society of Health Sys. Pharmacists*, 2009 U.S. Dist. LEXIS 25421 at *36-37 (S.D. Ind. Mar. 26, 2009) (safety of medical devices involved public interest); *CanaRx*, 2008 U.S. Dist. LEXIS 42236 at *18 (news report on the danger of importing prescription drugs from foreign countries was a matter of public interest).

The second step in the Anti-SLAPP analysis is to determine whether the statements were lawful, in good faith, and with a reasonable basis in fact and law.  Good faith is "a state of mind indicating honesty and lawfulness of purpose; belief in one's legal right; and a belief that one's conduct is not unconscionable."  *CanaRx*, 2008 U.S. Dist. LEXIS 42236 at *19 (S.D. Ind. May 29, 2008) (quoting *Owens v. Schoenberger*, 681 N.E.2d 760, 764 (Ind. Ct. App. 1997)).  If a party acts "in the belief they had the legal right to do so," regardless of motivation, the acts are taken in good faith.  *Lawlis v. Kightlinger & Gray*, 562 N.E.2d 435, 443 (Ind. Ct. App. 1990).  Sanders is entitled to judgment under the Anti-SLAPP Statute because his comments to reporters were lawful and in good faith.  Croce's case fails as a matter of law because (1) Croce has no evidence—much less the required clear and convincing evidence—that Sanders acted with actual malice in speaking to the reporters, as failure to investigate or insist that reporters mention authors besides Croce does not amount to actual malice and (2) Sanders' statements were true or substantially true, often reflecting his lawful opinion rather than an unverifiable statement of fact.  Sanders acted lawfully and in good faith, and is thus entitled to his attorneys' fees.

## CONCLUSION

For the foregoing reasons, Sanders respectfully requests that this Court grant his motion, dismiss all claims against him, award him attorneys' fees under the Indiana Anti-SLAPP Act, and grant him all other relief just and proper.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 11, 2019, a copy of the foregoing Motion was served electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or U.S. Mail.


*/s/ William A. Nolan*