IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Carlo M. Croce.,

        Plaintiff,

    v.

David A. Sanders,

        Defendant.

Case No: 2:17-cv-338

Judge Graham

Magistrate Judge Deavers

<u>Opinion and Order</u>

Dr. Carlo Croce, a cancer researcher at Ohio State University, brings this defamation action against Dr. David Sanders, a biological sciences professor at Purdue University. The suit largely relates to a March 8, 2017 article (the "Article") in *The New York Times* in which Dr. Sanders was quoted and paraphrased several times in connection with his claim that he had found falsified data and plagiarism in scientific papers for which Dr. Croce was listed as a co-author. "It's a reckless disregard for the truth," Dr. Sanders was quoted as saying in reference to the falsified data and plagiarism he had found in those papers.

*New York Times* reporter James Glanz interviewed Dr. Sanders in preparing the Article, entitled "Years of Questions, but Researcher Gets a Pass." The Article examined concerns that universities are "conflicted arbiters" when presented with allegations of scientific misconduct committed by their own "star researchers" who attract millions of dollars in grant money. The Article used Dr. Croce as its "case study of the complex and often countervailing forces at work as science seeks to police itself."

In separate suits, Dr. Croce sued both *The New York Times* and Dr. Sanders for defamation. He lost his suit against *The New York Times*. *See Croce v. New York Times Co.*, 930 F.3d 787 (6th Cir. 2019) (holding that the Article was not defamatory under Ohio law).

In this suit, Dr. Croce alleges that certain statements made by Dr. Sanders in the Article are defamatory. Dr. Croce also alleges that Dr. Sanders made defamatory statements recited in a letter (the "Letter") sent by Glanz to Ohio State and Dr. Croce in November 2016. The Letter sought Dr. Croce's responses to criticisms made by Dr. Sanders and others of papers for which Dr. Croce was listed as an author. Dr. Croce additionally alleges that Dr. Sanders made defamatory statements in a March 22, 2017 article published in the *Lafayette Journal & Courier* (the "*J&C* Article"), a local

newspaper in the area where Purdue University is located.  The *J&C* Article quoted Dr. Sanders as saying that data had been "made up" in papers with Dr. Croce's name as an author and that the authors of the papers had done it "over and over again."

This matter is before the Court on Dr. Sanders's motion for summary judgment.  For the reasons set forth below, the motion is GRANTED except for defendant's request for an award of attorney's fees and costs under Indiana law.

## I.      Background

### A.       Dr. Croce and His Authorship of Scientific Papers

Dr. Croce describes himself as "one of the world's most distinguished scientific researchers in the area of cancer genetics."  Croce Decl. at ¶ 2.  Over his 50-year career, he has been a "pioneer" whose discoveries have contributed to the prevention, detection, diagnosis and treatment of many different types of cancers.  *See* Second Am. Compl. at ¶ 5.  Since 2004, Dr. Croce has conducted research at his laboratory at Ohio State, where he has held various positions and distinctions, including Chair of the Department of Cancer Biology and Genetics, and Director of the Institute of Genetics. *See* Croce Decl. at ¶ 3.  He has received more than 64 national and international awards for his work. *See* Second Am. Compl. at ¶ 6.

An important aspect of this case is authorship of articles or papers appearing in scientific journals.  Dr. Croce's name has appeared as an author on over 1,250 such papers.  *See* Croce Decl. at ¶ ¶ 5, 9, 10.  His name has been listed on about 1,100 "research papers," which are articles reporting the results of scientific experiments.  *See id.* at ¶ ¶ 5, 9.  Dr. Croce's name has been listed on about 165 "review papers," which "review the work being done on a particular scientific issue."  *Id.* at ¶ 10.

Scientific research papers usually have multiple authors.  The listing of authors follows a convention, at least in the medical journals in which Dr. Croce's papers have appeared.[1]  The first author listed is the "lead author," the scientist who conducted the experiment being reported and who took a primary role in drafting the paper.  *Id.* at ¶ 6.  The last author listed is "the scientist who had

---

[1] The Court draws its account on the convention for listing authors from Dr. Croce's declaration.  His description aligns with the examples of papers which are in the record of this case, and defendant does not dispute Dr. Croce's declaration on this matter.  The Court, however, recognizes that conventions for listing authors in scientific papers varies by discipline and publication.  *See* Expert Report of Tiffany L. McKerahan (Doc. 59-21) at 2; Matthias Weber, *The Effects of Listing Authors in Alphabetical Order: A Review of the Empirical Evidence*, Research Evaluation, Vol. 27, No. 3 at 238 (Oxford Univ. Press July 2018); David B. Resnik, Ana M. Tyler, Jennifer R. Black, Grace Kissling, *Authorship policies of scientific journals*, Journal of Medical Ethics 2016;42(3):199-202.

the idea to do the experiment or research being reported" and is "generally the head of the lab in which the research was conducted." *Id.* at ¶ 7. The authors whose names appear between the lead and last authors are "contributing authors." *Id.* at ¶ 9. Though Dr. Croce does not define the role of a contributing author, a fair inference from his declaration is that they may have assisted in conducting the experiments, drafting the paper or examining or verifying the results.[2]

Of the roughly 1,100 research papers on which Dr. Croce's name is listed as an author, about 500 of them have originated from his lab. *Id.* at ¶ 8. For these papers, his name almost always appears last in the listing of authors, although occasionally first. *Id.* According to Dr. Croce, "[a]t a lab like mine . . . most of the experiments are conducted by junior research scientists including graduate students and post-doctoral fellows, who are primarily responsible for authoring the text of the paper and reporting the results." *Id.* at ¶ 6.

Dr. Croce's name also appears on about 600 other research papers as a contributing author. *Id.* at ¶ 9. Again, though not describing what contributions he made as a contributing author to these papers, Dr. Croce clarifies that the research for these papers was not conducted at his lab and that he personally did not conduct the research being reported or write the text of the papers. *Id.*

As for the 165 review papers on which his name appears, Dr. Croce states that he personally wrote or co-wrote those papers. *Id.* at ¶ 10.

### B.    Problems in Scientific Papers

Both sides agree that problems sometimes arise with the information reported in scientific papers, whether by honest mistake or otherwise. Problems have occurred in papers with Dr. Croce's name on them, though pinning down an exact tally is a bit tricky. Dr. Croce's Second Amended Complaint admits to 13 problems with his papers. *See* Second Am. Compl. at ¶¶ 24, 25, 27. Dr. Sanders and his expert believe the actual number of problems is closer to 30. *See* Doc. 63-1 at PAGEID 571-72; McKerahan Report at 4-5. Dr. Croce's discovery responses indicate that the number exceeds 30. *See* Doc. 63-2 at PAGEID 620-23.

Relevant to this case are three general types of problems: fabrication, falsification and plagiarism. Before the Court examines those types of problems in detail, some context is in order.

---

[2] It would seem the matter of contributing authorship is a gray area. *See* Weber, *supra*; Resnik, *et al.*, *supra*. According to the report of defendant's expert, Tiffany L. McKerahan, the International Committee of Medical Journal Editors recommends that four criteria be satisfied in order to qualify for authorship: (1) substantial contributions made to the conception of the work or to the data for the work; (2) drafting or revising the work; (3) final approval of the published version of the work and (4) agreement to be accountable for all aspects of the work. McKerahan Report at 2-3.

Under federal law, universities which receive federal funding for biomedical research "must take actions to ensure the integrity" of such research. Dr. Price Report at 2. Honest errors and differences of opinion do not constitute research misconduct, but fabrication, falsification and plagiarism do. 42 C.F.R. § 93.103. Ohio State has adopted standards for research integrity which are consistent with the federal regulations. Dr. Price Report at 3. Recipient institutions are largely left with the responsibility of self-policing complaints of misconduct. 42 C.F.R. § 93.300, *et seq.*

Plaintiff's expert, Dr. Alan R. Price, has offered definitions of the three types of research misconduct relevant to this case. His definitions are based on regulations promulgated by the United States Public Health Service. Neither Dr. Sanders nor his expert dispute the definitions.

Fabrication refers to "making up data or results and recording or reporting them." Price Report at 2. Falsification is "manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record." *Id.* Plagiarism is "the appropriation of another person's ideas, processes, results, or words without giving appropriate credit." *Id. See generally* 42 C.F.R. § 93.103.

Also relevant to this case are the terms "image manipulation" and image or data "duplication." It is unclear whether the parties would place these concepts into a certain category (fabrication, falsification or plagiarism) or would view them as a hybrid. At issue are images in scientific articles called blots. Based on the lab technique employed, some are known as "Western blots" and some are "Northern blots." Sanders Decl. at ¶ 4. In the case of Western blotting, the blot images are the results of experiments with proteins and they convey data about the type, size and amount of protein. *See id.* With Northern blotting, the blots are the results of experiments with RNA molecules and likewise convey information about the molecules. *See id.*

According to Dr. Sanders, each blot image should have its own distinct look. Each blot reported in a paper "represent[s] a different experimental condition" and thus should look different (at least to the trained eye) from the blots resulting from different proteins, different RNA molecules or a different set of experimental conditions. *Id.* at ¶ 5. Dr. Sanders has claimed to have found instances in Dr. Croce's papers where blot images have been duplicated or reused – that is, instances where an image in a paper looks the same as another image in the same paper or as one from a past paper in which Dr. Croce was listed as an author. In Dr. Sanders's view, the practice of duplicating images amounts to manipulating or making up the data being reported in the papers. *See id.*; Sanders Dep., Vol. I at 125-26.

4

Terms related to the concept of plagiarism have also been used in this case. Dr. Sanders and his expert use the term "text reuse" to refer to plagiarism when text is reused without attribution to the original author or source. Sanders Decl. at ¶ 6; McKerahan Report at 5. Dr. Sanders has claimed to have found instances of text reuse in Dr. Croce's papers. *See* Sanders Decl. at ¶ 6. Dr. Croce uses the term "text overlap" and admits that instances of text overlap have occurred in papers with his name as a co-author. *See* Second Am. Compl. at ¶ 25. However, he denies that he has engaged in plagiarism.[3] *See* Croce Decl. at ¶ 15.

### C. Corrections, Retractions, Withdrawals and Expressions of Concern

When problems in a paper come to light and the journal determines (or the authors volunteer) to take responsive action, the action can take several forms. One is a correction. Eight of the 500 research papers originating from Dr. Croce's lab (the ones for which Dr. Croce is almost always listed as the last author) have been the subject of corrections to a figure or sub-figure. *See* Second Am. Compl. at ¶ 24. "Figures" are "images of experimental results and other scientific information." *Id.* In these 8 papers, about 20 figures or sub-figures were corrected. As an example, Dr. Croce was the last-listed author of a 2013 article in the Journal of Experimental Medicine (JEM) which contained figures depicting images of the results from "Northern blot analysis of total RNA from HeLa cells" subjected to certain experiments. *See* Doc. 59-17 at PAGEID 490. JEM later issued a correction stating that aspects of the original figures were incorrect; the correction provided new figures supplied by the authors. *See* Doc. 59-18 at PAGEID 507.

According to plaintiff's discovery responses, a total of 12 corrections, including 3 for text overlap, have been issued for research papers from Dr. Croce's lab. *See* Doc. 63-2 at PAGEID 620. Of the research papers for which Dr. Croce was a contributing author, 10 have been the subject of a correction.[4] *Id.* at PAGEID 621. Four of Dr. Croce's review papers have been corrected, including one for text overlap. *Id.* at PAGEID 622.

Retraction is another response to a problem in a scientific paper. This occurs when a journal removes a paper without the authors' consent. None of the research papers from Dr. Croce's lab have been retracted, nor have any of his review papers been retracted. *Id.* at PAGEID 620, 622.

---

[3] Here too is gray area. The issue of when text reuse or overlap becomes plagiarism may depend on the amount of text at issue, how common the reused words or phrases are and whether the reuse is being done by an author of the original text. *See* Daniel T. Citron and Paul Ginsparg, *Patterns of text reuse in a scientific corpus*, PNAS 112(1):25-30 (2015).

[4] The discovery responses do not indicate the reasons for all of the corrections.

Research papers for which Dr. Croce was a contributing author have been retracted 3 times, but not, according to Dr. Croce, because of any contribution he or his lab made. *See id.* at PAGEID 621; Second Am. Compl. at ¶ 30.

The authors of a paper may elect to withdraw the paper. Dr. Croce withdrew one of the research papers from his lab after the publication of the *New York Times* Article because of errors in 5 of the figures. *See* Croce Decl. at ¶ 12; Second Am. Compl. at ¶ 28. Dr. Croce has also withdrawn one of his review papers. *See* Doc. 63-2 at PAGEID 622. Two papers for which Dr. Croce was a contributing author have been withdrawn. *See id.* at PAGEID 621.

A journal might choose to issue an editorial expression of concern. Two research papers from Dr. Croce's lab have been the subject of an expression of concern. *See id.* at PAGEID 623. As an example, shortly after the *New York Times* Article was published, the Proceedings of the National Academy of Sciences of the United States of America ("PNAS") issued an expression of concern over a research paper from Dr. Croce's lab published in its journal in 2005. *See* Doc. 59-8. The expression of concern noted that a certain figure in the paper appeared to have "duplicated bands" of blot images. *Id.* The expression of concern then noted that the authors of the paper did not have the original data but had replicated the experiment, and the results of the replicated experiment were provided in the expression of concern.

### D. Dr. Sanders, "Freelance Ethicist"

Dr. Sanders has been on the faculty of Purdue University since 1995 and currently serves as an associate professor in the Department of Biological Sciences. *See* Sanders Dep., Vol. I at 10; Sanders Decl. at ¶ 2. He has taught courses in microbiology, virology, protein structure and protein expression. *See* Sanders Dep., Vol. I at 12.

Dr. Sanders described himself in the *New York Times* Article as a "freelance ethicist." Doc. 59-9 at PAGEID 469. A "major focus of [his] research and speaking has been the ethics of scientific publication and strengthening peer review of grant applications and journal articles." Sanders Decl. at ¶ 2. Dr. Sanders endeavors to "scrutinize publications that come to [his] attention as possible instances of duplication, data manipulation, and/or plagiarism and, where appropriate, raise these issues through the appropriate channels with the publications." *Id.*

Dr. Sanders has been a guest lecturer and speaker on the topic of ethics in scientific publications. *See id.*; Sanders Dep., Vol. I at 12-14. At these talks attendees sometimes tell him about a paper he should look into. *Id.* at 104. One tip he received was about Dr. Croce and a paper entitled "*WWOX* gene restoration prevents lung cancer growth *in vitro* and *in vivo*." *Id.* at 104-05; Doc. 59-7.

Dr. Croce was the last-listed author on the *WWOX* paper, which was published in PNAS in 2005 and, as mentioned above, was later the subject of an editorial expression of concern. A figure in the paper featured numerous blot images depicting proteins that had been subjected to experiments. *Id.* at PAGEID 444 (Figure 1). The figure contained a subfigure with two rows, called panels, and nine columns, called lanes. *Id.* (Fig. 1B).

Dr. Sanders has a knack for detecting image duplication and remembering the blots he sees reported in scientific journals. *See* Sanders Dep., Vol. I at 134 ("I'm embarrassed to say some part of my brain has blots permanently burned into them."). With the *WWOX* paper, he believed that the blots in lanes 3, 4 and 5 of the bottom panel looked the same as the blots in lanes 6, 7 and 8 of the same panel. *See* Sanders Dep., Vol. I at 22; Doc. 59-22 at PAGEID 551.

Having seen this example of what he considered to be image duplication and manipulation, Dr. Sanders "started to dig." Sanders Dep., Vol. I at 104. He examined over 30 articles in which Dr. Croce was listed as an author and found what he believed to be other instances of image duplication and manipulation, as well as plagiarism. *See id.* at 135-36; Sanders Decl. at ¶ 6.

Dr. Sanders made it his practice to contact scientific journals when he found a problem with a paper they had published. *Id.* at ¶ 9. For example, Dr. Sanders emailed the Executive Editor of PNAS in April 2015 about his concerns over image duplication in the *WWOX* paper. In response, he was told that the authors of the paper had provided an "explanation stating that no duplication occurred." Doc. 59-22 at PAGEID 547. He was further told that PNAS's "scientific experts closely examined the materials and disagreed about potential image duplication in Fig. 1B. Given this difference of opinion and that the paper was published in 2005, our editors therefore could not conclusively determine whether image duplication had occurred." *Id.* at PAGEID 548. This response from PNAS comported with Dr. Sanders's experience that "scientific journals were taking little to no action in response" to reports of problems in published papers. Sanders Decl. at ¶ 9.

The response of the authors of the *WWOX* paper likewise was consistent with Dr. Sanders's experience "that the authors of the papers in which I had noticed errors did not own up to the errors." *Id.* at ¶ 8. According to Dr. Sanders, "it is important to the advancement of science and knowledge that the scientific record be as accurate as possible. Where authors are presented with objective evidence of errors in their scientific publication, yet they deny the presence of those errors, I believe that to be misconduct and fraud." *Id.* at ¶ 10.

### E. Communications Between Glanz and Dr. Sanders

Dr. Sanders reached out to a reporter[5] after reading a piece the reporter had written on "questions about science." Sanders Dep., Vol. I at 182. Dr. Sanders wanted to raise his concerns over the problems he had found in scientific papers and over "the responses of the journals." *Id.* The reporter introduced him by email to James Glanz, an investigative journalist and science writer for *The New York Times*. *See id.*; Glanz Decl. at ¶ 3.

Glanz and Dr. Sanders exchanged emails and telephone calls. *See* Sanders Dep., Vol. I at 163. On September 26, 2016 Glanz traveled to Purdue and Dr. Sanders demonstrated how Western blotting was done in the lab. *See id.* at 162, 165. They discussed blot images and Dr. Sanders focused specifically on the *WWOX* paper, which he believed contained duplicated bands of images. *See id.* at 166.

Dr. Sanders hoped that speaking to Glanz would bring broader attention to the need for accuracy in scientific journals and to the need for journals and authors to respond appropriately to credible reports of problems in scientific papers. *See* Sanders Decl. at ¶¶ 9-10.

At some point during their exchanges, Dr. Sanders realized that Glanz intended to write an article on the matter, and he understood that Glanz had decided to make Dr. Croce a focal point. *See* Sanders Dep., Vol. I at 201-02. Dr. Sanders did not request that Dr. Croce be the focus of the article. *See id.* According to Glanz, Dr. Sanders identified "what he believed to be image manipulation and plagiarism" in numerous scientific papers. Glanz Decl. at ¶ 6. A "number of" the papers which Dr. Sanders identified had Dr. Croce listed as an author. *Id.* Dr. Sanders told Glanz that "the presence of some errors is inevitable in published scientific research, but that, based on his research, he believed [Dr. Croce's papers] demonstrate[d] a higher frequency of errors than is usual in the field." *Id.* at ¶ 7.

Dr. Sanders described the image manipulation in the *WWOX* paper to Glanz as particularly obvious and stated that the journal and the paper's authors, after being alerted to the problem, had failed to correct the error. Glanz Decl. at ¶ 8. Dr. Sanders viewed "such failures to correct errors as 'a reckless disregard for the truth.'" *Id.* (quoting Dr. Sanders). Dr. Sanders did not single out Dr. Croce in making this statement. Rather, Glanz understood Dr. Sanders to be saying that "each co-author of any article containing such an error bears responsibility for ensuring that it is corrected." *Id.*

---

[5] In his deposition, Dr. Sanders identified the reporter as a Mr. Carey. *See* Sanders Dep., Vol. I at 182. According to plaintiff, an email produced in discovery (but not on the record before the Court) showed that the reporter was Ben Carey of *The New York Times* and that Dr. Sanders contacted him in early 2016. *See* Doc. 65-2 at PAGEID 712 n.2.

Dr. Sanders agrees that Glanz's understanding of his position was correct – "I believe everybody on the paper is responsible."  Sanders Dep., Vol. II at 51.

### F.     Glanz Sends the Letter to Ohio State

Glanz had decided at some point that his article would concern "Dr. Croce and his lab."  Glanz Decl. at ¶ 10.  Glanz arranged to interview Dr. Croce in person and tour his lab at Ohio State in early October 2016.  *See* Doc. 32 at ¶¶ 43-44 in *Croce v. New York Times Co.*, Case No. 2:17-cv-402 (S.D. Ohio).

On November 23, 2016, Glanz sent the Letter on *New York Times* letterhead to Ohio State and Dr. Croce.  *See* Doc. 59-11.  Glanz said he had questions he wanted to "put urgently" to Ohio State and Dr. Croce as part of an article he was preparing.  *Id.* at PAGEID 474.  Glanz requested responses to 25 paragraphs' worth of questions.

Glanz cited Dr. Sanders in six of those paragraphs.  He described Dr. Sanders as one of two whistleblowers (the other being an anonymous complainant) who had claimed there were problems in papers on which Dr. Croce was listed as an author.  The alleged problems included data manipulation and duplication and plagiarism.  Glanz commented also that "the integrity of the data or text in at least 20 papers coauthored by Dr. Croce" had been the subject of anonymous criticism on professional websites, including one called Pubpeer.  *Id.* at PAGEID 474.

Glanz wrote that Dr. Sanders had "lodged over a dozen complaints [with scientific journals] involving papers on which Dr. Croce is an author."  *Id.*  Though corrections had been issued in four instances, Glanz noted that in other cases "Dr. Croce and colleagues have successfully disputed the claims and prevented corrections or retractions from being issued."  *Id.*  Glanz asked Dr. Croce to respond to the claims of Dr. Sanders and the anonymous critics.

The Letter identified the *WWOX* paper and several other papers as being specific examples of papers containing what Dr. Sanders had claimed was image duplication and plagiarism. Glanz noted that Dr. Croce and his co-authors had not conceded any such problems with those papers, even when the journals which published the papers or other experts had agreed with Dr. Sanders that problems seemed to exist.  Glanz asked Dr. Croce to explain his position that there was nothing wrong with those papers.  *See id.* at PAGEID 475.

The Letter also included a paragraph that, according to the complaint, contained two defamatory statements.

Dr. Sanders argues – because in his observation the **image fabrication, duplication and mishandling, and plagiarism in Dr. Croce's papers is routine**, and because the authors routinely dispute those allegations when confronted with them through

9

the journals – that **Dr. Croce is knowingly engaging in scientific misconduct and fraud**. Does Dr. disagree with this allegation, and if so, why[?]

*Id.* at PAGEID 474 (emphasis added).

Dr. Croce retained legal counsel to respond to Glanz's Letter. He asserted that Dr. Sanders's statements were "outrageously false and defamatory." *See* Case No. 2:17-cv-402, Doc. 32-2 at PAGEID 687.

### G. The Article

*The New York Times* published the Article on its website on March 8, 2017. *See* Glanz Decl. at ¶ 4. The Article was entitled, "Years of Ethics Charges, but Star Cancer Researcher Gets a Pass." *See* Doc. 59-9 at PAGEID 457. On March 9, *The Times* published the Article on the front page of its print version under the headline, "Years of Questions, but Researcher Gets a Pass." *Id.* at PAGEID 471. The Article was substantial in length, comprising over 14 pages and about 90 paragraphs in the version submitted on the Court's record. *Id.* at PAGEID 457 to 471.

The Article contained an opening sequence of paragraphs which introduced Dr. Croce as a "prolific" cancer researcher who had attracted enormous sums of federal grant money and had received a multitude of awards. *Id.* at PAGEID 457. Yet a "quotient of controversy" had followed him. *Id.* Questions loomed over "his expansive claims for the therapeutic promise of his work" and concerns existed that "his laboratory is focused more on churning out papers than on carefully assessing its experimental data." *Id.* The Article reported that "Dr. Croce has been fending off a tide of allegations of data falsification and other scientific misconduct, according to federal and state records, whistle-blower complaints and correspondence with scientific journals obtained by The New York Times." *Id.*

In the fifth paragraph, the Article introduced Dr. Sanders as one of Dr. Croce's critics. Dr. Sanders "has made claims of falsified data and plagiarism directly to scientific journals where more than 20 of Dr. Croce's paper have been published." *Id.* The Article then quoted Dr. Sanders in a statement that the complaint alleges is defamatory:

**"It's a reckless disregard for the truth,"** Dr. Sanders said in an interview.

*Id.* at PAGEID 458 (emphasis added).

The Article next stated that "[a]s a result of complaints by Dr. Sanders and others, journals have been posting notices of problems with Dr. Croce's papers at a quickening pace." *Id.* Many of the problems, the Article explained, involved manipulation of blot images. A blot captures results and "often indicates whether an experiment has succeeded or failed." *Id.*

10

A graphic on the second page of the Article depicted blot images from the *WWOX* paper, with a caption stating that Dr. Sanders "has concluded that the blots in at least three lanes in Figure 1B in a 2005 paper by Dr. Croce were improperly duplicated." *Id.* Readers of the online version of the Article could select a "Show Duplication" button which created an animation whereby lanes 6, 7 and 8 were superimposed on top of lanes 3, 4 and 5 to show the duplication.

The thesis of the Article was then stated: universities are "inherently conflicted arbiters" when it comes to investigating and punishing misconduct by their rainmakers. *Id.* And, the Article told its readers, Dr. Croce would be the "case study of the complex and often countervailing forces at work as science seeks to police itself." *Id.* "Despite the lashing criticisms of his work, Dr. Croce has never been penalized for misconduct, either by federal oversight agencies or by Ohio State, which has cleared him in at least five cases involving his work or the grant money he receives." *Id.*

The Article covered much ground over the next nine pages. The viewpoints of several respected scientists about Dr. Croce's place in the field were offered: "I would say Carlo has made some important contributions to the molecular causes of cancer . . . . I can't condone the sloppiness he has in general." *Id.* at PAGEID 460. Concerns about Dr. Croce's history as an adviser to the tobacco industry were reviewed. *See id.* at PAGEID 461-63. A history of allegations of various types of misconduct against Dr. Croce was examined, as was Ohio State's record of responding to such allegations. The Article included in its presentation the statements of Dr. Croce and Ohio State in defense of their actions. *See id.* at PAGEID 463-67.

Twelve pages in, the Article circled back to Dr. Sanders, under the heading of "Raising Larger Questions." *Id.* at PAGEID 468. It described how Dr. Sanders used Figure 1B from the *WWOX* paper in one of his classes as an example of image duplication. "'This is the one I start with because it's so obvious,' Dr. Sanders said." *Id.* When Dr. Sanders tells the class that "the journal declined to take any action, . . . [the students are] very stunned that that sort of thing happens." *Id.*

The Article relayed how, when Dr. Sanders raised concerns about the *WWOX* paper, the journal retained two experts and contacted Dr. Croce. The experts disagreed with one another about whether the images were duplicates and Dr. Croce denied the allegations. This led the journal to conclude that it "could not conclusively determine" whether to issue a correction. *Id.*

Dr. Sanders commented – in the next statement that is allegedly defamatory – as follows:

> **"A lab that is engaging in violating scientific norms is being rewarded for that very effort,"** he said.

*Id.* at PAGEID 469 (emphasis added).

11

The Article then concluded by putting the concerns about Dr. Croce's papers in context. "Concerns about falsified data in the scientific literature run far deeper than Dr. Croce's papers." *Id.* The Article cited a study that had found 800 research papers, out of a sampling of 20,000, which contained improperly manipulated blot images. The implications are alarming, according to the Article. For one, "[s]cience is built on science . . . . Incorrect or fraudulent papers could be slowing the pace of everything." *Id.* at PAGEID 470 (internal quotation marks omitted). In addition, misconduct undermines public confidence: "It impugns the reputation of science in general and scientists in that field in particular." *Id.* (internal quotation marks omitted).

###### H.    The *Lafayette Journal & Courier* Article

Shortly after the Article was published, Dr. Sanders was contacted by a local news reporter, Meghan Holden from the *Lafayette Journal & Courier*, who requested an interview with him about the *New York Times* Article. *See* Sanders Dep., Vol. I at 151-52. He agreed to an in-person interview, which lasted 30 minutes. *Id.* at 151.

During the interview, he discussed a research paper published in 2013 in JEM. *Id.* The paper contained another example of what Dr. Sanders believed was image duplication or falsification of blot panels. *Id.* at 150. Dr. Croce was the last-listed author on the paper, which was entitled, "*In vivo* NCL targeting affects breast cancer aggressiveness through miRNA regulation." Doc. 59-17.

Dr. Sanders had raised his concerns about the paper to JEM. What followed only made the problems worse, he believed. The journal and authors of the JEM paper purportedly tried to correct the blots panels, but Dr. Sanders believed that, among other things, one of the supposedly corrected versions did not actually replace a problematic panel, but rather the authors inverted or flipped the blots in the panel to make them look different. *See* Sanders Dep., Vol. I at 128-30. He believed too that another problematic panel had been replaced in a supposedly corrected version with a panel that was copied and flipped from an earlier paper which had been published in a different journal, but with Dr. Croce as the last-listed author. *See id.* at 130-33.

The *Lafayette Journal & Courier* published an article on March 22, 2017 entitled, "Purdue biologist calls out cases of scientific misconduct." The *J&C* Article was two-and-a-half pages long in the version submitted on the Court's record. *See* Doc. 59-16. It opened by stating that scientists who accuse other scientists "of sloppiness or misconduct in their work" are likely to face repercussions which could adversely affect their careers. The *J&C* Article then introduced Dr. Sanders as a scientist who was willing to face that risk, and it made the following statement that the complaint alleges is defamatory:

> But that didn't stop Sanders from alleging that Dr. Carlo Croce, a prominent cancer researcher at Ohio State University, **falsified data or plagiarized text in more than two dozen articles Croce has authored**.

*Id.* (emphasis added).

The *J&C* Article then noted Dr. Sanders's track record for calling out scientists for "bad behavior" and stated that he had recently gone "more public" by taking his claims to *The New York Times. Id.* His motivation for doing so: "'[I]t's about the scientific record and the integrity of the scientific record . . . . I believe that it is the responsibility of the individual scientist and the journals and institutions to reinforce scientific integrity, and that's what I'm trying to do.'" *Id.* (quoting Dr. Sanders).

The *J&C* Article turned to a discussion of Dr. Sanders having found "a pattern of data being duplicated within either the same article or within papers in which Croce is listed as an author." *Id.* "He said he also found acts of textual plagiarism." *Id.* The *J&C* Article cited the *New York Times* Article's report that an anonymous critic had made claims of "falsified data in more than 30 of Croce's articles" and that "at least 20 corrections, retractions or editors' notices in his articles have been published in scientific journals." *Id.* at PAGEID 485. Many of the problems involved blot images. *See id.*

The *J&C* Article then offered this quotation that the complaint alleges contains three defamatory statements:

> "If you wanted to just **make up data** you could do it in a way that's much more difficult to detect, but they didn't because **they were able to get away with this relatively simple manipulation**," Sanders said. "**They continued to do it over and over again**."

*Id.* (emphasis added).

That quotation was then put in the context of the JEM paper. "He's alleging the correction, which was originally prompted by a complaint from Sanders, also includes an image that was duplicated and manipulated." *Id.* The Article then explained the situation in more detail:

> This original image involved a northern blot, which is used to detect specific RNA molecules among a mixture of RNA, in a 2013 paper by Croce in the Journal of Experimental Medicine. Sanders noticed that two of the images appeared to be strikingly similar. The original figures were replaced in the online article by the now corrected versions. But a screenshot of the images, which Sanders sent to the Journal & Courier, shows that two sets of blots in the article included the same images, with one set of blots enlarged a little.

Sanders contacted the journal about the duplication and a correction by the authors was quickly published. That was in late January. But Sanders still sensed something was off with the corrected images. He said he knew he had seen that same set of blots before. He believes that set appeared in a 2010 article, of which Croce was also an author, in another journal.

The corrected set of blots, Sanders alleges, includes a duplicate, mirror image of a set of blots that were published in a 2010 article in Cancer Cell.

*Id.*

The *J&C* Article next incorporated the perspective of a professor at a major university who opined that the "spike" in scientific misconduct stems from "fierce competition to get a share of the finite pool of federal research dollars." *Id.* at PAGEID 485-86. The pressure to "churn out papers and receive more grants" creates an incentive to "rush work, cut corners or oversell the implications of their research." *Id.* at PAGEID 486.

The *J&C* Article returned to Dr. Sanders in the concluding paragraphs. "'The fact that they're getting (grants) having engaged in this activity means somebody else who is honest is not receiving them,' Sanders said." *Id.* (alteration in original). "On top of that, acts of fraud and dishonesty undermine public trust in science, he said. . . . But he's hoping he has at least inspired other scientists to speak out and spur a discussion." *Id.*

## I. Procedural Background

Dr. Croce originally brought suit against Dr. Sanders in state court. The action was removed to federal court on the basis of diversity jurisdiction. The Second Amended Complaint asserts three causes of action: defamation *per se*, defamation *per quod* (in the alternative) and intentional infliction of emotional distress.

Plaintiff alleges that Dr. Sanders is liable for eight separate instances of defamation: two in the Letter, two in the *New York Times* Article and four in the *J&C* Article.

Defendant has moved for summary judgment. Defendant argues that the statements are not actionable in defamation for one or more reasons: they are substantially true; they are statements of protected opinion; or they are susceptible of an innocent construction. Defendant further argues that he did not make the statements with actual malice, which he believes is the applicable standard because he views Dr. Croce as a limited purpose public figure. Finally, defendant argues that he is entitled to an award of attorney's fees and costs under Indiana's Anti-SLAPP (Strategic Lawsuit Against Public Participation) Act. *See* Ind. Code § 34-7-7-1, *et seq.*

14

## II.  Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009).  The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465.  "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment."  *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248).  Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations.  *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).  Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

### III.     Threshold Issues

#### A.     Choice of Law

Defendant argues that Ohio or Indiana law could govern the claims in this action.  Even so, he recognizes that a choice-of-law analysis would lead to the application of Ohio law because the law of the place of the injury generally governs a tort action and Dr. Croce, the allegedly defamed person, is an Ohio resident.  *See Klaxon Co. v. Stentor Elec. Mfg., Co.*, 313 U.S. 487, 496 (1941) (federal court sitting in diversity applies the choice-of-law rules of the state in which it sits); *Morgan v. Biro Mfg. Co.*, 15 Ohio St.3d 339, 342, 474 N.E.2d 286, 289 (Ohio 1984) (the law of the state with the "more significant relationship" to the lawsuit prevails and the place of injury is a primary consideration). Defendant has conceded too that Ohio and Indiana law are "very similar" when it comes to plaintiff's defamation claims.  Doc. 63-1 at p. 8.

Defendant, however, argues that Indiana law must be applied to his claim for attorney's fees under Indiana's anti-SLAPP law.  The Court will return to the anti-SLAPP claim in Section VII below, but will apply Ohio law to plaintiff's defamation claims.

#### B.     Elements of a Defamation Claim

Defamation is the publication of a false statement of fact "made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 7, 651 N.E.2d 1283, 1289 (Ohio 1995).

To establish a defamation claim under Ohio law, the plaintiff must establish that:

> (1) a false statement of fact was made, (2) the statement was defamatory, (3) the statement was published, (4) plaintiff suffered injury as a proximate result of the publication, and (5) defendant acted with the requisite degree of fault in publishing the statement.

*See Am. Chem. Soc'y v. Leadscope, Inc.*, 133 Ohio St.3d 366, 389, 978 N.E.2d 832, 852 (Ohio 2012) (quoting *Pollock v. Rashid*, 117 Ohio App.3d 361, 368, 690 N.E.2d 903, 908 (Ohio Ct. App. 1996)).

Defendant's motion for summary judgment puts at issue the first, second and fifth elements. The Court will begin its analysis with the standard applicable for the fifth element – whether plaintiff must prove that Dr. Sanders acted with actual malice in making the allegedly defamatory statements. The Court will then examine each allegedly defamatory statement and determine whether defendant has demonstrated, for purposes of summary judgment, that plaintiff cannot establish the disputed elements of his defamation claims.

C.      Degree of Fault

The requisite degree of fault on defendant's part depends on the "public" nature of the plaintiff. Ohio law creates four classifications of defamation plaintiffs "(1) a private person; (2) a public official; (3) a public figure; and (4) a limited purpose public figure." *Talley v. WHIO TV–7 & WDTN TV–2*, 131 Ohio App.3d 164, 169, 722 N.E.2d 103, 106 (Ohio Ct. App. 1998). "The determination of whether or not a party is a public figure is a matter of law." *Kassouf v. Cleveland Magazine City Magazines*, 142 Ohio App.3d 413, 421, 755 N.E.2d 976, 982 (Ohio Ct. App. 2001).

Defendant argues that Dr. Croce is a limited purpose public figure who must show that Dr. Sanders acted with actual malice. "To recover in a defamation action, a public figure, including a limited-purpose public figure, must show by clear and convincing evidence that the statements were made with actual malice, that is, with knowledge that the statements were false or with reckless disregard of whether they were false or not." *Daubenmire v. Sommers*, 156 Ohio App.3d 322, 343, 805 N.E.2d 571, 587 (Ohio Ct. App. 2004) (citing New *York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964)).

Plaintiff contends that Dr. Croce is a private person and must establish only negligence on the part of Dr. Sanders. A "private plaintiff must show that the statement was false and that the defendant was at least negligent in publishing the false statement." *Kassouf*, 142 Ohio App.3d at 421, 755 N.E.2d at 982-83 (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 766 (1985)).

"A limited-purpose public figure is one who becomes a public figure for a specific range of issues by being drawn into or voluntarily injecting himself into a specific public controversy." *Kassouf*, 142 Ohio App.3d at 421, 755 N.E.2d at 982 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)). In determining whether a person is a limited purpose public figure, a court considers the "person's participation in the controversy from which the alleged defamation arose" and whether the person "has attained a general notoriety in the community by reason of that participation." *Talley*, 131 Ohio App.3d at 170, 722 N.E.2d at 107.

In arguing that Dr. Croce is a limited purpose public figure, defendant recites what Dr. Croce has said about himself. And there's no shortage of material – "I am considered like the Pope of the genetics of leukemias and lymphomas." Croce Dep. at 16. Dr. Croce calls himself a "pioneer" and "one of the world's most distinguished scientific researchers in the area of cancer genetics." Second Am. Compl. at ¶ 5; Croce Decl. at ¶ 2. His "groundbreaking" work" has led to "revolutionary innovations" and has "changed medicine" and "changed the way we think about cancer." Second Am. Compl. at ¶¶ 5, 8; Croce Dep. at 14, 18. Dr. Croce doesn't hesitate to boast of his "H Index,"

17

"an objective measure to assess scientific impact of a scientist." Croce Decl. at ¶ 4. His H Index of 223 ranks as "one of the highest in the world," and Dr. Croce adds, "I am one of the most cited scientists in the world." *Id.*; *see also* Croce Dep. at 12-13 ("I have one of the greatest impacts in the world. I have the highest H index of any Italian scientist ever."). Dr. Croce's "phenomenal" and "outstanding" work has merited "generational fame" and his position as "the lodestar" in "a field replete with stellar scientists." Croce Dep. at 17; Second Am. Compl. at ¶¶ 48, 71.

But Dr. Croce's high view of himself does not satisfy the standard for proving that someone is a limited purpose public figure – a standard which defendant's motion fails to address. Ohio law follows the United States Supreme Court's decision in *Gertz* in this area. *See Kassouf*, 142 Ohio App.3d at 421, 755 N.E.2d at 982; *Talley*, 131 Ohio App.3d at 170, 722 N.E.2d at 107. Under *Gertz*, a court must first examine whether a public controversy exists. *See Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 529 (6th Cir. 2014) (citing *Gertz*, 418 U.S. at 345). Second, a court examines "the nature and extent of the [plaintiff's] involvement in the controversy" so as to "determine whether the plaintiff voluntarily injected itself into the particular public controversy giving rise to the alleged defamation." *Id.* (internal quotation marks omitted).

The Court finds that defendant has failed to meet his burden at the summary judgment stage of showing as a matter of law that Dr. Sanders is a limited purpose public figure.[6] Undoubtedly, misconduct in scientific research, particularly cancer research, is a matter of great public importance. *See Croce v. New York Times Co.*, 345 F.Supp.3d at 982 ("There could hardly be an area of medical science of greater public concern than finding a cure for cancer."). The Court will assume, without deciding, that a public controversy exists concerning the use of false and manipulated data in reporting the results of scientific research. *See Waldbaum v. Fairchild Pub., Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980) (a public controversy is "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way").

Where the evidence is currently lacking, however, is in showing that Dr. Croce voluntarily injected himself into the controversy. A court may consider several factors in determining the nature and extent of a plaintiff's participation in a public controversy: the extent to which plaintiff's participation in the controversy was voluntary; whether plaintiff had "access to channels of effective communication in order to counteract false statements"; the prominence of the role plaintiff played

---

[6] In Dr. Croce's suit against *The New York Times*, defendant conceded that Dr. Croce was a private figure. *See Croce v. New York Times Co.*, 345 F.Supp.3d 961, 974, 976 (S.D. Ohio 2018), *aff'd*, 930 F.3d 787 (6th Cir. 2019).

in the public controversy; whether plaintiff "sought to influence the resolution or outcome of the controversy; and whether "the controversy existed prior to the publication of the defamatory statement." *Thomas M. Cooley*, 759 F.3d at 529; *Hatfill v. The New York Times Co.*, 532 F.3d 312, 319 (4th Cir. 2008). *See also Worldnet Software Co. v. Gannett Satellite Info. Network, Inc.*, 122 Ohio App.3d 499, 508, 702 N.E.2d 149, 155 (Ohio Ct. App. 1997).

Without discussing these factors, defendant relies on Dr. Croce's prominence as a cancer researcher as proof that Dr. Croce invited attention and critique of his work and should be treated as a limited purpose public figure. This argument goes too far. Dr. Croce published articles in scientific, peer-review journals, not in media of general public circulation. Dr. Croce was a prolific author in specialized journals where review and critique are expected, but the record does not support a conclusion that he voluntarily sought to influence public debate on misconduct in scientific research.

A public controversy involving Dr. Croce did not arise until the *Times* Article was published. Dr. Croce had been the subject of criticism before by peers in the scientific community, Dr. Sanders included. But the available evidence shows that when a journal would contact Dr. Croce with concerns about an article he co-authored, he confined his responses to the journal contacting him. *See*, *e.g.*, Doc. 63-3 (Dr. Croce's response to proposed expression of editorial concern by PNAS); Docs. 63-4, 63-5, 63-6, 63-7, 63-8. Dr. Croce did not make a public matter out of these disputes or defend himself to a larger audience. *Compare Thomas M. Cooley*, 759 F.3d at 530-31 (plaintiff was a limited purpose public figure because it used its access to channels of communication to publicly respond to claim that it "churn[ed] out too many [law school] grads") *with Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 167 (1979) (finding that accused spy was not a limited purpose public figure where he "never discussed [the] matter with the press and limited his involvement to that necessary to defend himself against the contempt charge").

Indeed the evidence indicates that Dr. Sanders was the one who, being frustrated with the inaction of the journals, sought access to wider channels of communication to cast attention on the issue of research misconduct and the failure of scientific journals to adequately address these problems. Dr. Sanders reached out to a journalist, which led him to Glanz and *The New York Times*. Dr. Sanders hosted Glanz to talk about his concerns. Glanz, in turn, reached out to Dr. Croce, but not to discuss scientific misconduct. He approached Dr. Croce under the guise of talking about "promising anti-cancer results" and "the fascinating topic of microRNA." *Croce v. New York Times Co.*, 345 F.Supp.3d at 971 (quoting Glanz's initial letter to Dr. Croce). Even when Glanz later sent the

Letter to Dr. Croce, detailing the accusations against him, Dr. Croce responded only to Glanz; he did not make a broader or more public self-defense. *See id.*

Dr. Sanders and *The New York Times* essentially drew Dr. Croce into the controversy. In their view, they had very good reasons for doing so – reasons of public importance – but that does not convert Dr. Croce into a public figure. "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Wolston*, 443 U.S. at 167. Nor can a person create their own defamation defense by dragging someone "unwillingly" into a public controversy. *Id.* at 166.

In *Hutchinson v. Proxmire*, 443 U.S. 111 (1979), the plaintiff was a professor and researcher whose receipt of federal funding attracted the ire of someone who decried it as an example of government waste. The Court rejected defendant's claim that the plaintiff's published writings and his willing receipt of government funding made him a limited purpose public figure: "[Plaintiff's] published writings reach a relatively small category of professionals concerned with research in human behavior. To the extent the subject of his published writings became a matter of controversy, it was a consequence of the Golden Fleece Award. Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Id.* at 135. *Compare Hatfill*, 532 F.3d at 320-24 (finding a research scientist to be a limited purpose public figure during the 2001 anthrax scare because, prior to the defamatory statements, he had made public speeches and appeared in national media where he was a "vocal critic of the government's unpreparedness for a bioterrorist attack") *with Gilbert v. WNIR 100 FM*, 142 Ohio App.3d 725, 738, 756 N.E.2d 1263, 1272 (Ohio Ct. App. 2001) (holding that a prominent attorney accused of crime was not a limited purpose public figure because he "did not thrust himself into the investigation of the murder of Mrs. Prade; rather, the investigation was . . . thrust upon him"); *Greenberg v. CBS Inc.*, 69 A.D.2d 693, 705, 419 N.Y.S.2d 988 (N.Y. 2d Dep't 1979) (holding that a doctor who had authored dozens of articles in scientific books and journals was not a limited purpose public figure in action against CBS over a *60 Minutes* story accusing him of improperly prescribing amphetamines because plaintiff's articles were "intended for a scholarly audience and not for a mass market," "nor did he seek the attention of the media").

The Court finds that Dr. Croce is not a limited purpose public figure by virtue of Dr. Sanders's communications with a *New York Times* journalist leading to an article which used Dr. Croce as a "case study" about how public institutions and peer-review journals police scientific misconduct. Yes, Dr. Croce enjoys acclaim as a scientist and he certainly is no wallflower. *See* Doc. 59-9 at PAGEID 457

(*Times* Article using the word "flamboyant" in connection with Dr. Croce); Sylvia Pagán Westphal, *High Hopes for a New Kind of Gene*, Smithsonian Magazine (July 2009) (discussing Dr. Croce's work with microRNA and his "extravagant" taste for Ferraris and Italian art).  But the summary judgment record does not establish that Dr. Croce invited involvement in the controversy for which Dr. Sanders's remarks and the *Times* Article were concerned.

The Court therefore will apply a negligence standard when examining the claims against Dr. Sanders.  *Kassouf*, 142 Ohio App.3d at 421, 755 N.E.2d at 982-83.

## IV.    The Letter

Plaintiff alleges that there are two defamatory statements contained in the November 23, 2016 Letter sent by Glanz to Ohio State and Dr. Croce.  Both statements appear in the following paragraph:

> Dr. Sanders argues – because in his observation the **image fabrication, duplication and mishandling, and plagiarism in Dr. Croce's papers is routine**, and because the authors routinely dispute those allegations when confronted with them through the journals – that **Dr. Croce is knowingly engaging in scientific misconduct and fraud**.  Does Dr. disagree with this allegation, and if so, why[?]

Doc. 59-11 at PAGEID 474 (emphasis added).  Though Glanz did not present these statements as direct quotations, defendant does not dispute for purposes of the present motion that they accurately reflect what he said to Glanz.  The parties identify the statements as Statements 1a and 1b.

### A.    Statement 1a

Defendant argues that the statement, "image fabrication, duplication and mishandling, and plagiarism in Dr. Croce's papers is routine," is not a false statement of fact.  According to defendant, discovery has proved that these problems did in fact exist in papers for which Dr. Croce was listed as an author.  Defendant further argues that the problems appeared enough to make the description of them as "routine" substantially true.  Defendant also contends that he was not negligent in making the statement, but based it on facts within his knowledge or "in his observation."

Plaintiff responds that an ordinary reader would interpret the statement as saying that Dr. Croce himself engaged in image fabrication and plagiarism.  A reader would not appreciate the distinction that the problems occurred in papers he personally did not write or research.  In this way, plaintiff argues, the statement is untrue in accusing Dr. Croce of personally and routinely engaging in fabrication and plagiarism.  Plaintiff continues that in no sense of the word "routine" could a dozen or so problems out of more than 1,000 papers be considered routine.  Lastly, plaintiff argues that Dr.

Sanders was negligent in accusing Dr. Croce of misconduct without verifying whether Dr. Croce was personally involved in each of the papers at issue.

### 1.    Truth

The first element of a defamation claim is that defendant made a false statement of fact.  *See Am. Chem. Soc'y*, 133 Ohio St.3d at 389, 978 N.E.2d at 852.  A false statement is one which "sets forth matters which are not true or statements without grounds in truth or fact.  A statement is not a false statement if, even though it is misleading and fails to disclose all relevant facts, the statement has some truth in it.  Moreover, a statement that is subject to different interpretations is not false."  *Susan B. Anthony List v. Driehaus*, 779 F.3d 628, 633 (6th Cir. 2015) (internal quotation marks omitted); *accord Serv. Emp. Int'l Union Dist. 1199 v. Ohio Elections Comm'n*, 158 Ohio App.3d 769, 822 N.E.2d 424, 430 (Ohio Ct. App. 2004).

Showing truth in defamation law is a "low threshold."  *Susan B. Anthony List*, 779 F.3d at 633.  What matters is "that the 'gist' or 'sting' of the statement is substantially true."  *Id.*; *accord National Medic Services Corp. v. E.W. Scripps Co.*, 61 Ohio App.3d 752, 573 N.E.2d 1148, 1150 (Ohio Ct. App. 1989).  The Court looks past "minor inaccuracies" to find the "gist."  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991).  An inaccuracy is minor, unless the statement "'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'"  *Id.* (quoting R. Sack, Libel, Slander, and Related Problems 138 (1980)).

Discovery has proved the existence of about 30 instances of fabrication or duplication of figures and text overlap in papers bearing Dr. Croce's name as a co-author.  Plaintiff's own inventory of problems has 35 entries, although as many as 3 to 5 entries relate to what are indicated as minor mistakes, such as a correction to an author's name or a misplaced comma, which are not the types of problems at issue here.  *See* Doc. 63-2 at PAGEID 620-23.

Plaintiff's response to the motion for summary judgment does not dispute that the problems in his inventory represent instances of fabrication, falsification and plagiarism.  Rather, plaintiff contends that Dr. Sanders's statement falsely accuses Dr. Croce of personally engaging in image fabrication and plagiarism.  *See, e.g,* Doc. 65 at PAGEID 668-69, 672-73, 76-77.  Plaintiff argues that a reasonable reader would interpret the statement as claiming that Dr. Croce directly committed those practices.

The Court disagrees.  The closest the statement gets to plaintiff's interpretation is by referring to the problematic articles as "Dr. Croce's papers."  But context is critical, and a court must review a publication in its entirety.  *See Am. Chem. Soc'y*, 133 Ohio St.3d at 389-90, 978 N.E.2d at 853;

*Connaughton v. Harte Hanks Commc'ns, Inc.*, 842 F.2d 825, 840 (6th Cir. 1988), *aff'd*, 491 U.S. 657 (1989) ("[T]he words of the publication should not be considered in isolation, but rather within the context of the entire article . . . .").

A reasonable reader reviewing the Letter in its entirety would understand that "Dr. Croce's papers" refers to papers for which he was listed a co-author. The Letter's first numbered paragraph sets the stage in its first sentence: "Dr. Croce is listed as a coauthor on at least 15 papers that have been retracted or corrected, many in recent years." Doc. 59-11 at PAGEID 474. The same paragraph discusses problems in "papers coauthored by Croce" and states that Dr. Sanders had lodged complaints with respect to "papers on which Dr. Croce is an author." *Id.* And to leave no doubt, the Letter further clarifies that in most of these papers "Dr. Croce is the senior author – indicated either by his position as last author, the fact that the research was done under his supervision or in his lab, or simply because he has far more seniority in the field than any of the other authors." *Id.*

Statement 1a is the first sentence in the second numbered paragraph and immediately follows the first numbered paragraph. So when Dr. Sanders said that the problems were in "Dr. Croce's papers," a reasonable reader would know without hesitation that the papers were ones for which Dr. Croce was listed as a co-author. They would understand that Dr. Croce's name could have been on a paper even though he did not personally write the article or conduct the research. And the rest of the Letter confirms this understanding. The Letter asks whether Dr. Croce "attempt[ed] to exercise any quality control on the papers that bear his name?" and whether he exercised any "oversight of the practices within his lab or among his collaborators?" *Id.* The Letter repeatedly refers to Dr. Croce as a co-author and as having collaborators. *Id.* at PAGEID 474-75.

The Court thus finds that Statement 1a was true or substantially true in stating that Dr. Croce's papers contained image fabrication, duplication and plagiarism.

Statement 1a describes the problems in Dr. Croce's papers as "routine." As an adjective, "routine" means "performed in a more or less identical way on repeated occasions" and "performed as or forming part of a regularly followed procedure." *Routine*, Oxford English Dictionary (3d ed. 2011). It describes a practice or procedure which is "normal," "usual" or "regular." *Routine*, Oxford American Writer's Thesaurus (3d ed. 2012).

The Court finds that Statement 1a is substantially true in using the word routine. The gist of Dr. Sanders's claim was that the problems of fabrication, duplication and plagiarism appeared repeatedly in papers Dr. Croce had co-authored. And they did – at least 30 times. As the Letter describes, it was normal for Dr. Sanders to find these problems in papers with Dr. Croce's name as a

co-author.  *See* Doc. 59-11 at PAGEID 474-75; Sanders Dep., Vol. I at 135; Sanders Dep., Vol. II at 46.

In plaintiff's view, "routine" does not accurately describe the existence of 30 or so problems out of over 1,000 papers on which Dr. Croce's name has appeared.  However, "defamation case law affords leeway in the reporting of numbers if the discrepancy does not alter the gist of what is being reported and does not produce a different effect in the mind of the reader."  *Croce v. New York Times Co.*, 345 F.Supp.3d at 987 n.5 (citing cases).  Here, the gist of Statement 1a is that problems had repeatedly been found in Dr. Croce's papers.  A reasonable reader would not expect a certain percentage.

The context in which Statement 1a appears supports this conclusion.  The Letter's first numbered paragraph again sets the tone by communicating the numerical magnitude involved.  It reports that 15 papers with Dr. Croce as co-author had been corrected or retracted, that Dr. Sanders had "lodged over a dozen complaints" and that "at least 20 papers" had been the subject of criticism on anonymous websites.  Doc. 59-11 at PAGEID 474.  The Letter proceeds to cite specific examples of papers of which Dr. Sanders had complained.  *See id.* at PAGEID 475.

It is clear then that the Letter and Statement 1a refer to a group of several dozen papers in which problems had been detected.  Neither the Letter nor Dr. Sanders purport to have canvassed all of Dr. Croce's papers or have found a certain ratio with problems in them.  Rather, for the papers with which the Letter and Dr. Sanders are concerned, repeated instances of fabrication, duplication and plagiarism were found.

The Court finds that Statement 1a is substantially true in describing the existence of problems in Dr. Croce's papers as routine.

### 2.    Negligence

Defendant argues that Dr. Sanders did not act negligently when he claimed the problems in Dr. Croce's papers were routine.  Plaintiff must prove "by clear and convincing evidence that the defendant failed to act reasonably in attempting to discover the truth or falsity or defamatory character of the publication."  *Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St.3d 176, 180, 512 N.E.2d 979, 984 (Ohio 1987).  "Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  *Id.*, 32 Ohio St.3d at 180-81, 512 N.E.2d at 984 (internal quotation marks omitted).

The Court finds that plaintiff has not, in response to the motion for summary judgment, put forth evidence from which a jury could find by clear and convincing evidence that Dr. Sanders was negligent in making Statement 1a.  Again, Dr. Sanders did not purport to have examined all of Dr. Croce's papers.  Once a problem with the *WWOX* paper was brought to his attention, Dr. Sanders confirmed the problem and began looking at other papers with Dr. Croce as a co-author.  *See* Sanders Dep., Vol. I at 135.  He reviewed at least 30 papers and found repeated examples of image duplication and plagiarism.  *Id.* at 135-36; Sanders Decl. at ¶ 6.

Statement 1a begins with the phrase "in his observation," making clear that Dr. Sanders was speaking of the papers which he had reviewed.  Plaintiff has not shown that Dr. Sanders was negligent in reviewing the papers for image fabrication, duplication and plagiarism.  Discovery has demonstrated the existence of these problems and plaintiff has not contested Dr. Sanders's credentials in being competent to identify such problems in scientific articles.

Plaintiff's theory of negligence returns to the argument that Dr. Sanders was accusing Dr. Croce of directly engaging in image fabrication and plagiarism.  Plaintiff contends that Dr. Sanders acted negligently by not verifying whether Dr. Croce had personally committed the misconduct.  But again this was not the claim.  Dr. Sanders claimed that the problems existed in papers for which Dr. Croce was a co-author, not that Dr. Croce personally committed the fabrication or plagiarism.

Accordingly, the Court finds that plaintiff cannot establish by clear and convincing evidence that Dr. Sanders made Statement 1a negligently.

### B.    Statement 1b

In Statement 1b, "Dr. Sanders argues . . . that Dr. Croce is knowingly engaging in scientific misconduct and fraud."  Doc. 59-11 at PAGEID 474.  He so argues because in his observation the problems in Dr. Croce's papers are routine and because "the authors routinely dispute those allegations when confronted with them through the journals."  *Id.*  Defendant contends that this statement qualifies as protected opinion.  The Court agrees.

"Expressions of opinion[,]" as opposed to statements of fact, "are generally accorded absolute immunity from liability under the First Amendment."  *Scott v. News-Herald*, 25 Ohio St.3d 243, 496 N.E.2d 699, 705 (Ohio 1986).  In determining "whether a statement constitutes protected opinion or actionable fact, courts should consider the totality of the circumstances, including factors such as: (1) the specific language used; (2) whether the statement is verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appeared."  *Bentkowski v. Scene Mag.*, 637 F.3d 689, 693-94 (6th Cir. 2011) (internal quotation marks omitted) (citing *Vail v. The Plain Dealer*

25

*Publ'g Co.*, 72 Ohio St.3d 279, 282-83, 649 N.E.2d 182, 185-86 (Ohio 1995)). Each factor should be considered, "but the weight given to any one will conceivably vary depending on the circumstances presented." *Vail*, 72 Ohio St.3d at 282, 649 N.E.2d at 185.

The language used in Statement 1b presents an argument: "Dr. Sanders argues . . . ." That language alone signals that an opinion will likely follow. *See Trebilcock v. Elinsky*, No. 1:05 CV 2428, 2006 WL 414064, at *6 (N.D. Ohio Feb. 21, 2006) ("[T]he Court finds that the use of the word 'contended' renders the statement an opinion. 'To contend,' by definition, means to put forth an opinion."). And an opinion does follow. It is Dr. Sanders's opinion that Dr. Croce "is knowingly engaging in scientific misconduct and fraud." The argument is based on two factual premises which are true or substantially true: (1) problems in Dr. Croce's papers are routine and (2) the authors of the papers "routinely dispute those allegations when confronted with them through the journals."[7] In other words, because Dr. Sanders has found that problems exist in the papers for which Dr. Croce is a co-author and found that Dr. Croce and his co-authors have disputed those problems, Dr. Sanders believes that Dr. Croce has engaged in misconduct and fraud.

To be sure, Statement 1b contains another premise, though not expressly stated. It goes to the issue which occupies much of plaintiff's attention – the notion that Dr. Croce was personally involved in the image fabrication and plagiarism. Again, Dr. Sanders never made that factual assertion, but Statement 1b is plainly built on his belief that all authors should be held responsible for the content of papers bearing their name. He told Glanz, "I believe everybody on the paper is responsible." Sanders Dep., Vol. II at 51; *accord* Sanders Decl. at ¶ 7. And the Letter conveys Dr. Sanders's opinion on the issue by explaining that in many instances Dr. Croce was the last-listed author on a paper and by reporting that Dr. Sanders had levied his allegations against Dr. Croce as well as his co-authors or collaborators. *See* Doc. 59-11 at PAGEID 474-75; *accord* Glanz Decl. at ¶ 10 (stating that Dr. Sanders expressed his belief that "co-authors who are directors of laboratories and their senior researchers have a particular responsibility for an article"). Thus, the conclusion made in Statement 1b (that Dr. Croce is knowingly engaging in misconduct and fraud) is itself premised on an opinion that all authors of a paper, particularly the last-listed one, should be held accountable for its contents.

Turning to the second factor, plaintiff argues that Statement 1b is more than just an opinion because the scientific community has standards in place for what constitutes misconduct. Plaintiff

---

[7] As explained in Section IV.A.1 above, the first factual premise is true or substantially true. And plaintiff does not deny the truth of the second premise. *See*, *e.g.*, Doc. 63-5 (Dr. Croce's letter to PNAS disputing the existence of problems with the *WWOX* paper).

contends that the statement can be verified because, under applicable federal policy adopted by the scientific community, image fabrication and plagiarism do not constitute sanctionable "research misconduct" unless done "intentionally knowingly, or recklessly." *See* 42 C.F.R. § 93.104(b).

If this were a debate about whether Dr. Croce violated the policy, plaintiff might have a point, but he misses the larger concern here. The whole point behind Statement 1b was Dr. Sanders's contention that the scientific community's system of self-regulation had failed.[8] Context again is key. *See Bentkowski*, 637 F.3d at 695 (the general context and broader context are often analyzed together). The first numbered paragraph of the Letter recounts how Dr. Sanders had lodged over a dozen complaints with journals to little avail. In many cases "Dr. Croce and colleagues have successfully disputed the claims and prevented corrections or retractions from being issued." Doc. 59-11 at PAGEID 474. The Letter additionally provides examples of papers about which Dr. Sanders had complained, where the journal initially agreed with Dr. Sanders's assessment but ultimately relented after Dr. Croce or his co-authors insisted that no wrong had been committed. *Id.* at PAGEID 475. The Letter also cites the *WWOX* paper which Dr. Sanders had complained of to PNAS. Though independent experts agreed with Dr. Sanders, the authors had at that point successfully urged PNAS not to issue a correction. *Id.*

Dr. Sanders's statement thus expresses an opinion: when authors are confronted with evidence of problems in a paper which they co-authored and they deny the existence of the problems and insist their papers should not be corrected, their response should be considered to be knowing misconduct and fraud, or failure to own up to the truth. This is a value judgment. *See Sarkar v. Doe*, 318 Mich. App. 156, 196, 897 N.W.2d 207, 229 (Mich. Ct. App. 2016) (holding that statements on Pubpeer which argued that professor should be investigated for research misconduct were protected opinion); *see also Adams v. Coughlan*, No. 2:14-cv-41, 2015 WL 300465, at *3 (S.D. Ohio Jan. 22, 2015) (holding that statements which argued that an attorney's conduct warranted concern and were not consistent with professional standards were protected opinion). Dr. Sanders was not arguing that Dr. Croce's conduct constituted research misconduct under federal policy; rather, he was expressing his belief that Dr. Croce's insistence on not correcting the scientific record should itself be treated as its own form of misconduct. *See also* Sanders Decl. at ¶ 10; Sanders Dep., Vol. II at 49-51.

Accordingly, the Court finds as a matter of law that Statement 1b is a protected opinion.

---

[8] The *Times* Article would also make the same argument.

## V.        The Article

Plaintiff alleges that the *New York Times* Article contains two separate defamatory statements. Both are direct quotations of Dr. Sanders.  The first refers to a "reckless disregard for the truth" and the second concerns a lab which is "violating scientific norms."

### A.        Statement 2a

"'It's a reckless disregard for the truth,' Dr. Sanders said in an interview."  Doc. 59-9 at PAGEID 458.  Under a natural reading of the Article, the word "it's" refers to the practice of falsified data and plagiarism occurring in Dr. Croce's papers.  The paragraph immediately before Statement 2a states that Dr. Sanders "has made claims of falsified data and plagiarism directly to scientific journals where more than 20 of Dr. Croce's paper have been published."  *Id.* at PAGEID 457

Defendant argues that Statement 2a is protected opinion and the Court agrees.  Dr. Sanders offered his value judgment about repeatedly having falsified data and plagiarism in one's scientific papers.  He said in essence that he had observed serious problems occurring repeatedly in papers with Dr. Croce's name on them and he believed those practices showed a reckless disregard for the truth." In "reckless disregard" he used a term whose meaning even courts strain to define and that would not be precise or verifiable to an ordinary reader.  *See St. Amant v. Thompson*, 390 U.S. 727, 730 (1968) ("'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition.  Inevitably its outer limits will be marked out through case-by-case adjudication . . . .); *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 293 n.18, 294 N.W.2d 437, 454 (Wis. 1980) (noting that the term "reckless disregard" leaves "room for interpretation" and makes it "difficult to predict" how a jury will handle it); *Christensen v. Cooper*, 972 So.2d 207, 211 n.2 (Fla. Dist. Ct. App. 2007) (observing that terms like "reckless disregard" are "difficult to define," "even for legal experts").

Context also points toward Statement 2a being an opinion.  Once again, Dr. Sanders did not tether his statement to some set of governing standards – the Article makes clear to readers that Dr. Sanders believed self-policing by journals had failed.  *See id.* at PAGEID 468.  And to be certain that readers knew Dr. Sanders had his own strong views of right and wrong, the Article describes Dr. Sanders as a "critic" and "freelance ethicist" who also ran "several quixotic campaigns" for political office as a Democrat in a deeply-Republican area. *Id.* at PAGEID 457, 469.  *See Freelance* (adj.), Oxford English Dictionary (3d ed. 2008) ("individualistic, independent"); *Quixotic* (adj.), *id.* ("naively idealistic").

Plaintiff has no answer to the proposition that Statement 2a is an opinion.  Much as he did with respect to the Letter, plaintiff argues that Statement 2a is defamatory because a reasonable reader

28

would take Dr. Sanders to be accusing Dr. Croce of personally committing research misconduct. But here too the language and context of the statement do not support plaintiff's interpretation. In all of the quoted statements by Dr. Sanders, he never mentions Dr. Croce by name. The Article reports that Dr. Sanders claimed to have found problems in Dr. Croce's papers. And the Article goes on to explain, "Academic papers often have multiple authors, with the scientists who perform the hands-on work listed at the beginning and the senior scientists in charge named at the end." *Id.* at PAGEID 459. Also included as authors are "junior researchers" in the senior scientist's laboratory and "collaborators at other labs." *Id.* A reasonable reader would understand that the problems could have been committed by any of these individuals.

That being said, the clear implication of Dr. Sanders's statements is, as it was in the Letter, that Dr. Croce should be held responsible for the papers bearing his name. He should answer for the false data and plagiarism found in papers coming from his lab, even if he was not personally involved in the writing or research. Dr. Sanders's position on this matter again is an expression of opinion.

The Court thus finds as a matter of law that Statement 2a is a protected opinion.

**B.      Statement 2b**

The Article quotes Dr. Sanders as saying, "A lab that is engaging in violating scientific norms is being rewarded for that very effort." Doc. 59-9 at PAGEID 469. Plaintiff argues that the statement is defamatory because it accuses Dr. Croce himself of violating scientific norms.[9]

Plaintiff's interpretation again is not supported by the language and context of the statement. Dr. Sanders referred to "a lab." Just as reasonable readers would appreciate from the whole Article that a scientific paper has many authors, they would understand that a lab has more than one scientist. The Article describes Dr. Croce's lab at Ohio State as "sprawling." *Id.* at PAGEID 457. "Junior colleagues," "junior researchers" and "younger scientists" perform work at the lab and help author papers. *Id.* at PAGEID 459, 463, 464, 466, 467. A photo of Dr. Croce in his lab shows many workstations and two individuals at work. *See id.* at PAGEID 463.

Again, Dr. Sanders did not accuse Dr. Croce of personally falsifying data and committing plagiarism. He said he found such problems in papers coming from Dr. Croce's lab. The Article states that Dr. Croce, when confronted with claims of misconduct occurring in his lab, "largely placed the blame" on "junior researchers" or other collaborators. *Id.* at PAGEID 459. The Article reports

---

[9]  In response to the motion for summary judgment, plaintiff does not argue that the "being rewarded" portion of Statement 2b is defamatory.

past instances in which Dr. Croce used junior researchers to shield himself from further scrutiny and to evade being required to correct problems. *See id.* at PAGEID 463-67. Against this backdrop, Statement 2b appears in a section of the Article entitled "Raising Larger Questions." *Id.* at PAGEID 468-69. Statement 2b reflects Dr. Sanders's belief the Dr. Croce should be held accountable for the problems occurring in his lab, and this view is protected opinion.

Plaintiff next argues that the statement is defamatory because it accuses Dr. Croce's lab of "violating scientific norms." Plaintiff contends that this aspect of the statement is not opinion because a violation of scientific norms can be verified with reference to federal standards as to what constitutes research misconduct. *See* 42 C.F.R. § 93.104(b).

Plaintiff's argument fails. Dr. Sanders made no reference to the federal standards[10] and the Article conveys his view that self-policing had failed and that misconduct was indeed being "rewarded." The view of this self-described "freelance ethicist" as to the "norms" of the scientific community is protected opinion. As this Court said in Dr. Croce's suit against *The New York Times*, statements in reference to "the norms and 'generally expected' boundaries of the research community" and "attempt[s] to position Dr. Croce relative to them . . . . are opinion; they make judgments about consensus, bounds and norms that aren't well enough defined to prove or disprove." *Croce v. New York Times Co.*, 345 F.Supp.3d at 989-90 (citing *Adams*, 2015 WL 300465, at *3; *Roberts v. Murawski*, No. C-060741, 2007 WL 2019833, at *4 (Ohio Ct. App. July 13, 2007)).

But even if Statement 2b were verifiable against federal or research community standards, the Court would find the "violating scientific norms" statement to be substantially true. Discovery has proved the existence of many instances of image manipulation and plagiarism in papers Dr. Croce co-authored, including papers which originated from his lab. *See* Doc. 63-2 at PAGEID 620-23. Plaintiff has failed to create a genuine issue of fact disputing that these instances meet the definitions of fabrication, falsification and plagiarism found in the federal standards.[11] *See* 42 C.F.R. § 93.103. And

---

[10] The Article itself mentions the existence of federal standards, but only to point out the "awkward constraint" that the federal Office of Research Integrity "does not carry out its own investigations, but relies on accused researchers' own institutions to forward their findings." Doc. 59-9 at PAGEID 465. "With their own reputations on the line, institutions have a tremendous conflict of interest . . . . There's a terrible temptation to bury it all." *Id.* (internal quotation marks omitted).

[11] Plaintiff instead argues that these problems do not rise to the level of sanctionable research misconduct because the scienter requirement is not met. *See* 42 C.F.R. § 93.104.(b). But what matters is the gist of what Dr. Sanders said – that norms were violated because the papers contained image manipulation and plagiarism. Whether or not the technical standard of sanctionable research misconduct was met does not alter the substantial truth of the statement.

even with the journals' alleged reluctance to enforce standards, about 30 of Dr. Croce's papers have been the subject of correction, retraction, withdrawal or expressions of concern.  *See* Doc. 63-2 at PAGEID 620-23.  Thus, whether one is referring to the federal standards or to the journals' own editorial guidelines, the record establishes that papers from Dr. Croce's lab have violated scientific norms.

The Court further finds that plaintiff has not produced evidence from which a jury could find by clear and convincing evidence that Dr. Sanders was negligent in making Statement 2b.  Plaintiff relies once more on the argument that Dr. Sanders acted negligently by not verifying whether Dr. Croce had personally committed the misconduct.  This misinterprets what Dr. Sanders said, and plaintiff has not otherwise shown that Dr. Sanders was negligent in reviewing the papers for image manipulation and plagiarism.

Defendant is thus entitled to summary judgment with respect to Statement 2b.

## VI.    The *J&C* Article

The *Lafayette Journal & Courier* published an article on March 22, 2017 about Dr. Sanders and his appearance in the *Times* Article.  The *J&C* Article is entitled, "Purdue biologist calls out cases of scientific misconduct."  It contains four allegedly defamatory statements.

### A.    Statement 3a

The Article states in the third paragraph, "But that didn't stop Sanders from alleging that Dr. Carlo Croce, a prominent cancer researcher at Ohio State University, falsified data or plagiarized text in more than two dozen articles Croce has authored."  Doc. 59-16 at PAGEID 484.

Statement 3a is not a direct quotation and defendant contends that he did not make or publish the statement and cannot be held liable for it.  *See Am. Chem. Soc.*, 133 Ohio St. 3d at 389, 978 N.E.2d at 852; *Fuchs v. Scripps Howard Broad. Co.*, 170 Ohio App.3d 679, 691, 868 N.E.2d 1024, 1034 (Ohio Ct. App. 2006).  In support of his factual assertion that he did not make or publish the statement, defendant provides both his declaration and deposition testimony.  "I have never asserted to anyone that Dr. Croce himself manipulated an image or wrote plagiarized text.  Rather, I have pointed out errors in papers in which he is listed as a co-author."  Sanders Decl. at ¶ 7.  "I have not made any allegations against Dr. Croce for falsification or fabrication.  I have said that there is fabrication or falsification in these papers."  Sanders Dep., Vol. I at 138.

Plaintiff responds without elaboration, "While Sanders may deny that he made Statement 3a, the Journal-Courier Article itself is evidence to the contrary."  Doc. 65 at PAGEID 688.

The matter in dispute is whether Dr. Sanders said that Dr. Croce "falsified data or plagiarized text in more than two dozen articles." Defendant has submitted evidence in admissible form that he did not. Plaintiff contends that the statement in the *J&C* Article ("that didn't stop Sanders from alleging") is itself evidence that he did.

The Court finds that the statement in the Article is inadmissible hearsay. *See* Fed. R. Evid. 802. Plaintiff attempts to offer the out-of-court statement of the author of the *J&C* Article for the truth of the matter that Dr. Sanders actually made the allegation against Dr. Croce. *See* Fed. R. Evid. 801. Because plaintiff has not shown that the statement in the Article fits within any hearsay exception, the rule against hearsay prevents plaintiff from using the Article to prove that Dr. Sanders made Statement 3a. *See Turner v. City of Taylor*, 412 F.3d 629, 652 (6th Cir. 2005) (newspaper article is inadmissible hearsay when offered to prove the truth of its contents); *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) (newspaper articles are "classic, inadmissible hearsay" and are "unusable to defeat summary judgment").

Thus, defendant is entitled to summary judgment with respect to Statement 3a.

**B.      Statements 3b, 3c and 3d**

The final set of allegedly defamatory statements are related and appeared in the following paragraph:

> "If you wanted to just **make up data** you could do it in a way that's much more difficult to detect, but they didn't because **they were able to get away with this relatively simple manipulation**," Sanders said.  "**They continued to do it over and over again**."

Doc. 59-16 at PAGEID 485 (emphasis added). Defendant does not deny he made these statements.

Both parties analyze the three statements together as one. Combined, the statements convey that data manipulation occurred repeatedly.[12] Defendant argues that the statements are true or substantially true because data manipulation did occur in papers for which Dr. Croce was a co-author. Plaintiff's argument is familiar – that the statements are defamatory because they accuse Dr. Croce of personally engaging in data manipulation.

The *J&C* Article says less about the practice of multiple authors in scientific papers than do the Letter and *Times* Article. Even so, the Court finds that a reasonable reader would understand from Dr. Sanders's statements and the context of the *J&C* Article that Dr. Sanders was referring to data manipulation occurring in papers for which Dr. Croce was a co-author. Dr. Sanders is never quoted

---

[12]  Plaintiff does not argue that the "able to get away with this" portion of the statement is defamatory.

in the Article as mentioning Dr. Croce by name.  Two paragraphs before the one in question, the Article reports that Dr. Sanders had found a pattern of duplicated data in "papers in which Croce is listed as an author."  Doc. 59-16 at PAGEID 484.  And several paragraphs later it refers to the "authors" (in the plural) of a paper against which Dr. Sanders had made a complaint.  *Id.* at PAGEID 485.  Dr. Sanders used the plural pronoun "they" in referring to the individuals who made the data up and did it over and over again.  *Id.*

Even if there is room to interpret Dr. Sanders's statements as suggesting that Dr. Croce himself manipulated data, defendant would prevail under Ohio's innocent-construction rule.  When an allegedly defamatory statement is susceptible to both a defamatory meaning and an innocent meaning, the innocent one is adopted and recovery is barred.  *See Konica Minolta Bus. Sols., U.S.A., Inc. v. Allied Office Prod., Inc.*, 724 F.Supp.2d 861, 871 (S.D. Ohio 2010) (citing *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 193, 783 N.E.2d 920, 928 (Ohio Ct. App. 2002)).  In light of Dr. Sanders's use of the word "they" and his reference to "authors" and papers with Dr. Croce listed as an author, the innocent interpretation – that the data manipulation occurred in papers for which Croce was listed as an author – is a reasonable one and must be adopted.  *See McKimm v. Ohio Elections Comm.*, 89 Ohio St.3d 139, 146, 729 N.E.2d 364, 372 (Ohio 2000).

The Court also finds that the innocent interpretation is substantially true.  As explained above, data manipulation has been found multiple times in papers for which Dr. Croce is an author.  The Court further finds that plaintiff has not submitted evidence from which a jury could find by clear and convincing evidence that Dr. Sanders acted negligently in making the statements.  Dr. Sanders made Statements 3b, 3c and 3d in reference to the 2013 JEM paper.  *See* Doc. 59-16 at PAGEID 485.  He found that the JEM paper contained duplicated blot images in one of the figures and found that purported corrections to the paper contained inverted images to make them look different and contained duplicated images from a 2010 Cancer Cell paper.  *See id.*; Sanders Dep., Vol. I at 128-33, 150-53.  Plaintiff, whose own discovery responses acknowledge that the JEM paper and Cancer Cell paper were corrected for problems with the figures, has not demonstrated how Dr. Sanders was negligent in saying that the data manipulation in the papers occurred repeatedly.  *See* Doc. 63-2 at PAGEID 620.

The Court thus finds that defendant is entitled to summary judgment with respect to Statements 3b, 3c and 3d.

## VII.    Indiana Anti-SLAPP Act

Indiana's Anti-SLAPP Act provides a good faith defense in defamation lawsuits. *See* Ind. Code § 34-7-7-5. It protects individuals against "meritless suits aimed at silencing a plaintiff's opponents, or at least diverting their resources." *Nexus Grp., Inc. v. Heritage Appraisal Serv.*, 942 N.E.2d 119, 122 (Ind. Ct. App. 2011). To avail himself of the Act, a defendant must plead the defense and file a special motion to dismiss, which operates as a stay on discovery. *See* Ind. Code § 34-7-7-6. The filing of the special motion to dismiss triggers an "expedited proceeding" provision by which the trial court, within 180 days, supervises limited discovery and determines whether defendant has proved by a preponderance of the evidence that he was sued for lawfully speaking on a public issue or a matter of public interest. *Id.* at § 34-7-7-9. If the Act's procedural and substantive provisions are satisfied, defendant may recover attorney's fees and costs. *Id.* at § 34-7-7-7.

In arguing that Indiana law can provide a defense when Ohio law governs plaintiff's defamation claims, defendant invokes a legal doctrine known as *depeçage*, from the French word for "dismemberment." *See Boomsma v. Star Transp., Inc.*, 202 F.Supp.2d 869, 874 (E.D. Wis. 2002) (citing Black's Law Dictionary 448 (7th ed. 1999)). Under this doctrine, different issues in a case arising from the same set of facts can be decided under the laws of different states. *Estate of Sample through Cornish v. Xenos Christian Fellowship, Inc.*, 2019-Ohio-5439, ¶¶ 23-27, 139 N.E.3d 978, 985-86 (Ohio Ct. App. 2019). Although "courts must use *depeçage* with caution," *id.*, 2019-Ohio-5439 at ¶ 27, 139 N.E.3d at 986, it has been applied in anti-SLAPP cases. *See, e.g.*, *Intercon Sols., Inc. v. Basel Action Network*, 969 F.Supp.2d 1026, 1035 (N.D. Ill. 2013), *aff'd*, 791 F.3d 729 (7th Cir. 2015) ([T]he plaintiff's defamation claims and defendant's anti-SLAPP defenses need not be governed by the same state's laws."); *Diamond Ranch Acad., Inc. v. Filer*, 117 F.Supp.3d 1313, 1322-23 (D. Utah 2015).

The Court finds that even if *depeçage* were applied, defendant is ineligible to recover fees and costs under Indiana's anti-SLAPP Act. The Act is more than a fee-shifting statute. It provides a mechanism for speedy dismissal of suits which chill free speech on public issues. *See Nexus Grp.*, 942 N.E.2d at 124; *Hamilton v. Prewett*, 860 N.E.2d 1234, 1242 (Ind. Ct. App. 2007) ("The anti-SLAPP statute is intended to reduce the number of lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances."). In order to avail himself of the Act's great benefits – quick dismissal of the suit and an award of attorney's fees and costs – the defendant must comply with the Act's procedural and substantive requirements. *Cf. Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1235 (D.C. App. 2016), *as amended* (Dec. 13, 2018) ("The special motion to dismiss is a mechanism by which a SLAPP defendant can expeditiously and

34

economically dispense of litigation . . . . To this end, a special motion to dismiss must be filed and decided in the early stage of litigation.") (internal quotation marks omitted).  These requirements include filing a pre-discovery motion to dismiss and satisfying a particularized burden of proof in a special, expedited proceeding.  Other than pleading the defense in his answer, defendant did not comply with any of the Act's requirements.

Defendant argues that, no matter, prevailing on summary judgment is just as good as proving his defense by a preponderance of the evidence.  But a federal court in Indiana has rejected this very argument.  In *Filippo v. Lee Publications, Inc.*, the court granted summary judgment to defendant in a defamation action on the grounds that a qualified privilege applied, the actual malice standard was not satisfied and certain of defendant's statements were protected opinion.  485 F.Supp.2d 969 (N.D. Ind. 2007).  The court noted that defendant had requested attorney's fees under the Anti-SLAPP Act, and it ordered the parties to brief the issue of whether defendant was eligible for recovery under the Act. *Id.* at 982.

Upon full briefing, the court held that "based on the plain language of § 34-7-7-7, defendant is unable to recover attorneys' fees and costs."  *Filippo v. Lee Publications, Inc.*, No. 2:05 CV 64, 2007 WL 2822432, at *2 (N.D. Ind. Sept. 24, 2007).  "The defense contained within the Anti-SLAPP act is designed to be raised via a preliminary motion to dismiss," and "the language of the statute . . . only allows for the recouping of costs when a defendant prevails 'on a motion to dismiss *made under this chapter* . . . .'"  *Id.* at **1-2 (quoting Ind. Code § 34-7-7-7) (emphasis added in *Filippo*).  The court concluded that because defendant prevailed on a motion for summary judgment which was not based on the Act, she "cannot recoup fees under that statute."  *Id.* at *3.

So too here, defendant did not prevail on a preliminary motion made under the Act and thus he cannot recover attorney's fees and costs under the Indiana statute.  *See also People for the Ethical Treatment of Animals, Inc. v. Wildlife in Need & Wildlife in Deed, Inc.*, No. 417CV00186RLYDML, 2018 WL 2063882, at *2 (S.D. Ind. Jan. 8, 2018) ("Fees and costs are only recoverable when a motion to dismiss is granted under that section.  *See* Ind. Code § 34-7-7-7.  Since the court is granting Plaintiff's motion to dismiss under Rule 12(b)(6) for failure to state a claim, and not under Indiana's Anti-SLAPP statute, the court declines Plaintiff's request for fees.").

## VIII.   Intentional Infliction of Emotional Distress

Where, as here, a claim for intentional infliction of emotional distress "arises out of the same facts as a defamation claim, and is therefore entirely derivative of the defamation claim, the emotional

distress claim cannot survive the dismissal of the underlying cause of action." *McGee v. Simon & Schuster, Inc.*, 154 F.Supp.2d 1308, 1315-16 (S.D. Ohio 2001) (citing federal and state cases applying Ohio law).  Defendant is therefore entitled to summary judgment as to plaintiff's claim for intentional infliction of emotional distress.

**IX.    Conclusion**

For the reasons stated above, defendant's motion for summary judgment (Doc. 59) is GRANTED as to plaintiff's claims for defamation and intentional infliction of emotional distress and DENIED as to defendant's request for attorney's fees and costs under Indiana Code § 34-7-7-7.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: May 12, 2020